UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| UNITED STATES SECURITES AND EXCHANGE COMMISSION,<br><br>          Plaintiff,<br><br>vs.<br><br>CHRISTOPHER J. HALL,<br><br>          Defendant. | Case No. _____ |

# COMPLAINT

Plaintiff United States Securities and Exchange Commission ("Commission") alleges as follows:

## SUMMARY OF THE ALLEGATIONS

1.      In 2009 and 2010, Defendant Christopher J. Hall perpetrated multiple frauds to obtain millions of dollars in loans from his brokerage firm, Penson Financial Services, Inc. ("Penson").  Hall was the chairman of the board of directors and the controlling shareholder of a publicly traded company called Call Now, Inc. ("Call Now"), which operated a horse racetrack in Texas.  Both Hall and Call Now had brokerage accounts at Penson.  Between 1999 and 2008, Hall and Call Now borrowed millions of dollars in margin loans through these brokerage accounts and used the loan proceeds to fund, among other things, the operating expenses of the horse racetrack.

2.      By 2009, the collateral in Hall's and Call Now's Penson accounts had substantially diminished in value.  As a result, both accounts were subject to outstanding margin

calls. To satisfy these margin calls, Penson demanded that Hall and Call Now deposit additional collateral into both accounts.

3.  In at least two instances, Hall offered to pledge Call Now stock to Penson to satisfy the margin calls. Hall, however, falsely represented that he needed millions of dollars to unencumber these shares because they were pledged to other lenders. Relying on Hall's misrepresentations, Penson arranged for Hall to receive loans and other payments in excess of $5.5 million to pay off his purported lenders. But in fact, Hall paid only $850,000 to a single lender and kept the remaining funds for his personal use.

4.  Hall also offered to pledge his interest in a real estate limited partnership as additional collateral for his margin loans and agreed to obtain Penson's written consent if he decided to sell that interest. As he had with the Call Now stock, Hall claimed that his interest in the limited partnership was subject to an existing lien, and so Penson agreed that its newly acquired interest would be subordinate to that existing lien. Hall failed to disclose, however, that *he* was the holder of the existing lien—through an entity created for his benefit to hide his assets from Penson, among others. In 2010, Hall sold his interest in the limited partnership for approximately $1.3 million without obtaining Penson's written consent. Instead of delivering the proceeds to Penson, Hall directed $1 million to his entity and transferred the remainder to his personal bank account.

5.  By engaging in the conduct described in this Complaint, Hall violated and will continue to violate unless enjoined by this Court at least the following provisions of the federal securities laws:

    a.  Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [*15 U.S.C. § 78j(b)*] and Rule 10b-5 thereunder [*17 C.F.R. § 240.10b-5*]; and

  b. Section 17(a) of the Securities Act of 1933 ("Securities Act") [*15 U.S.C. § 77q(a)*].

The Commission seeks injunctive relief, including an officer and director bar, disgorgement of ill-gotten gains and prejudgment interest thereon, civil penalties, and other appropriate and necessary equitable relief from Hall.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over this action pursuant to Sections 21(d)(1), 21(d)(2), 21(d)(3)(A), 21(e), and 27 of the Exchange Act [*15 U.S.C. §§ 78u(d)(1), 78u(d)(2), 78u(d)(3)(A), 78u(e), & 78aa*].

7. Hall, directly or indirectly, made use of a means or instruments of interstate commerce or of the mails, or of the facilities of a national securities exchange, in connection with the transactions, acts, practices, and courses of business alleged in this Complaint.

8. Venue is proper in this district pursuant to Section 27 of the Exchange Act [*15 U.S.C. § 78aa*] because Hall can be found in and is a resident of this district.

## LIMITATIONS

9. Hall has executed a series of tolling agreements that collectively tolled any applicable statute of limitations during the period beginning June 11, 2014 and ending August 31, 2015.

