UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 1:15-CV-23489-ALTONAGA/O'SULLIVAN

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,

      Plaintiff,

v.

CHRISTOPHER J. HALL,

      Defendant.

_____

## **DEFENDANT CHRISTOPHER J. HALL'S MOTION FOR FINAL SUMMARY JUDGMENT AND MEMORANDUM OF LAW IN SUPPORT**

BROAD and CASSEL

One Biscayne Tower, 21st Floor   2 South Biscayne Blvd.  Miami, Florida  33131-1811  305.373.9400

## TABLE OF CONTENTS

I.    BACKGROUND ...................................................................................1

     A.  Christopher Hall and Penson Accounts.................................................1

     B.  PFSI Seeks Additional Collateral .......................................................2

     C.  SAI Holdings, Inc. enters into a Loan Transaction with Hall .................3

     D.  Hall and Call Now Execute a Stock Swap Agreement ...........................6

     E.  Hall Executed Security Agreement with PFSI ......................................8

II.   MEMORANDUM OF LAW ....................................................................10

     A.  Legal Standard for Summary Judgment ..............................................10

     B.  Standards for Establishing a Violation of Exchange Act Section 10(b)
         and Securities Act Section 17(a)(1) ...................................................11

     C.  The 2009 Loans from SAI to Hall .....................................................12

         1.  The Alleged Misrepresentation Regarding the Lien on the
            Collateral Was Not Made in Connection with the Purchase
            and Sale of Securities ...........................................................12

         2.  The Alleged Misrepresentation to PFSI Relating to Collateral
            Held Outside Mr. Hall's Accounts at PFSI Was Not Material
            to the SAI Loan Transaction .................................................15

     D.  The February 25, 2010 Security Agreement Between Hall and PFSI ...........18

         1.  The Alleged Misrepresentation to PFSI Relating to Hall's
            Interest in Stone Oak Prime Was Not "Material" to the
            Security Agreement ..............................................................18

## TABLE OF CONTENTS

E.   The February 11, 2010 Purchase and Sale Agreement Between Hall and Call Now ......................................................................................20

   1.   The Commission Also Cannot Prevail on Its Claim that Hall Made A Misrepresentation to PFSI Regarding the Lien on the Collateral, Because the Alleged Representation Was Not False or Misleading ..........20

   2.   The Commission Also Cannot Prevail on Its Claims,  Because the Misepresentations Were Not Material  ......................................................20

   3.   The Commission Cannot Prevail on Its Claim that the Alleged Representations Regarding the Collateral Violated Sections 17(a) and 10(b).  Because the Representations Were Not in Connection with the Purchase and Sale of Securities  ................................20

III.   CONCLUSION ......................................................................................21

IV.   REQUEST FOR HEARING ..............................................................................21

## TABLE OF AUTHORITIES

### CASES

*Aaron*, 446 US at 701-02 ......................................................................................... 13

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986) .................................. 12

*Banca Cremi, S.A. v. Alex. Brown & Sons, Inc.,* 132 F.3d 1017, 1028–29 (4th Cir.1997) ......... 18

*Celotex v. Catrett,* 477 U.S. 317, 325 (1986) ........................................................ 12

*Chemical Bank v. Arthur Andersen & Co.,* 726 F.2d 930 (2d Cir.1984)........................ 14, 16, 20

*Citibank, N.A. v. K-H Corp.,* 745 F. Supp. 899, 903 (S.D.N.Y. 1990)..................... 15, 16

*DM Residential Fund II, LLC v. First Tennessee Bank Nat'l Assoc.,* 2013 WL 12077975, at *4
(C.D. Cal. 2013)................................................................................................... 20

*Grossman v. Novell, Inc.,* 120 F.3d 1112, 1119 (10th Cir. 1997)................................ 17

*Gurwara v. LyphoMed, Inc.,* 937 F.2d 380, 382 (7th Cir. 1991) ................................ 20

*Harpold v. Stock,* 65 So. 2d 477, 478 (Fla. 1953)...................................................... 21

*Hunt v. Robinson,* 852 F.2d 786, 787–88 (4th Cir. 1988)............................... 13, 15, 16

*Kearney v. Prudential–Bache Securities, Inc.,* 701 F.Supp. 416, 424 (S.D. N.Y.1988) ............. 14

*Kesling v. Kesling,* 546 F. Supp. 2d 627, 637 (N.D. Ind. 2008) ................................ 15

*Ketchum v. Green,* 557 F.2d 1022, 1027 (3d Cir. 1977)............................................. 15

*Lamar v. Wells Fargo Bank,* 597 Fed. Appx. 555, 556–57 (11th Cir. 2014) ............... 11

*Leisure Founders, Inc. v. CUC, Intern., Inc.,* 833 F. Supp. 1562, 1569........................... 14

*Oakland Raiders v. Oakland-Alameda County Coliseum, Inc.,* 144 Cal. App. 4th 1175 (Cal. Ct.
App. 2006) .......................................................................................................... 21

*O'Brien v. Cont'l Ill. Nat. Bank & Trust,* 593 F.2d 54, 60 (7th Cir.1979) .................... 13

*Rand v. Anaconda–Ericsson, Inc.,* 794 F.2d 843, 847 (2d Cir.1986) ........................... 15

*Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 477-78 (1977) ............................... 13

*Searls v. Glasser,* 64 F.3d 1061, 1065–66 (7th Cir. 1995) .......................................... 17

*SEC v. Betta,* 2011 WL 4369012, *9 (S.D. Fla. Sept. 19, 2011)................................. 13

*SEC v. First Jersey Sec., Inc.,* 101 F.3d 1450, 1467 (2d Cir. 1996)............................ 13

*SEC v. Goble,* 682 F.3d 934, 944 (11th Cir. 2012)...................................................... 17

*SEC v. Happ,* 392 F.3d 12, 21 (1st Cir. 2004) ........................................................... 18

*SEC v. Morgan Keegan & Co., Inc.,* 678 F.3d 1233, 1246 (11th Cir. 2012)................ 18

*SEC v. Roanoke Tech. Corp.,* Fed. Sec. L. Rep. P 94139 (M.D. Fla. 2006)................. 16

*SEC v. Stoker,* 2012 WL 2708391, at *7 (S.D. N.Y. July 09, 2012) ........................... 13

*SEC v. Wolfson,* 539 F.3d 1249, 1262 (10th Cir. 2008) .............................................. 15

*Simpson v. Southeastern Inv. Trust,* 697 F.2d 1257, 1258 (5th Cir. 1983)................... 20

*Superintendent of Ins. of N.Y. v. Bankers Life and Casualty Co.,* 404 U.S. 6 (1971).................. 15

*Victoria Materials & Gravel Co. v. Sauerman Bros.,* 61 F.2d 850, 851 (5th Cir. 1932) ............. 21

BROAD and CASSEL

One Biscayne Tower, 21st Floor   2 South Biscayne Blvd.  Miami, Florida 33131-1811   305.373.9400

2

Pursuant to Federal Rule of Civil Procedure 56, Defendant Christopher J. Hall ("Mr. Hall") moves for final summary as to both counts Plaintiff Securities and Exchange Commission ("SEC" or "Commission") brought against him in the Complaint [D.E. 1.], because after a four year investigation and a year of litigation, the Commission has failed to identify a sufficient basis under Section 10(b) of the Exchange Act and Rule 10b-5 and Section 17(a) of the Securities Act to supports its claims that Hall made misrepresentations or omissions in connection with the purchase or sale of securities. In support, Hall states:

