## EXHIBIT H

**DENNIS FERGUSON
DEPOSITION TRANSCRIPT PAGES
AND
EXHIBITS**

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA


- - - - - - - - - - - - - - - -

UNITED STATES SECURITIES AND    )

EXCHANGE COMMISSION,            )

       Plaintiff,            )   CASE NO.

vs.                            )   1:15-cv-23489-CMA

                    )

CHRISTOPHER J. HALL,           )

       Defendant.            )

- - - - - - - - - - - - - - - -




VIDEOTAPED DEPOSITION OF WILLIAM DENNIS FERGUSON

TUESDAY, OCTOBER 18, 2016




BEHMKE REPORTING AND VIDEO SERVICES, INC.

BY:  MICHELE L. SAVOY, RMR

160 SPEAR STREET, SUITE 300

SAN FRANCISCO, CALIFORNIA 94105

(415) 597-5600

981b40d7-22c0-4299-a382-7e362f327f54

1                                EXHIBITS

2                        WILLIAM DENNIS FERGUSON

3        Number                    Description                Page

4        Exhibit 160   Expert Report - 12 pages                 7

5

6        Exhibit 161   Supplemental Expert Report - 13 pages    7

7

8        Exhibit 162   Excerpt of FINRA RULE 4210 - 5 pages     59

9

10       Exhibit 163   Penson Financial Services, Inc.,

11                     and/or Broker Dealers for Which it

12                     Clears Customer Account Agreement;

13                     PWI-SEC340212 through PWI-SEC340214

14                     - 3 pages                               172

15

16

17

18

19

20

21

22

23

24

25

981b40d7-22c0-4299-a382-7e362f327f54

Page 6

1              TUESDAY, SEPTEMBER 27, 2016, 9:38 a.m.

2

3              (Thereupon, documents were marked as

4     Plaintiff's Exhibit Nos. 160 and 161 for

5     Identification.)

6

7              VIDEO OPERATOR:   Here begins DVD number 1 in

8          the deposition of William Dennis Ferguson in the

9          matter of Securities and Exchange Commission, v.

10          Christopher J. Hall in the United States District

11          Court, Southern District of California -- or,

12          excuse me, Florida, Case No. 115-CV-23489.

13              Today's date is Tuesday, October 18, 2016.

14          The time on the video monitor is 9:22 a.m.

15              The video operator today is Anthony Barbaro,

16          contracted by Behmke Reporting and Video Services,

17          Inc., 160 Spear Street, Suite 3400, San Francisco,

18          California.   This video deposition is taking place

19          at Two South Biscayne Boulevard, Miami, Florida,

20          and was noticed by Sarah H. Concannon, Esquire, of

21          Securities and Exchange Commission.

22              Counsel, please voice identify yourselves and

23          state whom you represent.

24              MS. CONCANNON:   I am Sarah Heaton Concannon.

25          I represent the Plaintiff, Securities and Exchange

981b40d7-22c0-4299-a382-7e362f327f54

1        Commission.

2            MR. NEWMAN:  Dan Newman from Broad and Cassel.

3        I represent Christopher Hall.

4            VIDEO OPERATOR:  The court reporter today is

5        Michele Savoy, certified shorthand reporter,

6        contracted by Behmke Video and Services, Inc.

7            Would the reporter please swear in the

8        witness.

9            THE COURT REPORTER:  Sir, if I could ask you

10       to raise your right hand, please?

11   Thereupon:

12                WILLIAM DENNIS FERGUSON,

13        having been first duly sworn, testified as

14   follows:

15            THE WITNESS:  I do.

16            THE COURT REPORTER:  Thank you.

17            VIDEO OPERATOR:  Please begin.

18                    EXAMINATION

19   BY MS. CONCANNON:

20        Q    Good morning, Mr. Ferguson.

21        A    Good morning.

22        Q    Again, my name is Sarah Concannon.  I

23   represent the Plaintiff in this action, which is the

24   Securities and Exchange Commission, and I'm going to be

25   asking you some questions today about the expert reports

981b40d7-22c0-4299-a382-7e362f327f54

1    that you have submitted in this case.

2         So I'm handing you what has previously been

3    marked as Plaintiff's Exhibit 160 and 161.  Plaintiff's

4    Exhibit 160 is your initial expert report submitted on

5    September 12, 2016; and Exhibit 161 is your supplement

6    expert report, submitted on October 14, 2014 (sic).