## THE DEFENDANT

10. Christopher J. Hall, age 56, resides in Miami Shores, Florida. From November 2001 to approximately November 2011, Hall was the controlling shareholder of Call Now, and by 2009 Hall owned 2,584,648 of the 2,902,367 outstanding shares of Call Now stock. Hall was a member of the board of directors of Call Now from November 2001 until 2008, at which time

he became the chairman of Call Now's board and continued in that capacity until November 2011. Hall also was a self-employed investor and trader of municipal bonds.

## OTHER RELEVANT PERSONS AND ENTITIES

11.     **Penson Financial Services, Inc. ("Penson")** was a brokerage firm incorporated in North Carolina and headquartered in Dallas, Texas. Penson generated substantial income from its margin lending business—extending credit, collateralized by cash or securities, to correspondent brokerage firms and other customers to purchase securities. Penson was a wholly owned subsidiary of **SAI Holdings, Inc. ("SAI")**, which in turn was a wholly owned subsidiary of **Penson Worldwide, Inc. ("PWI")**, a publicly traded company incorporated in Delaware and headquartered in Dallas, Texas. Penson's bank account was located in Texas.

12.     The **"Penson Executive"** co-founded Penson. Until July 2012, he was a director and the chief executive officer of PWI, an officer of SAI, and an executive vice president and a registered principal of Penson.

13.     Until the Nevada Secretary of State revoked its registration in 2013, **Call Now, Inc. ("Call Now")** was a Nevada corporation headquartered in Selma, Texas. Call Now's principal business was operating a financially struggling horse racetrack called Retama Park, located in Selma. Call Now had been a publicly traded company, but in September 2014, the SEC revoked the registration of Call Now's stock.

## FACTS

14.     From 1999 to 2008, Hall and Call Now obtained substantial margin loans from their Penson accounts to purchase municipal bonds and to fund Retama Park's operating expenses. As of December 31, 2008, Hall had a margin loan balance of nearly $38 million with Penson, and Call Now had a margin loan balance of over $14 million. Both debts were largely

secured by unrated municipal bonds held in their Penson accounts. In the wake of the financial crisis, those bonds plummeted in value, while the interest on the margin loans was ever increasing, causing Hall's and Call Now's margin loans to be unsecured or under-margined. Under the terms of Penson's account agreement, which applied to both Hall's and Call Now's accounts, Penson was entitled to issue margin calls to Hall and Call Now and demand that they deposit additional cash or securities into their accounts. When Penson initially issued the margin calls, however, Hall and Call Now failed to deposit the required additional collateral.

15. Penson was reluctant to liquidate Hall or Call Now's collateral and so worked with them to improve the condition of their accounts. Hall seized on Penson's reluctance and—through a series of misstatements and omissions—fraudulently obtained additional funds from Penson in exchange for pledging his controlling interest in Call Now stock as additional collateral.

16. Under the terms of Penson's account agreement, by depositing securities or other property in a Penson account, Hall and Call Now pledged those assets to Penson under a first and priority lien and security interest for the payment of all current or future debts or other obligations owed to Penson. A pledge of securities constitutes an "offer" or a "sale" for purposes of the federal securities laws.

**I.     Hall's False and Misleading Statements in Obtaining the SAI Loan**

17. By March 31, 2009, Hall's Penson account had a negative balance of approximately $9 million. Hall also had unmet margin calls in the amount of approximately $15.8 million. To address these deficiencies, the Penson Executive demanded that Hall deposit additional collateral into his account to bring his account back to a positive balance.

18. Hall agreed to pledge to Penson as additional collateral his interest in approximately 1.5 million restricted shares of Call Now's stock, which Penson internally valued at $10 per share. In a series of misrepresentations, Hall claimed that he needed a total of $3.7 million to pay off existing liens on those shares before he could pledge them to Penson. In fact, there were no existing liens on these shares.