## I.       BACKGROUND

### A.       Christopher Hall and Penson Accounts

Christopher Hall ("Mr. Hall") is 57 years old. He lives in San Antonio, Texas with his wife and two children, ages 13 and 16.  *See* transcript of September 21, 2016 deposition of Christopher J. Hall,  attached as Exhibit "A", p. 53:10-12. Mr. Hall established accounts with Penson Financial Services, Inc. ("PFSI") in 1999. Ex. A, p. 36:20-24; Transcript of September 13, 2016 deposition of Phillip Pendergraft  attached as Exhibit "B", pp. 41:17-43:8; transcript of August 2, 2016 deposition of Jonathan Gilliland attached as Exhibit "C", p. 29:19-24. Specifically, Mr. Hall established, among others, an individual margin account and a margin account for the Hemisphere Trust. *See* Ex. B, pp. 44:8-13, 53:17-19, 54:7-9. Mr. Hall purchased and sold securities on margin in these accounts.[1] *See* Ex. A, pp. 38:15-39:4; Ex. C, pp. 29:19-24; *see generally* Ex. B, pp. 44:14-45:20, 46:9-12.[2]

---

[1] A margin account is an account in which the broker lends the customer cash to purchase securities. *See* Ex. B, pp.  44:14-45:20, 46:9-12.  The broker charges the customer interest to borrow the money and uses the securities as collateral. *See* Ex. B, pp. 44:14-45:20, 46:9-12.

[2] In the early 2000s, Philip Pendergraft ("Pendergraft"), Chief Executive Officer of PWI encouraged Mr. Hall to utilize margin loans from his account to invest in a predecessor entity to Penson Worldwide, Inc. ("PWI")[2]. *See* transcript of July 20, 2016 deposition of Thomas Johnson attached as Exhibit "D", pp. 28:16-29:4; Ex. A, pp. 41:5-42:1; Ex. B, pp.  50:22-51:11. At or about the same time, Pendergraft encouraged another PFSI account holder, Call Now, Inc. ("Call Now"), to do the same. Ex. D, pp.  28:16-29:4; *see* Ex. B, pp. 50:20-51:4. Both Mr. Hall and Call Now maintained large holdings in bonds issued by the Retama Development Corporation ("RDC Bonds") an entity formed to manage and run a racetrack in Selma, Texas. Ex. B, pp. 47:16-48:25, 51:18-52:13. By no later than 2009, legislation was pending in the Texas legislature to allow gaming at a race track called Retama Park as well as other racetracks in Texas. Ex. B, p. 95:13-17. Call Now owned a controlling interest in RDC. Ex. D, pp.  26:23-27:1.

BROAD and CASSEL

One Biscayne Tower, 21st Floor  2 South Biscayne Blvd.  Miami, Florida 33131-1811  305.373.9400

3

### B.    PFSI Seeks Additional Collateral

Due to a general decline in real estate market values and an issue related to a specific bond position in Mr. Hall's accounts, the equity in the accounts declined below zero in the latter half of 2008. Ex. B, p. 141:11-16, Pl. Ex. 101. By January 8, 2009, Pendergraft was aware, and PFSI's internal documentation reflected, that the market values of the securities in Mr. Hall's individual account and the Hemisphere Trust account were less than the debit balance in the accounts. Ex. B, pp. 129:18-21, 130:10-14, 133:3-6, D. Ex. 43.

Despite the ability to liquidate Mr. Hall's individual account and the Hemisphere Trust account once the accounts dropped below the required maintenance levels, Pendergraft did not want to liquidate the accounts. Ex. B, pp. 141:11-16, 142:5-10, 188:18-191:17, D. Ex. 57. Pendergraft and PFSI believed that the holdings in the accounts, including the positions in the RDC Bonds, were worth significantly more than the level at which they were priced. Ex. B, pp. 145:12-22, 154, 188, 216, D. Ex. 47, 57, 67. In addition, Mr. Hall maintained a large stock position in PWI from his previous investment in the PWI predecessor entity's private placement. *See* Ex. A, pp. 41:5-42:1; Ex. B, 50:22-51:11. If his accounts were liquidated, the RDC Bonds would have been sold out at a value both PFSI and Pendergraft considered below their true value, and the sale of PWI's stock on the open market would have driven down the market price for PWI's stock. Ex. B, pp. 61, 188:18-191:17; D. Ex. 57, Pl. Ex. 101.

### C.    SAI Holdings, Inc.[3] enters into a Loan Transaction with Hall

In April 2009, Pendergraft sought to acquire additional collateral that could be placed in Mr. Hall's PFSI account. *See* Ex. B, pp. 60:15-23; 67:22-68:2. Specifically, Pendergraft sought to obtain Call Now stock from Mr. Hall that was held outside of PFSI. Pendergraft believed that by securing virtually all the outstanding RDC Bonds that were  collectively held in Mr. Hall's, Hemisphere's and/or Call Now's accounts, as well as Mr. Hall's controlling interest in Call Now, PFSI stood to benefit from an increase if the Texas legislature passed a gambling resolution then pending before it. Ex. B, pp. 60:24-61:4; 65:7-13, 65:18-66:3.

---

[3] PFSI and SAI were separate legal entities. *See* transcript of July 11, 2016 deposition of Mary Smith attached hereto as Exhibit "E", p. 117:7-10; transcript of July 28, 2016 deposition of Andrew Koslow, attached hereto as Exhibit "F", pp. 119:25-120:5.

BROAD and CASSEL
One Biscayne Tower, 21st Floor  2 South Biscayne Blvd.  Miami, Florida  33131-1811  305.373.9400

4

Mr. Hall executed three promissory in favor of SAI Holdings, Inc. ("SAI"), bearing effective dates between April and June 2009. None of these transactions were effectuated with PFSI.

On April 9, 2009, PWI General Counsel, Andrew Koslow ("Koslow"), forwarded to Pendergraft a draft promissory note reflecting a proposed loan between SAI and Mr. Hall in the amount of $672,568. Ex. F, p. 52, Pl. Ex. 54. The prior day, Koslow sent to Pendergraft a draft stock pledge agreement between SAI and Mr. Hall. Ex. F, p. 51, Pl. Ex. 53. Both documents were drafted at the instruction of Pendergraft.[4] Ex. F, pp. 53:22-54:16. Koslow drafted the form of the note and forwarded it to Pendergraft, who added certain loan specific information, such as the name of the maker, the amount, date and rate of interest, and then presented it to Mr. Hall. *See* Ex. F, pp. 53:22-54:3, 54:10-16; *see* Ex. B pp. 177:13-178:8, D. Ex. 53; *see also* Ex. A, p. 194: 8-10. Koslow testified generally it was important that PWI and its affiliate's loan documents reflect all material terms of the transaction "so [the parties] understand the transaction." Ex. F, p. 131:12-20.

On or about April 16, 2009, Mr. Hall executed a Promissory Note in favor of SAI ("April 2009 Promissory Note") in the form prepared by Koslow and provided by Pendergraft. Ex. B, pp. 71-72, Pl. Exs. 104-105. Pursuant to the unambiguous terms of the April 2009 Promissory Note, SAI agreed to loan Mr. Hall $672,568. Ex. B, p. 71, Pl. Ex. 104. The April 2009 Promissory Note, which was due on demand,[5] accrued interest on principal prior to maturity at the rate of 7.45 percent and on past due principal and interest at the greater of 12.45 percent or the maximum amount allowable under the law. Ex. B, p. 71, Pl. Ex. 104. SAI's loan to Mr. Hall was secured by 300,724 shares of Call Now stock. Ex. B, pp. 71-72, Pl. Ex. 105. At the time he executed the April 2009 Promissory Note, Mr. Hall knew that Pendergraft was affiliated with SAI, *see* Ex. A, pp. 194:24-195:3, but he did not know that SAI was affiliated with PFSI. Hall Depo. 193:4-9; 194:16-23. He understood SAI to be a "third-party lender", because that was how

---

[4]  According to the SEC's Complaint in this action, Mr. Hall told PFSI that certain of his Call Now shares of stock held outside of his PFSI were subject to liens and at that time he could pledge 297,946 shares by paying down $672,568 in liens. [D.E. 1, ¶¶ 22-23.]