7         Do you recognize those documents?

8    A     Yes, I do.

9    Q     And these are the expert reports that you

10   submitted in this matter?

11   A     They appear to be.

12   Q     If you turn first to Exhibit 160, at page 4,

13   that is your signature?

14   A     Yes, it is.

15   Q     And in Exhibit 161, at page 5, that is also

16   your signature?

17   A     Yes, it is.

18   Q     Now, I mentioned that Exhibit 161 was received

19   on October 14, 2014 (sic), which was last Friday; did

20   you provide your counsel with a copy of this report,

21   Exhibit 161, on Friday, October 14?

22   A     I believe I did.

23   Q     At what time?

24   A     I don't recall exactly.  It was -- I don't

25   recall.

981b40d7-22c0-4299-a382-7e362f327f54

Page 9

1      Q    Sometime in the afternoon?

2      A    Yes.

3      Q    And if I represented to you that it was sent

4  to me at 4:46 p.m. on Friday, October 14, is that around

5  the time that you sent it to your counsel?

6      A    I don't believe so.

7      Q    You think you sent it earlier?

8      A    I think I sent it earlier, but not by a great

9  margin.  It was sometime in the afternoon, but I don't

10  think it was later in the afternoon.

11      Q    Okay.  Do your initial and supplemental

12  reports set forth, in full, the opinions that you intend

13  to offer in this matter?

14      A    They do.

15      Q    On behalf of the Defendant, Christopher Hall?

16      A    They do.

17      Q    And there are no opinions that you intend to

18  offer in this matter that are not set forth in your

19  initial and supplement reports?

20      A    There are not.

21      Q    And you are not intending, at this time, to

22  further supplement the opinions that you offer?

23      A    That's correct.

24      Q    The bases for the opinions that you intend to

25  offer in this matter are fully set forth in your initial

981b40d7-22c0-4299-a382-7e362f327f54

**EXHIBITS**
**TO**
**DENNIS FERGUSON**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,

       Plaintiff,

v.

CHRISTOPHER J. HALL

      Defendant.

Case No. 1:15-cv-23489-CMA

---

**SUPPLEMENTAL**

**EXPERT REPORT OF W. DENNIS FERGUSON ON MERITS ON BEHALF OF DEFENDANT CHRISTOPHER HALL**

I Introduction and Summary of Findings

II Analysis

Upon receipt and review of additional documents including the deposition of Philip Pendergraft, Plaintiff's Exhibits as well as Defendant's Exhibits, the following opinions are to serve as a supplement to my Expert Witness report:

(1)     On completion of my review of the additional documents and Exhibits set forth in Appendix A, my review of the pleadings and discovery in this matter, my review and analysis of the regulatory rules, policies and procedure, standard actions normally taken by Broker Dealers ("BDs") in the securities industry, information provided by Penson Financial Securities, Inc. ("PFSI"), and based on my education and extensive knowledge and experience in the financial services investment industry, my experience being both from a private and a regulatory policy making and enforcement perspective, it is my professional opinion that the Broker Dealer's handling of Christopher Hall's securities account resulted in a situation detrimental to Hall's best interest as a customer of PFSI and its affiliates.

EXHIBIT _161_    PLTF.
WITNESS _Ferguson_  DEFT.
CONSISTING OF _13_
DATE _10/18/16_   PAGES
BEHMKE REPORTING AND VIDEO SERVICES, INC.

1

(2)  PFSI had established policies and procedures regarding establishment of and handling of customer margin accounts keeping with generally accepted industry practices, applicable regulatory parameters (NASD/FINRA Rule 2520, 4314, 4330, 4340, 4210; Regulation T of the Federal Reserve Board; NYSE Rule 431) and competitive market forces.  PFSI failed its duty of care to Hall by acting in a manner inconsistent with and in contravention of its own published statement of policies and procedures.

(3)  Hall should be able to rely on PFSI to oversee his margin account in a fashion that would follow PFSI own margin account agreement as well as PFSI policies and procedures. By doing so PFSI provides protection to  Hall against a situation where the margin account equity in his account falls below house and Federal Reserve Board prescribed limits to a point of causing losses greater than should have been experienced under PFSI duty of care to its's customers.