19. To obtain Hall's pledge of Call Now shares to Penson, the Penson Executive—relying on Hall's misrepresentations—arranged for SAI to loan Hall the money he claimed he needed to pay off the existing liens on the shares (the "SAI Loan"). As described in detail below, between April and June 2009, Penson, on behalf of SAI, wired in three installments a total of $3,687,915.20 from its bank account in Texas. Prior to each wire transfer, Hall provided Penson with wiring instructions for a trust account in Florida but failed to disclose to Penson that he was the beneficiary of that account.

20. To secure the SAI Loan, Hall executed three promissory notes and stock pledge agreements in favor of SAI, one for each tranche of money. The final promissory note, executed in June 2009, amended and restated Hall's prior promissory notes to SAI, executed in April and May 2009. Through the three stock pledge agreements, Hall pledged a total of 1,537,412 shares of Call Now stock to SAI, which the Penson Executive (who also was an SAI officer) directed Penson to deposit into Hall's account as additional collateral for Hall's underwater margin loans.

**A.     The April 2009 Note**

21. On April 1, 2009, Hall emailed the Penson Executive. In that email, Hall told the Penson Executive that Hall could "retrieve slightly less than 300,000 shares by paying down $672,568. This could be consummated fairly quickly. I'll get back to you when I hear from the other 2." This statement was false and misleading. The shares Hall identified were not subject

6

to any liens so there was nothing that Hall needed to "pay down" in order to pledge them to Penson.

22. When the Penson Executive asked for a precise share count, Hall specified that he could retrieve 297,946 shares. The Penson Executive responded that he was ready to proceed and asked what should happen next. Hall replied by sending wiring instructions for a lawyer's trust account in Florida, adding, "They will release the stock certificates upon receipt." This statement was false and misleading because it implied that a third party controlled the shares and was awaiting these funds. In fact, Hall controlled the Florida trust account and held the shares in a brokerage account at another firm.

23. On April 16, 2009, the Penson Executive caused Penson to wire, on behalf of SAI, $672,568 to the trust account Hall had specified. At no point did Hall inform anyone at Penson that he was the beneficiary of that trust account. That same day, Hall executed a first promissory note in favor of SAI for $672,568. That promissory note was secured by a stock pledge agreement Hall had executed in favor of SAI on April 14, 2009. The Penson Executive signed the stock pledge agreement on behalf of SAI. Under the terms of the stock pledge agreement, Hall pledged and assigned to SAI 300,724 shares of Call Now stock (297,946 new shares and 2,778 already in Hall's account). If Hall failed to make any required payments under the promissory note, SAI could, among other things, take possession of or sell the Call Now shares.

24. On April 27, 2009, after receiving the 297,946 shares of Call Now stock from Hall, Penson deposited them into Hall's account.

7

**B.     The May 2009 Note**

25.     On May 20, 2009, Hall sent an email to the Penson Executive forwarding wiring instructions for the same trust account in Florida. With the instructions, Hall wrote, "I finally heard back, there are a total of 702,654 shares being held. This time I will have the certificates sent via Fed-ex." This message was false and misleading. As with the first tranche of shares, there was no existing lien, and Hall held them in a brokerage account at another firm.

26.     In order to obtain these shares, on May 20, 2009, the Penson Executive caused Penson to wire, on behalf of SAI, $1,586,500 to the trust account Hall had specified. Once again, Hall did not inform anyone at Penson that he was the beneficiary of the specified trust account. That same day, Hall executed a promissory note in favor of SAI for $1,586,500. This promissory note was secured by a stock pledge agreement executed by Hall and by the Penson Executive on behalf of SAI, this one dated June 23, 2009. Under the terms of this stock pledge agreement, Hall pledged and assigned 702,654 shares of Call Now stock to SAI such that if Hall failed to make any required payments under the promissory note, SAI could, among other things, take possession of or sell the Call Now shares.

27.     On June 8, 2009, after receiving the 702,654 shares of Call Now stock from Hall, Penson deposited them into Hall's account.