[5]  PWI's then General Counsel, Koslow,  testified that the "due on demand" language meant that "the lender can ask the borrower to repay, and the borrower should repay". Ex. F, p. 137:15-22.

BROAD and CASSEL

One Biscayne Tower, 21st Floor   2 South Biscayne Blvd.  Miami, Florida  33131-1811   305.373.9400

it was presented to him. Ex. A, p. 193:4-9. On April 16, 2009, Mr. Hall and Pendergraft, in his capacity as SAI's EVP, executed the April 2009 Promissory Note and a Stock Pledge Agreement pursuant to the terms discussed above. Ex. B, pp. 71-72, Pl. Ex. 104- 105; Ex. C, p. 93:3-6.

In May 2009, SAI made a second loan to Mr. Hall, which was documented through a Promissory Note dated May 20, 2009 (the "May 2009 Promissory Note"). Ex. B, pp. 73-74, Pl. Exs. 106, 107. Pursuant to the unambiguous terms of the May 2009 Promissory Note, SAI agreed to loan Mr. Hall $1,586,500. Ex. B, pp. 73-74, Pl. Ex. 106. The May 2009 Promissory Note had virtually the same terms as the April 2009 Promissory Note. Ex. B, pp. 73-74, Pl. Ex. 106. SAI's loan to Mr. Hall, as reflected in the May 2009 Promissory Note, was secured by 702,654 shares of Call Now stock.[6] Ex. B, pp. 74-75, Pl. Ex. 107. Koslow, who drafted the form for the April and May 2009 Promissory Notes, testified that it would have been in SAI's interest to incorporate all key terms for the loan transactions. Ex. F, pp. 202:21-203:5.

SAI and Mr. Hall entered into a third loan agreement, which was reflected through an Amended and Restated Promissory Note, effective as of June 30, 2009, executed by Mr. Hall in favor of SAI ("June 2009 Amended and Restated Promissory Note").[7] Ex. B, pp. 66-67, Pl. Ex. 102; Ex. A, p.  103, Pl. Ex. 138. The June 2009 Amended and Restated Promissory Note incorporated and replaced the two prior notes and reflected a total principal amount of $3.7 milllion. Ex. C, pp. 41:16-42:7, Pl. Ex. 82; Ex. B, pp. 68:23-70:8, Pl. Ex. 103. The terms of the June 2009 Amended and Restated Promissory Note were almost identical in terms to the April and May 2009 Promissory Notes, except for the paragraph referencing the April 2009 Promissory Note (partially quoted above) and corresponding stock pledge agreement and a different  principal amount. Ex. C, pp. 41:16-42:7, Ex. 82; Ex. B, pp. 68:23-70:8, Pl. Ex. 103. The June Amended and Restated Promissory Note was due on demand and accrued interest on principal prior to maturity at the rate of 7.45 percent and on past due principal and interest at the greater of 12.45 or the maximum amount allowable under the law. Ex. B, p. 66, Pl. Ex. 102. The June 2009 Amended and Restated Promissory Note was  drafted by PWI's Deputy General

---

[6]  Pendergraft valued these shares at approximately  $7 million. *See* Hall Depo. 91, Pl. Ex. 132.

[7]  The June 2009 Amended and Restated Promissory Note was executed sometime on or after February 6, 2010. Ex. B, pp. 68-69, Ex. 103.

BROAD and CASSEL
One Biscayne Tower, 21st Floor  2 South Biscayne Blvd. Miami, Florida 33131-1811  305.373.9400

6

Counsel Jonathan Gilliland ("Gilliland") and presented to Mr. Hall for execution.  Ex. C, pp. 41:16-42:7, Pl. Ex. 82; Ex. B, pp. 68:23-70:8, Pl. Ex. 103.

The loan transactions reflected in the April and May 2009 Promissory Notes, and the June 2009 Amended and Restated Promissory Note were reflected on SAI's books.  *See* Ex. E, p. 120:5-7.  It is undisputed that neither the  April 2009 Promissory Note, the May 2009 Promissory Note, and the June 2009 Amended and Restated Promissory Note (collectively, the "Loan Documents" or "SAI Loan") reference any lienholders on Mr. Hall's Call Now stock or contain any restriction on Mr. Hall's use of the funds received pursuant to these loans.  *See* Ex. B, pp. 66-67, 71-72, 73-74, Pl. Exs. 102, 104-107.  The Loan Documents contain no instructions regarding paying off any liens, nor any instructions directing that the Call Now stock pledged as collateral for the SAI loans be deposited into Mr. Hall's PFSI account(s).  *See* Ex. B, pp. 66-67, 71-72, 73-74, Pl. Exs. 102, 104-107.   Gilliland , who drafted the June 2009 Amended and Restated Promissory Note, testified that based upon what he was aware,  the June 2009 Amended and Restated Promissory Note contained all of the terms of the loan transaction between Mr. Hall and SAI.[8]  Ex. C, p.  93:7-11. Gilliland further testified that he was not told to put in any terms that would restrict the use of the funds Mr. Hall received, Ex. C, p.  94:23-95:15, and that he was never told that the purpose of the SAI loan was to pay-off liens on Mr. Hall's Call Now shares. Ex. C, p.  40:16-19.

### D.     Hall and Call Now Execute a Stock Swap Agreement

On February 11, 2010, Mr. Hall entered into an agreement with Call Now.  Ex. D., pp. 58, 136:3-8, Pl. Ex. 38.  The agreement related to the parties' purchases and sales of various stocks and bonds then currently owned by the other party and was documented through a Purchase and Sale Agreement (the "Purchase and Sale Agreement").  Ex. D, pp. 58, 136:3-8, Pl. Ex. 38.  The transactions set forth in the Purchase and Sale Agreement were solely between Call Now and Mr. Hall.  Ex. D, p.  138:2-11. PFSI was not a party to that Agreement, Ex. D, p. 138:2-6, and did not make any payments to Mr. Hall under this Agreement.  Ex. D, pp.  58, 141, Pl.. Exs. 38, 39.  However, PFSI and Pendergraft were at all times aware of the Purchase and

---

[8] According to General Counsel for PWI, one of Gilliland's responsibilities was drafting deal documents. Koslow Depo. 29:23-24, 30:5-8, 36:22-37:1.

BROAD and CASSEL

One Biscayne Tower, 21st Floor   2 South Biscayne Blvd.  Miami, Florida  33131-1811   305.373.9400

7

Sale Agreement and its terms pursuant to which Call Now and Mr. Hall agreed between them to the purchase and sale of various securities. Ex. D, pp. 58-59, 138:8-11, Pl.. Ex. 38.