(4)  PFSI has a duty during normal course of its business conduct to verify the existence of any Lien(s) placed on security positions presented to the BD for collateral purposes.

(5)  PFSI has a duty to promptly liquidate collateral in a commercially responsible manner to satisfy unmet margin calls.

III Conclusions

Appendix A: Documents reviewed

Appendix B:  W. D. Ferguson Qualifications

Appendix C: List of Prior Testimony at Deposition or Trial within past 4 years

**I Introduction and Summary of Findings**

After additional discovery and document production, I have been retained as an expert witness by Defendant, Christopher Hall ("Hall"), regarding the questions of whether Penson's conduct in the oversight and maintenance of his margin account was just, appropriate, equitable, and based on sound industry practice, and whether the BD's conduct is governed by FINRA/SEC rules as well as Federal Reserve Board Regulations and if so was the governance of Hall's account compliant with all rules, regulations and industry customs.

Furthermore, did Hall receive from Penson a level of service consistent with the duty of care owed to Hall in the maintenance of his margin account? A duty of care designed to protect Hall against the results of adverse market conditions that would be mitigated by prompt action on the part of Penson.

**Expert Qualifications:**  After graduating from Florida Southern College (BS degree Business and Economics) in 1966 and following my Military Service in 1970, I commenced a career in the securities industry.  My experience from 1971 until 1982 involved retail sales, branch office and regional

2

management in which I gained a broad range of knowledge concerning all aspects of product specifications, regulatory compliance, and expense management of a brokerage enterprise. From 1982 until July 2014, I held a number of senior level management positions in the back office processing section of the securities industry including all aspects of the processes used with introducing broker dealers and proprietary sales divisions.

These positions included responsibilities for marketing, execution, clearing and settlement of securities transactions, compliance, as well as supervising margin department activities and lending policies of a broker dealer. I was an equity shareholder of, and operated, a clearing firm that executed and cleared transactions, among other services, for 110+ Broker Dealers in the U.S.

Based on my 30 plus years of industry experience in providing execution and clearing services as well as in-depth knowledge of the subject matter of this claim, I believe that my professional experience, education, and training have provided me with extensive knowledge and experience to address the regulatory issues as well as margin account supervision which are the subject of Plaintiff's claim.

In accordance with FRCP Rule 26, the below report contains:

1.     A complete statement of all opinions expressed and the reasons supporting them
2.     The facts and applicable Rules supporting the opinions presented
3.     Appendix A, a list of the documents I reviewed in connection with this case
4.     Appendix B showing my qualifications and experience
5.     Appendix C List of prior Testimony at deposition or trial within past 4 years

My fee serving as an expert in this case is $300 per hour plus reasonable expenses.   Preparation and Appearance for testimony or deposition is billed at $350 per hour.

**Summary of Findings:**  For all the reasons stated herein, and based upon my financial investment industry background and regulatory experience, it is my opinion that the handling of Hall's margin account by Penson was not in accordance with prescriptive regulatory rules or that of similar firms in the same industry at the same time consistent with industry standards.  Additionally, by failing to oversee and act promptly resulting in the declining equity level of the account, Penson failed to act in the best interest of the client.

**II Analysis**

The Margin Concept:  in addition to Experts initial opinion, new documents have disclosed the following:

   a)   Opening the Hall Accounts: PFSI had an obligation, and in the normal course would have been expected, to verify the existence of any lien against proposed security collateral by inquiry and communicating with any client disclosed lien holders. This investigation would assist in determining the scope of any lien as well as the facts and circumstances that may impact PFSI's ability to extend credit against that collateral or utilize such collateral to reduce any margin maintenance requirement. Additionally, in the normal course of operation a broker dealer would not have dispersed monies to any party prior to taking possession of the collateral shares after verifying their authenticity by checking with, at a minimum, the transfer agent and the lien

3

holder as described above. If appropriate, it would also be expected that PFSI establish a pledge or some similar agreement with that lienholder. The Hall margin account(s) should have been handled in the same manner, without discrimination, as all PFSI margin account customers in accordance with PFSI published Margin Account Agreement, Written Supervisory Procedures and Operations Manual.