**C.     The Amended and Restated June 2009 Note**

28.     On June 16, 2009, Hall sent an email to the Penson Executive. Hall wrote, "I have a total of 534,034 remaining with this lender and a total owed of $1,428,847.20. Does that work?" This statement was false and misleading. Hall owned the shares outright, and there was no other lender.

29. The Penson Executive responded to Hall's email by stating that the proposal was acceptable and asked for wiring instructions. Hall replied with wiring instructions for the same trust account in Florida. Hall again failed to tell anyone at Penson that he was the beneficiary of the identified trust account.

30. On June 30, 2009, in order to obtain these shares of Call Now stock, the Penson Executive caused Penson to wire, on behalf of SAI, $1,428,847.20 to the trust account Hall had specified. That same day, Hall executed an amended and restated promissory note in favor of SAI for $4,000,000 "or such lesser amount as shall have been advanced by [SAI] to [Hall] and as evidenced hereby as set forth on the grid attached hereto as Schedule 1." Schedule 1 to the amended and restated promissory note listed three dates of advance and the principal amount advanced on each date:

### SCHEDULE 1
### to
### AMENDED AND RESTATED PROMISSORY NOTE

| Date of Advance | Principal Amount ($) | Repayments of Principal ($) | Total Principal Amount ($) |
|---|---|---|---|
| 4/16/2009 | 672,568.00 | | |
| 5/20/2009 | 1,586,500.00 | | |
| 6/30/2009 | 1,428,847.20 | | 3,687,915.20 |

31. After Hall received the $1,428,847.20, he delivered the promised 534,034 Call Now shares to Penson, consistent with the terms of the prior stock pledge agreements. On July 9, 2009, Penson deposited the shares into Hall's account.

32. Hall made materially false and misleading statements to Penson in pledging and assigning his Call Now shares to obtain the SAI loan. Contrary to his representations to the Penson Executive, the approximately 1.5 million Call Now shares that Hall pledged to SAI were not subject to any preexisting liens. Hall did not need to "pay down" any money to any lender before he could pledge his shares to SAI. The trust account in Florida to which Penson wired

$3.7 million on behalf of SAI was controlled by Hall, not a different lender, a material fact that Hall concealed from SAI and Penson.

## II.     The 2010 Restructuring

33.    Although the SAI loan temporarily improved the condition of Hall's account, by early 2010, the account had a negative balance of over $14 million, and Call Now's account was under-margined by more than $6 million. Penson had issued margin calls on both accounts, but neither Hall nor Call Now had satisfied these calls.

34.    In February 2010, Hall, Call Now, and Penson entered into a complex series of transactions designed to "restructure" Hall's and Call Now's debts (the "2010 Restructuring"). Under the terms of Penson's various agreements with both Hall and Call Now, Penson had to approve the transactions between Hall and Call Now.

### A.     Hall's False and Misleading Statements in His Sales of Call Now Shares to Call Now

35.    As part of the 2010 Restructuring, Penson, Hall, and Call Now agreed that Hall would sell to Call Now 721,463 shares of Call Now stock for $2.50 per share so that Call Now could pledge the shares to its account as additional collateral. At that time, Penson internally valued the shares at $7.52 per share. Call Now, however, did not have enough cash or other liquid assets to purchase the shares, and Hall told the Penson Executive that he needed approximately $1.8 million to pay off a preexisting lien on the shares. This statement was false and misleading. While there was a preexisting lien on the shares, it was for a substantially smaller amount.

36.    Relying on Hall's false and misleading statements, Penson agreed to facilitate Call Now's purchase of the 721,463 shares by extending a $1.8 million loan to Call Now, which Call Now would use to pay Hall and Hall in turn would use to pay his lender.

10

37. On February 26, 2010, Hall emailed an in-house attorney for Penson with the subject line, "amended and restated promissory note signature & wire info for stock loan payoff." Hall wrote, "I've forwarded the wire instructions for the 721,463 shares of [Call Now] that require a $1,803,657.5 payoff. Do we have a feel for when that wire will be sent? (the lender has been asking)."