On February 11, 2010, Call Now President Thomas Johnson ("Johnson") sent a letter to Pendergraft attaching the Purchase and Sale Agreement and requesting that certain specified securities and monies be transferred between Call Now and Mr. Hall's account to effectuate the terms of the Purchase and Sale Agreement. Ex. B, p. 211, D. Ex. 65. Among other things, Johnson requested that $1,802,500 be transferred from Call Now's PFSI account to Mr. Hall's PFSI account. Ex. B, p. 211, D. Ex. 65. This reflected payment by Call Now of $2.50 per share for approximately 721,000 shares of Call Now then not currently maintained in an account at PFSI. Ex. B, p. 211, D. Ex. 65. Final transfers under the Purchase and Sale Agreement were to take place upon Hall's delivery of 721,000 Call Now shares to Call Now's PFSI account. *See* Ex. B, p. 211, D. Ex. 65. There is no dispute that Mr. Hall delivered the shares called for under the Purchase and Sale Agreement. Ex. B, p. 214:5-10.

On March 2, 2010, consistent with the Purchase and Sale Agreement and Johnson's February 11, 2010 letter, Ex. B, p. 211, D. Ex. 65, Johnson sent a letter to PFSI requesting that $1,802,500 be wired from Call Now's PFSI account to the Trust Account of James J. Hurchalla & Associates, P.A. *See* Ex. C, p. 59, Pl. Ex. 86, p. 2. On March 3, 2010, the $1,802,500 payment was deposited into the Trust Account. *See* transcript of July 15, 2016 deposition of James Hurchalla, Jr., attached hereto as Exhibit "G", p. 63, D. Ex. 21. More than two weeks later, on March 19, 2010, Hall used a portion of the funds to pay-off the lien on the shares of Call Now stock held by June Ozner. ("Ozner"). Ex. G, p. 63, Pl. Ex. 21.

At the time the Purchase and Sale Agreement was executed, Mr. Hall owed Ozner at least $1,800,000 pursuant to the Second Note Modification Agreement dated February 25, 2008 (the "Second Note") and that this amount owed was secured by a lien on the Call Now stock. *See* Ex. G, p. 118, Pl. Ex. 28. According to the Second Note, Mr. Hall owed as of February 25, 2008 the principal amount of the loan ($1,350,000) plus accrued interest ($298,730) from the Note and Security Modification Agreement dated January 15, 2007 (the "First Note") for a total amount owed in February 2008 of $1,648,730 on the First Note. Ex. G, p. 118, Pl. Ex. 28.

BROAD and CASSEL

One Biscayne Tower, 21st Floor   2 South Biscayne Blvd.  Miami, Florida  33131-1811   305.373.9400

Pursuant to the terms of the Second Note, the interest was to accrue on the Second Note at 14% annual on the principal amount.[9] Ex. G, p. 118, Pl. Ex. 28. Hall was to pay off the accrued interest from the first note and make three quarterly interest payments of $47,250.00 on May 23, 2008, August 23, 2008, and November 23, 2008. Ex. G, p. 118, Pl. Ex. 28. The remainder of the interest due on the Second Note was to be paid at maturity on February 22, 2009. Ex. G, p. 118, Pl. Ex. 28. The total interest due in on the Second Note (excluding accrued interest from the First Note) would have been approximately $189,000 ($1,350,000 x 0.14) in February 2009. Ex. G, p. 118, Pl. Ex. 28. There is no record evidence *any* payments were made on the outstanding principal or accrued interest on the Second Note prior to the April 2010. *See* Ex. G, p. 63, Ex. 21.[10] Thus, the total accrued interest from the Second Note approximately two years later would have been $378,000 ($189,000 x 2). If you add the interest accrued pursuant to the Second Note ($378,000) to the interest accrued pursuant to the First Note ($298,730,000) to the principal ($1,350,000), you arrive at a total amount owed pursuant to the terms of the Second Note of over $1.8 million in February 2010.

At some point after February 2010, Mr. Hall began to perform under a settlement agreement with Ozner to pay off the lien she had on his Call Now shares pursuant to the Second Note. *See* Ex. G, p. 115, Pl. Ex. 27. On March 19, 2016, an initial payment of $850,000 was paid to Ozner pursuant to a settlement entered into between Hall and Ozner. Ex. G, p. 115, Pl. Ex. 27. In consideration for this payment, Ozner's attorney sent to Mr. Hall that same day a letter enclosing the stock certificates issued by Call Now and advising that they were to be held in escrow until Mr. Hall received confirmation from Ozner's counsel that a new note for $500,000 was acceptable and a second mortgage was placed on the Breckenridge, Colorado property. Ex. G, p. 115, Pl. Ex. 27. Therefore, the evidence is undisputed that as of March 19, 2016, no final settlement agreement had been executed. Because no final agreement had been reached as of this date, the Second Note was still the operative agreement between the parties.

E.    **Hall Executes Security Agreement with PFSI**

---

[9] The Second Note incorporated the terms of the first Note which provided that the principal was to accrue interest 14% annually. Ex. G, p. 118, Ex. 28.
[10] Hurchalla's trust account statement does not show any payments were made from that account in 2008 or 2009 toward the Second Note. The first payment to Ozner reflected on the statement was made in April 2010. *See* Ex. G, p. 63, Ex. 21.

BROAD and CASSEL
One Biscayne Tower, 21st Floor   2 South Biscayne Blvd.  Miami, Florida 33131-1811   305.373.9400

9

On February 25, 2010, Mr. Hall and Hemisphere Trust entered into a Security Agreement with PFSI (the "Security Agreement") in which Mr. Hall and Hemisphere pledged additional collateral to PFSI to address certain margin debits in their PFSI accounts. *See* Ex. Ap. 151, Pl. Ex. 147. PWI Deputy General Counsel Gilliland  drafted this agreement. Ex. C, pp. 40:20-41:9. When the Commission asked Gilliland at his deposition about the function of this agreement, he testified that it "creates the security interest in the collateral that's referred to in the [ ] security agreement in favor of PFSI." Ex. C, p. 45:16-21. The Security Agreement by its unambiguous terms does not contain terms reflecting the purchase or sale of any securities between Mr. Hall and PFSI. *See* Ex. C, p. 47, Pl. Ex. 84. The Security Agreement does not provide for Mr. Hall to receive any money.   Rather, it solely provided for PFSI and/or its affiliates to obtain a security interest in certain assets owned by Mr. Hall as specified in that document. *See* Ex. C, p. 47, Pl. Ex. 84.

Among the additional collateral pledged was Mr. Hall's interest in Stone Oak Prime . *See* Ex. C, p. 47, Pl. Ex. 84. The Security Agreement unambiguously stated that the Stone Oak Prime interest was being pledged subject to existing liens previously disclosed to PWI in writing and approved by PWI. *See* Ex. C, p. 47, Pl. Ex. 84. The lien that was disclosed to PWI was a lien by Sweezy Investments on Mr. Hall's Stone Oak Prime interest.[11] Ex. C, pp. 65, 68:17-69:3, Pl. Ex. 87. Stone Oak Prime had invested in the Estates of Canyon Ridge, Ex. D, p. 77: 6-10, and at the time, it was reported to PFSI by  Johnson that the Stone Oak Prime's interest had no significant value. Ex. F, p. 60, D. Ex. 57. Specifically, in an e-mail dated on December 18, 2009, PFSI General Counsel Koslow told Pendergraft that Johnson told him that "the liens they would pick up on Cambrdge/Estates [of Canyon Ridge] were worthless as the properties already have prior liens with significant debt".[12]

Approximately two weeks prior to accepting whatever interest Mr. Hall had in Stone Oak Prime as collateral, PWI ran lien searches on Mr. Hall and found no evidence of any lien on his Stone Oak Prime interest.  Ex. C, pp.  69:8-12, 17-22 Pl. Ex. 87.  When asked by the

---

[11] In assigning his interest in Stone Oak Prime subject to the lien, Mr. Hall testified that he was assigning any equity in this interest above the amount of his initial investment discussed above. Ex. A, p. 164:8-11.