b) **Penson's Duty of Care:** Each FINRA Member Firm while having a Regulatory required client care Suitability Standard also internally crafts a Duty of Care standard (FINRA 2110). The firm's "duty of care" standard prescribes that the firm is to act in the clients' best interest and not for the sole betterment of the Firm (Defense Exhibit 47,57,62). PFSI had responsibilities under FINRA Regulatory Notice 10-57 to ensure that the Hall or any customer's margin account as a result of illiquidity or impairment would not create risk to the member firm or customer. PFSI failed in this duty by accumulating Call Now and Retama securities in such quantities while knowing they were illiquid. PFSI acted in a manner inconsistent with Industry Standards by accepting the Call Now/Retama issues as adequate collateral for margin loan purposes. PFSI had an additional duty under Suitability and Know Your Customer (NYSE 405) to understand client Hall's financial situation and ability to support a margin account.

c) **Sell-Out Procedures:** PFSI harmed client Hall by not following Regulatory mandates as well as their own internal operating procedures (SEC Document Release No. 3697 para 15, 60). Also at some point PFSI accumulated, in Hall related accounts, quantities of shares of Call Now stock that exceeded the 5% threshold under SEC Reg. SK. Following NYSE 431 and Regulation T of the Federal Reserve Board PFSI should have insisted on a maintenance margin requirement of 40% equity at all times. In contravention of these requirements PFSI without taking affirmative corrective sell out action, caused to the detriment of Hall the equity in Hall's accounts to drop below Regulatory minimum maintenance of 40%; below Federal Call minimum of 25% and even into a negative equity position (SEC Release #3697 para 15). At the point where PFSI failed take corrective sell out action to protect the client's equity, PFSI became liable for the unmet Regulatory required calls under SEC 15c3. PFSI assumed the financial liability of the unmet calls arising in customer Hall's accounts. Similarly Hall could reasonably rely on the provisions of the PFSI margin agreement requiring PFSI sell out his account(s). If PFSI had followed their own margin policy and Regulatory mandates, Hall's position would have been sold out upon the event of Halls failure to meet his accounts first margin maintenance call.

d) **Penson Alternative Financing:** With my 35 years of industry experience, I have never been party to nor heard of an instance where a FINRA Member Firm arranges alternative financing, with an affiliate, for the purpose of and to the extent of "bailing out" a client's troubled margin account while considering an additional potential benefit of an unjust enrichment to the firm through an elevated interest rate, potential result of some legislative action and the use of carry interest. As evidenced by the Pendergraft testimony and documentary exhibits, one of the broker dealers affiliated entities, not a FINRA regulated firm, concluded that the Call Now and Retama securities could result in a windfall profit for the Penson group of companies (Defense Exhibit 47, 57, 55). By arranging the alternative financing, PFSI (the FINRA Member Firm) violated a number of FINRA Rules including: Rule 2330 (improper use of customer securities); Rule 2120 (use of Manipulative, Deceptive or Other Fraudulent Devices); Rule 2110 (Standards of

4

Commercial Honor and Principals of Trade).  PFSI and or its parent or affiliate directed customer Hall to supply additional shares of the troubled Call Now securities for collateral.  PFSI, while the Hall account was in "negative equity" (debit in the margin account was greater than the market value of the collateral), permitted an additional $1million to be paid out of Hall's account (defense exhibit 70).  Such a practice is totally inconsistent with securities industry practice, in violation of all margin related rules and guidance with the additional negative consequence of placing customer Hall, and PFSI, in a more grievous financial position. Penson affiliated entities, through a series of self-dealings, placed the firms' interest above that of client Hall.

**III Conclusion**

Based on the above and my review of the Hall margin account metrics, PFSI failed to act in a manner consistent with that of like firms in the community when faced with similar facts and circumstances. PFSI had a duty of care to Hall to protect Hall against Hall's failure to act. PFSI had a duty to minimize Hall's margin exposure by selling out the collateral prior to the accounts equity falling below 40% to 25% then to negative equity.  Had PFSI acted in an appropriate manner, Hall would have exited the accounts with a positive cash balance.  My conclusion is based on methodologies used by similar professionals in our community, rules of governing regulatory bodies and the duty of care owed by a BD to its clients in similar circumstances.