38. On March 3, 2010, the Penson Executive caused Penson to wire $1,802,500 from Call Now's Penson account in Texas to the trust account in Florida. Hall subsequently delivered the Call Now shares to Penson, which deposited them into Call Now's account to complete the purchase and sale.

39. Hall made materially false and misleading statements to Penson in selling his Call Now shares to Call Now as a part of the 2010 Restructuring. Although Hall had pledged the 721,463 shares of Call Now stock to another lender, he did not need over $1.8 million to pay off the lien, as he had misrepresented to Penson. Those shares (along with other collateral) had been pledged to the other lender to secure a $1.35 million loan, and Hall was able to convince that lender to release the shares in return for a payment of only $850,000. Hall, however, concealed those facts from Penson and pocketed the remaining $950,000, using it for his own purposes, including transfers to his personal bank account and payments for other investments and expenses. In addition, Hall again failed to disclose to Penson that he was beneficiary of the trust account to which Penson wired the $1.8 million.

### B. Hall's Fabricated Pledge of His Interest in a Limited Partnership

40. As another part of the 2010 Restructuring, Hall pledged to Penson his interest in a limited partnership called Stone Oak Prime, L.P. ("SO Prime"). Limited partnership interests are securities for purposes of the federal securities laws.

41. During negotiations over the terms of the pledge, Hall represented to individuals at Penson that his interest in SO Prime was already subject to an existing lien. Penson's in-house counsel revised the draft Security Agreement to reflect the existence of this prior lien and asked Hall by email to disclose the name of the lienholder and the value of the lien. On February 11, 2010, Hall emailed in response that the lien was in the amount of "$3,120,444.9 + [*sic*] interest that accrues at 10%" and that the lienholder was "Sweezy Investments LLC."

42. In the executed Security Agreement, dated February 25, 2010 and signed in Texas and New Jersey, Hall pledged his interest in SO Prime to Penson. The pledge was subject to any "Existing Liens" previously disclosed to Penson, including the lien on Hall's SO Prime interest held by Sweezy Investments. Under the terms of the Security Agreement, Hall was not allowed to sell his interest in SO Prime without Penson's prior consent, whereas Penson could sell his interest and apply the proceeds of the sale to Hall's debts.

43. Hall's representations regarding an existing lien on his SO Prime interest were false and misleading in multiple ways. First, there was no lien on the interest, in particular not one for $3,120,444.90 with a 10% interest rate. Second, Hall failed to disclose to anyone at Penson that Sweezy Investments existed for Hall's benefit and to conceal his assets from others, including Penson—a material fact necessary to make his statements to Penson regarding Sweezy Investments not false and misleading. At Hall's request, his best friend and attorney had created Sweezy Investments in 2009 as a vehicle in which Hall could hide his assets from creditors, including Penson. Hall never told anyone at Penson that the pledge of his interest in the SO Prime partnership was subject to a lien that, even if it actually existed, Hall owed to himself.

44. Without obtaining Pensons' prior written consent, Hall sold his SO Prime interest in November 2010 for approximately $1.3 million. Contrary to his obligations under the

Security Agreement, Hall did not deliver the proceeds of this sale to Penson. Instead, Hall directed Sweezy Investments to loan $1 million to the owner of the Retama Park horse racetrack and to transfer the remaining $300,000 to his personal bank account. In a separate lawsuit by Hall against his best friend in the Palm Beach County Circuit Court, Hall testified under oath that he did not deliver to Penson the proceeds from the sale of his SO Prime interest as he had promised because "[it] was money that I couldn't lose," and "Penson wasn't entitled to the money . . . [because] [t]hey had no judgment against me."