[12] Stone Oak Prime was the limited partnership which owned an interest in the Estates of Canyon Ridge.

BROAD and CASSEL

One Biscayne Tower, 21st Floor   2 South Biscayne Blvd.  Miami, Florida 33131-1811  305.373.9400

Commission why he was concerned about the lien, Gilliland responded that he wanted to know the value of the lien so PFSI would know the value it was receiving in the collateral.  Ex. C, p. 67:12-25.   Despite finding no evidence of a lien and being told the collateral was worthless, PFSI entered into the Security Agreement on February 25, 2010 and accepted the Stone Oak Prime interest subject to any existing lien held by Sweezy Investments. *See* Ex. C, p.  47, Pl. Ex. 84.

William Ferguson, Defendant's expert witness, prepared a report and testified in this matter.  With regard to broker-dealer conduct when presented with a situation where the broker-dealer - here PFSI - believed it was acquiring collateral that had a pre-existing lien, Ferguson's report states (and his testimony was consistent with same) that industry practice requires a broker dealer to "verify the existence of any lien against proposed security collateral by inquiry and communicat[e] with any client disclosed lien holders." *See* transcript of October 18, 2016 deposition of William D. Ferguson, attached hereto as Exhibit "H", p. 8, Pl. Ex. 161.  Ferguson explained that "[t]his investigation would assist in determining the scope of any lien as well as the facts and circumstances that may impact PFSI's ability to extend credit against that collateral or utilize such collateral to reduce any margin maintenance requirement.  Additionally, in the normal course of operation a broker dealer would not have dispersed monies to any party prior to taking possession of the collateral shares after verifying their authenticity by checking with, at a minimum, the transfer agent and the lien holder as described above.  If appropriate, it would also be expected that PFSI establish a pledge or some similar agreement with that lienholder. The Hall margin account(s) should have been handled in the same manner, without discrimination, as all PFSI margin account customers in accordance with PFSI published Margin Account Agreement, Written Supervisory Procedures and Operations Manual."  Ex. H, p. 8, Pl. Ex. 161.

## II.   MEMORANDUM OF LAW

### A.   Legal Standard for Summary Judgment

Summary judgment is proper when the evidence shows that "no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law." *Lamar v. Wells Fargo Bank*, 597 Fed. Appx. 555, 556–57 (11th Cir. 2014) (citing *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1264 (11th Cir. 2010)).  The movant also may carry its burden by showing the court that there is an absence of evidence to support the nonmoving party's case.

BROAD and CASSEL

One Biscayne Tower, 21st Floor  2 South Biscayne Blvd.  Miami, Florida 33131-1811  305.373.9400

11

*Celotex v. Catrett,* 477 U.S. 317, 325 (1986).  When that burden has been met, the burden shifts to the non-movant to demonstrate that there is a genuine issue of material fact, which precludes summary judgment. *Id.*

As the United States Supreme Court recognized, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."   *Celotex Corp.*, 477 U.S. at 322–23; *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986) ("[T]h[e] standard [for granting summary judgment] mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a)".").   One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses . . . ." *Celotex Corp.*, 477 U.S. at 323–24.   Where a nonmoving party has failed to make sufficient showing on an essential element of her case with respect to which she has the burden of proof, the moving party is entitled to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 323.  Self-serving allegations in a Complaint that are unsupported by the any record evidence are insufficient to create a genuine issue of material fact.  *Dalton v. Severson*, 2016 WL 1271467, at *6 (M.D. Fla. 2016) ("Plaintiff's self-serving allegations in the Complaint that [Defendant] watched the October 25 incident from outside of the cell and failed to intervene, which are unsupported by any evidence of record, are insufficient to create a genuine issue of material fact.").

### B.   Standards for Establishing a Violation of Exchange Act Section 10(b) and Securities Act Section 17(a)(1)

Hall is entitled to judgment as a matter of law, because there are no material facts in dispute concerning the Commission's securities fraud claims and no evidence on which a jury could render a verdict in favor of the Commission.   To establish a violation of section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder, the Commission must establish that the party (i) employed a device, scheme or artifice to defraud or

BROAD and CASSEL
One Biscayne Tower, 21st Floor  2 South Biscayne Blvd.  Miami, Florida 33131-1811  305.373.9400

12

made materially false statements, (ii) in connection with the purchase or sale of securities, (iii) using an instrumentality of interstate commerce, and (iv) acted with scienter. *See, e.g., SEC v. Betta*, 2011 WL 4369012, *9 (S.D. Fla. Sept. 19, 2011) (citations omitted); *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1467 (2d Cir. 1996). The same elements must be proven to establish a violation of Securities Act of 1933 ("Securities Act") section 17(a)(1). *See First Jersey Sec., Inc.*, 1010 F.3d at 1450. For alleged violations of Securities Act  sections 17(a)(2) or (3), the SEC must show that (i) material misrepresentations or misleading omissions, (ii) in the offer or sale of securities, (iii) with negligence.[13] *See, e.g., Aaron v. SEC*, 446 US 680, 701-02 (1980).

"The scope of § 10(b) must be interpreted with due regard for congressional intent. The fundamental purpose of the Securities Exchange Act of 1934 is to implement a "philosophy of full disclosure," *Santa Fe Indus., Inc. v. Green,* 430 U.S. 462, 477-78 (1977), by providing participants in stock transactions with the information they need to make their investment decisions. *O'Brien v. Cont'l Ill. Nat. Bank & Trust,* 593 F.2d 54, 60 (7th Cir.1979). That goal is not furthered by bringing within the ambit of Exchange Act § 10(b) claims amounting to breach of contract or common law fraud which have long been the staples of state law." *Hunt v. Robinson*, 852 F.2d 786, 787–88 (4th Cir. 1988) (dismissing complaint for fraudulent non-conveyance of stock based on section 10(b) of the Exchange Act, because plaintiff's claims were nothing more than claims for breach of contract or common law fraud that could be redressed by state law).[14]

### C. The 2009 Loans from SAI to Hall

---

[13] Although the Commission has cited sections 17(a)(1) and (a)(3) of the Securities Act in its Complaint, it has not alleged any facts supporting scheme liability and does not appear to be taking the position that there was any scheme giving rise to violations of these sections. [D.E. 1, ¶49.] Therefore, in addition to the grounds discussed below, summary judgment is appropriate as to subsections (a)(1) and (a)(3). *Morgan Keegan & Co., Inc.*, 1:09-CV-1965-WSD, 2013 WL 10944536, at *55 ("Because the Court finds that Morgan Keegan and its brokers did not engage in a deceptive scheme or course of conduct beyond the isolated material misrepresentations and omissions that have been found in this action, the Court also finds that Morgan Keegan did not violate Section 17(a)(3)."); *see also* *SEC v. Stoker*, 873 F. Supp.2d 605, 615 (S.D.N.Y. July 09, 2012).

[14] Although *Hunt v. Robinson* involved private litigants, this Court should apply the same reasoning when viewing the SEC's claims against Mr. Hall. The Commission seeks to enforce its claims under the same federal securities laws.

BROAD and CASSEL
One Biscayne Tower, 21st Floor  2 South Biscayne Blvd.  Miami, Florida 33131-1811  305.373.9400

The Commission alleges that Hall made misrepresentations to PFSI regarding the existence of liens on shares he pledged to SAI as part of certain loan transactions between SAI and Hall. [D.E. 1, ¶18, 32]. More specifically, the Commission alleges that Hall told PFSI that he needed $3.7 million to pay off liens before he could pledge these shares to PFSI as collateral for his accounts at PFSI. [D.E. 1, ¶18.] Pursuant to these representations, the Commission alleges that PFSI's executive, Pendergraft, made arrangements for SAI to make loans to Hall. [D.E. 1, ¶19.] As discussed in greater detail below, summary judgment is appropriate as to both claims based on this alleged representations, because the facts are undisputed that (1) the alleged misrepresentations were not made in connection with a transaction for the purchase or sale of securities between Mr. Hall and PFSI, (2) the alleged representations were not material as to SAI's decision to make the loan to Hall, and (3) Hall did not act with the requisite scienter.