Respectfully Submitted:

W. Dennis Ferguson
October 14, 2016

5

**APPENDIX A**

ADDITIONAL DOCUMENT REVIEW

In preparation for this supplement I reviewed the following documents:

1.    Defense Exhibit 55
2.    Defense Exhibit 57
3.    FINRA Rule 2110
4.    FINA Rule 2330
5.    FINRA Rule 2120
6.    Defense Exhibit 47
7.    Defense Exhibit 70
8.    SEC Release No. 3697 September 17, 2015
9.    Pendergraft Investigative Testimony 10/16/2013
10.   Defense Exhibit 44
11.   FINRA Rule 2520
12.   NYSE Rule 431
13.   NYSE Rule 405
14.   FINRA RN 10-57
15.   Pendergraft Deposition dated 9/13/2016

APPENDIX B

## Summary

Over 40 years of experience in the securities industry including retail sales, operations/clearing, branch office supervision and management, retail sales management and broker dealer enterprise governance. Articulate with in depth knowledge of securities clearance and trade processing. Extensive experience with regulatory oversight through years of industry service on the regional and national committee level with NASAA, and NASD/FINRA Board of Governors.

## Licenses and Certifications (past and current)

Series 7      General Securities Agent
Series 24     General Securities Principal
Series 27     Financial and Operations Principal
Series 4      Registered Options Principal
Series 8      NYSE B.O.M.
Series 63     Uniform States Registration
MSRB Principal
Registered Options Principal
Certified Financial Planner (CFP)

## Employment History

2014 – Present    Capital Investment Group
Consultant to President on strategic issues regarding retail enterprise

2001 – 2014     President, Sterne Agee Clearing, Inc.
Vice Chairman Board of Directors
Boca Raton, Florida

Provide execution and clearing services for Introducing Broker Dealers, Prime Brokerage as well as Foreign Registrants. Developed processes, procedures and supervisory systems for the clearing enterprise.

9

1999 – 2001    Executive Vice President, Member Executive Committee,
Fiserv Correspondent Services, Inc.
Boca Raton, Florida

Provide execution and clearing services for Introducing Broker Dealers, Prime Brokerage as well as Foreign Registrants.

1983-2001 Executive Vice President, Board of Directors
    JW Genesis Financial Corp., Inc.
    Executive Vice President, Chief Operations Officer
    JW Genesis Clearing Corp., Inc.

Vertically integrated full service broker dealer.  Provide execution and Clearing services for Introducing Broker Dealers, Prime Brokerage, Commercial Bank brokerage activities and Non-NASD Securities Dealers. Developed processes and procedures covering all facets of the clearing activities for over 100 introducing broker dealers.

1980-1983   Senior Vice President, Principal, and Stockholder
Allen & Company of Florida
Boca Raton, Florida

1973-1980 Office Manager  and Area Vice President
Dean Witter Reynolds
Boca Raton, Florida


Professional Designations

Chairman FINRA Regulatory Policy Committee of Board of Governors (2014 - 2015)
Member FINRA Board of Governors (2006 – July 2015)
Chairman, FINRA National Adjudicatory Council (2007-2008)
FINRA National Adjudicatory Council (2005-2008)
Member, FINRA Financial Responsibility Committee (current)
 Member, FINRA Uniform Practice Committee (current)
Board Member, Securities Dealers Risk Purchasing Group, Inc.  (1998)
Securities Industry Association Clearing Firms Committee (current)(Chairman 1996)
Member, NASD National Membership Committee (1996)
Chairman, NASD District 7 Committee (1995)
Member, NASD Board of Governors Advisory Council (1995)
President, Board of Governors, Florida Securities Dealers Association (1995)
Chairman, Securities Industry Association Membership Committee (1994)
Charter Member, Gold Coast Financial Planners Association
Associate Member, Independent Bankers of America

10

NASD District 7 Committee (1992-1995)
Member, Florida Council on Economic Education

Military Service

1966-1969 US Army Signal Corps, attaining the rank of Captain.
        Stationed at the Pentagon, Washington, DC, and Karlsruhe, Germany.

Education

Graduate School Florida Atlantic University, Boca Raton, Florida
                        (attended, did not degree)
Undergraduate                Florida Southern College
        BS Economics                        Lakeland, Florida

APPENDIX C

12

List of prior testimony or depositions in which I participated during the last four (4) years

1.      United States District Court, Southern District of Florida
Case no. 0:15-cv-60334-WPD
Jyll Brink v. Raymond James & Associates, Inc.
Deposition January 18 2016