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder**

45.　Paragraphs 1 to 44 are re-alleged and incorporated herein by reference.

46.　From at least April 1, 2009 through approximately December 31, 2010, as a result of the conduct alleged in this Complaint, Hall knowingly, or with severe recklessness, in connection with the purchase or sale of securities, directly or indirectly, by use of the means or instrumentalities of interstate commerce or of the mails, or of a facility of a national securities exchange:

 a. employed devices, schemes, or artifices to defraud;

 b. made untrue statements of material fact, omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

 c. engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person.

47. By engaging in the foregoing conduct, Hall violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [*15 U.S.C. § 78j(b)*] and Rule 10b-5 thereunder [*17 C.F.R. § 240.10b-5*].

## SECOND CLAIM FOR RELIEF
### Violations of Securities Act Section 17(a)

48. Paragraphs 1 to 44 are re-alleged and incorporated herein by reference.

49. From at least April 1, 2009 through approximately December 31, 2010, as a result of the conduct alleged in this Complaint, Hall, in the offer or sale of securities, directly or indirectly, by the use of the means or instruments of transportation or communication in interstate commerce, or by use of the mails:

   a. employed devices, schemes or artifices to defraud;

   b. obtained money or property by means of any untrue statements of material fact, or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

   c. engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchasers of securities.

50. With respect to violations of Section 17(a)(1) of the Securities Act, Hall acted knowingly or severely recklessly. With respect to violations of Sections 17(a)(2) and (3) of the Securities Act, Hall acted at least negligently.

51. By engaging in the foregoing conduct, Hall violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act [*15 U.S.C. § 77q(a)*].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter a Final Judgment:

**I.**

Finding that Hall violated Section 10(b) the Exchange Act [*15 U.S.C. § 78j(b)*] and Rule 10b-5 thereunder [*17 C.F.R. § 240.10b-5*] and Section 17(a) of the Securities Act [*15 U.S.C. § 77q(a)*];

**II.**

Permanently enjoining Hall from violating, directly or indirectly, Section 10(b) the Exchange Act [*15 U.S.C. § 78j(b)*] and Rule 10b-5 thereunder [*17 C.F.R. § 240.10b-5*] and Section 17(a) of the Securities Act [*15 U.S.C. § 77q(a)*];

**III.**

Requiring Hall to disgorge all ill-gotten gains, illegal losses avoided, and unjust enrichment that he obtained as a result of his fraudulent statements, omissions, acts, or courses of conduct described in this Complaint and to pay prejudgment interest thereon;

**IV.**

Requiring Hall to pay civil money penalties pursuant to Section 21(d)(3) of the Exchange Act [*15 U.S.C. §78u(d)(3)*] and Section 20(d) of the Securities Act [*15 U.S.C. § 77t(d)*];

**V.**

Permanently barring Hall from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [*15 U.S.C. § 78l*] and that is required to file reports under Section 15(d) of the Exchange Act [*15 U.S.C. § 78o(d)*] pursuant to Section 21(d)(2) of the Exchange Act [*15 U.S.C. § 78u(d)(2)*];

## VI.

Granting any and all such equitable relief as the Court may deem just and appropriate for the benefit of investors pursuant to Section 21(d)(5) of the Exchange Act [*15 U.S.C. § 78u(d)(5)*]; and

## VII.

Retaining jurisdiction of this action for purposes of enforcing any Final Judgment or other order.

## JURY DEMAND

Under Rule 38 of the Federal Rules of Civil Procedure, the Commission demands trial by jury in this action on all the issues so triable.

Dated: September 17, 2015                    Respectfully submitted,

_____
Melissa J. Armstrong (Special Bar No. A5502124)
David S. Johnson (Special Bar No. A5502126)
Mark M. Oh (Special Bar No. A5502125)
U.S. SECURITIES AND EXCHANGE
   COMMISSION
100 F Street, N.E.
Washington, DC 20549
202.551.4724 (Armstrong)
202.772.9292 (facsimile)
armstrongme@SEC.gov
*Counsel for Plaintiff*