1. **The Alleged Representations Regarding the Lien on the Collateral Was Not Made in Connection with the Purchase and Sale of Securities**

The Commission cannot prevail on its claims that Hall violated sections 17(a) of the Securities Act and 10(b) of the Exchange Act by making misrepresentations to PFSI regarding the existence of liens on his Call Now stock, because the alleged representations were not made in connection with the purchase from or sale to PFSI of any security.   "To satisfy the 'in connection with' requirement, [courts have held that a] plaintiff may not allege fraudulent acts which merely happened to involve [securities] in some way.   The 'in connection with' requirement mandates that the alleged fraud concern the fundamental nature of [securities]: namely, the characteristics and attributes that would induce an investor to buy or sell the particular [securities]." *Kearney v. Prudential–Bache Securities, Inc.,* 701 F.Supp. 416, 424 (S.D. N.Y.1988).   Other courts have taken a broader view holding that the misrepresentation must relate to "a significant part of the consideration offered." *Leisure Founders, Inc. v. CUC, Intern., Inc.*, 833 F. Supp. 1562, 1569; *see also Chemical Bank v. Arthur Andersen & Co.,* 726 F.2d 930, 943 (2d Cir.1984) (Friendly, J.) (recognizing that "[t]he purpose of § 10(b) and Rule 10–b(5) is to protect persons who are deceived in securities transactions—to make sure that buyers of securities get what they think they are getting and that sellers of securities are not tricked into parting with something for a price known to the buyer to be inadequate or for a consideration known to the buyer not to be what it purports to be").

Regardless of which view has been taken, however, courts have recognized that in order for the in connection requirement to be met, the misrepresentation must be of such character that it either affects the value of the consideration received or causes someone to part with or purchase a security that they would have not have otherwise parted with or purchased. *See, e.g., Superintendent of Ins. of N.Y. v. Bankers Life and Casualty Co.*, 404 U.S. 6, 9 (1971) (holding that the in connection with requirement was satisfied where the seller was duped into departing with the treasury bonds pursuant to a fraudulent scheme). Thus, "[t]o fall within Section 10(b), misrepresentations must have some direct pertinence to a securities transaction." *Rand v. Anaconda–Ericsson, Inc.*, 794 F.2d 843, 847 (2d Cir.1986). *Citibank, N.A. v. K-H Corp.*, 745 F. Supp. 899, 903 (S.D.N.Y. 1990); *see Ketchum v. Green*, 557 F.2d 1022, 1027 (3d Cir. 1977) (noting that "Congress by § 10(b) did not seek to regulate transactions which constitute no more than internal corporate mismanagement"); *accord Kesling v. Kesling*, 546 F. Supp. 2d 627, 637 (N.D. Ind. 2008); *see also SEC v. Wolfson*, 539 F.3d 1249, 1262 (10th Cir. 2008) (quoting *United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd.*, 210 F.3d 1207, 1221 (10th Cir.2000)) (recognizing that misrepresentations made to induce a party to purchase a security or to influence an investment decision are made "in connection with the purchase or sale of a security").

The SEC contends that the alleged misrepresentations in this case were made to PFSI to induce it to extend funds to Mr. Hall to pay off non-existent liens. [D.E. 1]. It is undisputed that in fact SAI loaned funds to PFSI and was the source of monies sent to him under the Loan Documents. Mr. Hall did not have a pre-existing relationship with SAI and, thus, no obligation to SAI to provide any collateral absent the Loan Documents. Further, as a separate legal entity, SAI had the authority to enter into a contract with third parties separate and distinct from any relationship that may have existed between Mr. Hall and PFSI. Although it appears that *SAI* ultimately provided to PFSI the Call Now shares Mr. Hall pledged to SAI, that fact does not alter the undisputed fact that Mr. Hall's pledge was to SAI in exchange for loans under the Loan Documents. Mr. Hall had no say in what SAI did with this collateral once such shares were delivered in accordance with the requirements of the SAI Loans. Therefore, the SEC's attempt to shoe-horn a federal securities fraud claim based on a private transaction is not supported by the facts or applicable law. *See Hunt*, 852 F.2d at 787–88 ( holding that the congressional intent of

BROAD and CASSEL
One Biscayne Tower, 21st Floor   2 South Biscayne Blvd.   Miami, Florida 33131-1811   305.373.9400

15

section 10(b) was not furthered by bringing within its ambit "claims amounting to breach of contract or common law fraud which have long been the staples of state law").

The law is clear that the purpose of Securities Act section 17(a) and Exchange Act Section 10(b) claims is to make sure that purchasers of securities get exactly what they think they are getting and that sellers of securities are not tricked into departing with securities for a price that the buyer knows is inaccurate or for consideration that is not what it purports to be. *SEC v. Roanoke Tech. Corp.*, Fed. Sec. L. Rep. P 94139 (M.D. Fla. 2006) (quoting *Chemical Bank v. Arthur Andersen & Co.,* 726 F.2d 930, 943 (2d Cir.1984); *accord Citibank, N.A.*, 745 F. Supp. at 903. In line with this purpose, courts have rejected the SEC's attempt to apply these laws to situations in which the misrepresentation was merely part of the transaction. *See, e.g., SEC v. Roanoke Tech. Corp.*, Fed. Sec. L. Rep. P 94139, at *5 (M.D. Fla. 2006) (dismissing the SEC's complaint because the alleged facts were insufficient to show a securities transaction in connection with the alleged fraud); *Chemical Bank,* 726 F.2d at 943 (2d Cir.1984) (holding that the alleged misrepresentation made by the accounting firm in the financial statements of the parent company were not in connection with the loan the bank made to the parent company because the only shares pledged were those of the subsidiary and the accounting firm was not alleged to have deceived the bank with respect to the pledge of the subsidiary's stock); *Hunt*, 852 F. 2d at 787-788 (holding that complaint alleging fraudulent non-conveyance of stock pursuant to agreement did not meet the in connection with requirement). When parties receive exactly what they expected in terms of the securities they bargained for, courts have consistently found as a matter of law that the misrepresentation did not meet the "in connection with" requirement. *Hunt*, 852 F. 2d at 787-788.

The alleged representation to PFSI as a matter of law could not be deemed in connection with SAI's loans to Mr. Hall. The alleged representation did not mislead SAI as to the character or value of the securities or the value of the consideration received. *Cf. Citibank, N.A. v. K-H Corp.*, 745 F. Supp. at 903 (holding that the alleged misrepresentation regarding loan transaction that induced bank to make loan to company secured by its collateral was not in connection with the purchase of the collateral because it did not affect "the nature or value of the securities involved" and, thus, was too tenuous to satisfy the "in connection with" requirement).

Accordingly, the undisputed facts unequivocally establish that the representation was not made in connection with the SAI loan.[15]

In sum, the SAI Loan represented a private transaction between SAI and Mr. Hall. Even though Pendergraft was directly involved in discussions concerning the SAI Loan and an integral part of same, for whatever reason, he chose not to make PFSI a party to these transactions. If SAI felt that it did not receive the benefit of its bargain, it could have brought an action against Hall. However, the facts here are clear that SAI got exactly what it bargained for under the SAI loan agreements and that there was no federal securities law fraud committed in connection with these transactions. Thus, to the extent the Commission claims that Mr. Hall violated sections 17(a) of the Securities Act and 10(b) of the Exchange Act and Rule 10(b)(5) in connection with these transactions, that position is contradicted by the undisputed record evidence and law.

> ### 2.    The Alleged Misrepresentations to PFSI Relating to Collateral Held Outside Mr. Hall's  Accounts at PFSI Was Not Material to the SAI Loan Transactions

Summary judgment is appropriate as to the section 10(b) and rule 10b-5 claim and the section 17(a) claims, because the alleged misrepresentations were not material to the SAI Loan transaction as a matter of law. The test for materiality in the securities fraud context is "whether a reasonable man would attach importance to the fact misrepresented or omitted in determining his course of action." The Eleventh Circuit has defined course of action as "an investment decision". "'A statement or omission is only material if a reasonable investor would consider it important in determining whether to buy or sell stock.'" *SEC v. Goble*, 682 F.3d 934, 944 (11th Cir. 2012) (quoting *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir. 1997)); *Searls v. Glasser*, 64 F.3d 1061, 1065–66 (7th Cir. 1995) (["[A] statement is material depends on how it affects an investor's perception of the security."). Whether information is material also depends on other information already available to the market; unless the statement "significantly altered the 'total mix' of information" available, it will not be considered material. *Grossman*, 120 F.3d at 1119 (quoting *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449 (1976)). The role of the materiality inquiry is "to filter out essentially *useless information that a reasonable investor would not consider significant,* even as part of a larger 'mix' of factors to consider in making his

---

[15] The facts are undisputed that Mr. Hall delivered the collateral described in the SAI Loan Documents.

BROAD and CASSEL
One Biscayne Tower, 21st Floor  2 South Biscayne Blvd.  Miami, Florida 33131-1811   305.373.9400

17

investment decision." *SEC v. Morgan Keegan & Co., Inc.*, 678 F.3d 1233, 1246 (11th Cir. 2012) (citing *Basic Inc. v. Levinson*, 485 US 224, 234 (1988)) (emphasis added).

In evaluating what a reasonable investor would view as important, the court must take into account the sophistication of the investor. *See Banca Cremi, S.A. v. Alex. Brown & Sons, Inc.,* 132 F.3d 1017, 1028–29 (4th Cir.1997) (citation omitted) ("A sophisticated investor requires less information to call a '[mis-]representation into question' than would an unsophisticated investor . . . . Likewise, when material information is omitted, a sophisticated investor is more likely to 'know[ ] enough so that the . . . omission still leaves him cognizant of the risk.'"); *SEC v. Happ*, 392 F.3d 12, 21 (1st Cir. 2004) (quoting *Basic Inc.*, 485 U.S. at 234 (internal quotation marks and citation omitted)) ("The Supreme Court has made clear . . . that the role of the materiality requirement is not to attribute to investors a 'child-like simplicity . . . but to filter out essentially useless information that a reasonable investor would not consider significant.'").

The SEC's Complaint in this action alleges that misrepresentations were made to PFSI to induce it to extend credit to Mr. Hall. The undisputed evidence is that SAI loaned funds to Mr. Hall pursuant to the SAI Loan. The evidence shows that SAI and Mr. Hall did not view information concerning a potential lien on Mr. Hall's Call Now stock as material. The facts in this case are undisputed that the SAI Loan Documents did not reference any language pertaining to liens on Mr. Hall's Call Now stock which was to serve as collateral for the loans, nor contain any restrictions on the use to which Mr. Hall could place on the loaned funds. In fact, both General Counsel and Deputy Counsel for PWI, who prepared the drafts of the Loan Documents, testified that they were not told about any liens on the Call Now Stock or told to incorporate information in the agreement pertaining to same. Accordingly, it is clear from the parties' own conduct and the written agreements in this case that the alleged representations regarding the existing liens on the collateral were not material to SAI's decision to accept Call Now stock as collateral for its loans to Hall and no conditions were placed requiring Mr. Hall to use loan proceeds to pay off any such liens.

The alleged representation also could not be material as a matter of law, because a sophisticated broker dealer, like PFSI, would not rely solely on a statement concerning the existence of a lien to base its decision to extend significant amounts of credit. A reasonable

BROAD and CASSEL
One Biscayne Tower, 21st Floor   2 South Biscayne Blvd.  Miami, Florida 33131-1811  305.373.9400

18

broker dealer would have been familiar with and acted in accordance with the industry customs at the time for verifying and confirming the scope of any liens, and would not have made a decision exclusively based on a customer's unverified representation. *Cf. Flannery v. SEC*, 810 F. 3d 1 (1st Cir. 2015) (In determining as a matter of law that there was not sufficient evidence to support the Commission's decision regarding materiality, the First Circuit found compelling the expert's testimony that the presentation in which the misrepresentation was made was only intended to be "starting points", after which the investor was expected to do additional due diligence.). As securities expert Dennis Ferguson testified, industry standards required a broker-dealer in PFSI's situation to directly contact the lienholder to verify the scope of any lien through lien searches, as well as negotiate with the lienholder and secure all appropriate documentation from such lien holder to ensure satisfaction of the lien and/or that the broker dealer was obtaining a secure position on such collateral. A reasonable broker dealer would have in these circumstances verified the existence of a lien before making a decision to accept the collateral and extend funds. Thus, Mr. Hall's alleged representation regarding the existence of liens on his Call Now stock could not have altered the total mix of information available and misled PFSI or any reasonable broker-dealer.

In sum, summary judgment is appropriate, because the alleged representations could not have been material as a matter of law to PFSI's extension of credit to Mr. Hall as it is undisputed PFSI did not loan funds to Mr. Hall under the Loan Documents – nor to SAI's decision to accept the pledges of securities as collateral for the loans.

**D.** **February 25, 2010 Security Agreement Between Hall and PFSI**

**1.** **The Alleged Misrepresentation to PFSI Relating to Hall's Interest in Stone Oak Prime Was Not "Material" to the Security Agreement**

Summary judgment is also warranted as to the SEC's claim that Mr. Hall made misrepresentations to PFSI regarding a lien on his Stone Oak Prime interest, because it was not material to PFSI's, nor would it be to any reasonable investor's decision to accept that interest as part of the collateral pledged in the February 25, 2010 Security Agreement.

As an initial matter, Mr. Hall respectfully submits that the plain terms of the Security Agreement should govern and they provided for Mr. Hall's pledge of interests in various collateral to PFSI. The Security Agreement did not provide for Mr. Hall to receive anything in

BROAD and CASSEL
One Biscayne Tower, 21st Floor  2 South Biscayne Blvd.  Miami, Florida  33131-1811  305.373.9400

19

return.  Stated differently, PFSI received considerable benefit under the Security Agreement but provided no funds to Mr. Hall in return.  Mr. Hall respectfully submits that this fact alone demonstrates that the statement could not have been material to PFSI's decision to accept this pledge.  *See Gurwara v. LyphoMed, Inc.*, 937 F.2d 380, 382 (7th Cir. 1991) (quoting *Chemical Bank.*, 726 F.2d at 943.

The alleged misrepresentation also could not have been material as a matter of law to a reasonable investor's decision to accept Mr. Hall's Stone Oak Prime interest as collateral. Indeed, if there was no lien on his Stone Oak Prime interest, then the investor would have more than he bargained for and been in a better position than if the interest did not have a lien.  In an analogous case, investors brought an action against the partnership and investment trust charging defendants with securities fraud, among other things, relating to a misrepresentation in the prospectus implying that the defendant owned certain property when in fact he only leased it. *Simpson v. Southeastern Inv. Trust*, 697 F.2d 1257, 1258 (5th Cir. 1983). In determining that the investors could not state a Section 10(b) and Rule 10b-5 claim, the Fifth Circuit Court of Appeals explained that the misrepresentation was not material to the transaction, because a reasonable investor would not have found the value of the business practice was affected by the identity of the current owner of the property.  The court explained further that the real interest of the investor was the ability of the lessee to acquire the property if it decided and the lease agreement did provide him this option.  Thus, the court concluded, the misstatement was not such that a reasonable investor would have considered it important in making its decision.Similar to the *Simpson* case, a reasonable investor in this case would not have found the fact that the securities were not in fact pledged important to its decision to accept the collateral.

Even assuming, *arguendo*, the alleged misrepresentation occurred concerning the Stone Oak Prime interest, it could not be considered material to PFSI's decision to accept it as collateral, because PFSI's own lien search on Mr. Hall revealed there was no lien and PFSI allegedly proceeded with the transaction under the belief a lien existed.  *See* Pl. Ex. 115.  In this regard, the Court should look to the numerous federal and state court cases holding that a defrauded party is barred as a matter of law from bringing a fraud claim where the defrauded party discovered the alleged fraud prior to entering into the transaction.  *DM Residential Fund II, LLC v. First Tennessee Bank Nat'l Assoc.*, 2013 WL 12077975, at *4 (C.D. Cal. 2013) (holding

BROAD and CASSEL

One Biscayne Tower, 21st Floor   2 South Biscayne Blvd.  Miami, Florida 33131-1811   305.373.9400

20

plaintiff waived the right to pursue a fraud claim based on the fact that plaintiff found out about the event giving rise to the later-alleged fraud, but nevertheless continued the business relationship with the party they later accused); *Oakland Raiders v. Oakland-Alameda County Coliseum, Inc.*, 144 Cal. App. 4th 1175, 1193 (Cal. Ct. App. 2006)(plaintiff waived its fraudulent inducement claim when it entered into new contract with knowledge that representations were fraudulent); *Victoria Materials & Gravel Co. v. Sauerman Bros.*, 61 F.2d 850, 851 (5th Cir. 1932) (affirming lower court's dismissal of fraud claim because buyer continued to use machinery after discovering the fraud); *Harpold v. Stock*, 65 So. 2d 477, 478 (Fla. 1953) (plaintiff waived fraud claim by entering into contract after learning of alleged fraud).

Mr. Hall acknowledges that the SEC does not need to prove reliance to prevail on its claim. However, the above authorities suggest that while the SEC attempts to bootstrap as part of the basis for its claim alleged misrepresentations to PFSI. PFSI would not have found these representations material or been able to claim reliance upon them. PFSI's General Counsel reported to Pendergraft that the Stone Oak Prime interest was worthless.

### E.       February 11, 2010 Purchase and Sale Agreement between Hall and Call Now

#### 1.       The Commission Also Cannot Prevail on Its Claim That Hall Made a Misrepresentation to PFSI Regarding the Lien on the Collateral, Because the Alleged Representation Was Not False or Misleading

The Commission contends that Hall violated the federal securities laws when he told PFSI there was a lien for approximately $1.8 million on his Call Now stock that he sold to Call Now pursuant to the Purchase and Sale Agreement between Call Now and Hall. [D.E. 1, ¶35.] The Commission's contention rests on the fact that the alleged representation was false or misleading. [D.E. 1, ¶35.] However, as discussed above, the statement regarding the lien was accurate. At the time of the alleged misrepresentation to PFSI, Hall owed more than $1.8 million on the Second Note to which the Call Now shares were pledged. Thus, the Commission's claim is not supported by the material facts and summary judgment is also warranted on this basis.

#### 2.       The Commission Also Cannot Prevail on Its Claims, Because the Misrepresentation Was Not Material

The alleged representation by Hall to PFSI regarding the Call Now collateral being pledged to Call Now was not material as a matter of law. The Commission alleges as the basis

BROAD and CASSEL

One Biscayne Tower, 21st Floor   2 South Biscayne Blvd.  Miami, Florida 33131-1811   305.373.9400

21

for its claims that Hall made a misrepresentation to PFSI regarding his Call Now collateral being pledged to a lender. This position is fundamentally flawed, however, because a representation made to PFSI could not have been important as a matter of law to Call Now's decision to purchase the shares. A reasonable investor would not have viewed this information as important to its decision to purchase the securities but rather would have been concerned about whether it was receiving a fair price for the securities purchased. The facts are undisputed that Call Now received a fair price for the Call Now shares. Because a reasonable investor would have entered into this transaction regardless of the representation, the representation could not have been material as a matter of law and summary judgment is appropriate.

3. **The Commission Cannot Prevail on Its Claim That the Alleged Representations Regarding the Collateral Violated Sections 17(a) and 10(b), Because the Representations Were Not in Connection with the Purchase and Sale of Securities**

Summary judgment is also appropriate, because the alleged representation regarding the lien on the collateral was not in connection with the purchase or sale of securities. The alleged representation regarding the lien on the Call Now stock was made to PFSI, who was not a party to the agreement. Accordingly, because the undisputed facts show the statement was not made in connection with the transaction, summary judgment is also warranted on this ground.

## III.   <u>CONCLUSION</u>

For each of the reasons discussed, Hall respectfully requests this Court enter Final Summary Judgment in its favor and such other relief the Court deems appropriate.

## IV.   <u>REQUEST FOR HEARING</u>

Pursuant to Local Rule 7.1(b), Defendant Christopher J. Hall requests oral argument on the subject Motion and estimates that it will need one hour. Defendant believes oral argument will assist the Court in understanding the complexity of the alleged transactions and the legal issues addressed in this Motion.

Dated: November 1, 2016

Respectfully submitted,

**BROAD AND CASSEL**

BROAD and CASSEL

One Biscayne Tower, 21st Floor   2 South Biscayne Blvd.  Miami, Florida  33131-1811   305.373.9400

*Counsel for Defendant Christopher J. Hall*
One Biscayne Tower, 21st Floor
2 South Biscayne Boulevard
Miami, Florida  33131
Telephone: (305)373-9467
Facsimile: (305) 373-6387

By:____*/s/Sara M. Klco*_____
DANIEL S. NEWMAN, P.A.
Florida Bar No. 962767
dnewman@broadandcassel.com
SARA M. KLCO, ESQ.
Florida Bar No. 060358
sklco@broadandcassel.com
KIMBERLY J. FREEDMAN, ESQ.
Florida Bar No. 71826
kfreedman@broadandcassel.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 1, 2016, a true and correct copy of the foregoing document was duly furnished via electronic transmission to all parties of record on the attached service list.

*/s/ Sara M. Klco*_____
Sara M. Klco, Esq.

## SERVICE LIST

BROAD and CASSEL
One Biscayne Tower, 21st Floor  2 South Biscayne Blvd.  Miami, Florida  33131-1811   305.373.9400

23

Mark M. Oh, Esq.
ohma@sec.gov
David S. Johnson, Esq.
johnsonds@sec.gov
Sarah H. Concannon, Esq.
concannons@sec.gov
U.S. Securities and Exchange Commission
100 F. Street, N.E.
Washington, DC 20549
Tel: 202-551-4436
*Counsel for Plaintiff United States Securities
and Exchange Commission*

BROAD and CASSEL

One Biscayne Tower, 21st Floor   2 South Biscayne Blvd.  Miami, Florida  33131-1811   305.373.9400

24