IN THE CIRCUIT COURT OF THE
15TH JUDICIAL CIRCUIT IN AND
FOR PALM BEACH COUNTY, FLORIDA

CHRISTOPHER HALL, an individual

    Plaintiff,

v.

WILLIAM P. MCNEER, III, an individual; and
SWEEZY INVESTMENTS, LLC, a Delaware
limited liability company,

    Defendants.

_____/

CIVIL DIVISION

CASE NO.:

2013 CA 001 958 XXXX

## VERIFIED COMPLAINT FOR TEMPORARY, PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF AND DAMAGES

Plaintiff, CHRISTOPHER HALL sues Defendants WILLIAM P. MCNEER, III and

SWEEZY INVESTMENTS, LLC ("Sweezy Investments") (collectively "Defendants"), and

alleges as follows:

### PARTIES, JURISDICTION, AND VENUE

1.     This is an action for injunctive relief and damages in excess of $15,000.00,

exclusive of interest, costs, and attorneys' fees.

2.     Upon information and belief, McNeer is a resident of Palm Beach County, Florida

and acts as an agent for Sweezy Investments.

3.     Upon information and belief, Sweezy Investments is a Delaware limited liability

company, with its principal place of business in Broward County, Florida.

4.     Mr. Hall is a resident of Bexar County, Texas.

5.     Pursuant to § 48.081, Sweezy is subject to the personal jurisdiction in this State

because it operates, conducts, engages in, or carries on a business or business venture in this

PX
82

State, maintains an office in this state and committed a tortious act within this state and/or because it conducts substantial and not isolated activities within this State.

6.    Pursuant to § 47.011, §§ 47.021 and 47.051, Florida Statutes, venue is proper before this Court because Defendant McNeer resides in Palm Beach County, Florida.

**COMMON ALLEGATIONS**

**THE RDC LOAN TRANSACTION**

7.    Mr. Hall and McNeer were good friends since 2002.

8.    Upon information and belief, McNeer formed Sweezy Investments in September 2010 and is its sole member. McNeer formed Sweezy Investments for the benefit of Mr. Hall to make a one-time loan to Retama Development Corporation ("RDC") in the amount of $1.6 million at maturity (the "RDC Loan"). *See* Affidavit of James Hurchalla attached hereto as Exhibit "A" at ¶ 4.

9.    Mr. Hall owned interests in a multifamily housing project which was sold in November 2010. *Id.* at ¶ 6. Mr. Hall received certain proceeds from his investment in the property pursuant to a settlement agreement. *Id.*

10.    On November 12, 2010, the majority of Mr. Hall's proceeds from the settlement agreement described in paragraph 9, the sum of $1,050,000, were sent via wire transfer to Mr. Hall's attorney, James Hurchalla. *Id.*

11.    At Mr. Hall's direction, the funds transferred to Mr. Hurchalla from the settlement were to be loaned to RDC for the purpose of funding the RDC Loan. *Id.* at ¶ 8. The beneficial owner of the funds was, and at all times was to remain, Mr. Hall, who was to receive the repayment of the RDC Loan in full, including interest on all his loaned monies. *Id.* at ¶¶ 4, 12.

2

**BROAD and CASSEL**

One Biscayne Tower, 21st Floor   2 South Biscayne Blvd.  Miami, Florida 33131-1811   305.373.9400

12.     The RDC Loan, which was made with Mr. Hall's monies, was recorded on Mr. Hurchalla's records as a loan from Mr. Hall to RDC. *Id.* at ¶ 8.

13.     McNeer and Mr. Hall share a confidential and fiduciary relationship because Mr. Hall entrusted McNeer to hold and protect Mr. Hall's funds and securities for the benefit of Mr. Hall and McNeer accepted that position of trust. *See id.* at ¶¶ 4, 12. The sole purpose of Sweezy Investments, as formed by McNeer, is to loan Mr. Hall's funds to RDC. *Id.* at ¶ 4.

14.     Sweezy Investments and McNeer agreed to return Mr. Hall's investment, plus interest, upon repayment of the RDC Loan pursuant to the Note, in exchange for Mr. Hall's funds to finance the RDC Loan. *See id.* at ¶¶ 4, 12.

15.     In reliance on Sweezy Investments and McNeer's representation and agreement, on December 17, 2010, Mr. Hall directed that Mr. Hurchalla transfer $962,503 of Mr. Hall's funds to **RDC** for the sole purpose of funding the RDC Loan. *See id.* at ¶ 8.

16.     Mr. Hall provided all of the funding to Sweezy Investments to allow it to extend the RDC Loan to RDC.  At the end of the term of the loan or repayment, all proceeds were to be paid to Mr. Hurchalla for the benefit of Mr. Hall.  *Id.* at ¶ 9.

17.     Pursuant to the Promissory Note executed by RDC on December 21, 2010, RDC is obligated to repay the RDC Loan in the amount of $1,600,000 which includes principal and interest, less any reduction for advance payment pursuant to Section 4 of the Note. *Id.* at ¶ 10.

18.     Sweezy Investments and RDC also entered into a Mortgage, Assignment of Rents and Security Agreement to secure the repayment of RDC's indebtedness pursuant to the Note. *Id.* at ¶ 11.

BROAD and CASSEL
One Biscayne Tower, 21st Floor   2 South Biscayne Blvd.  Miami, Florida 33131-1811   305.373.9400

19.     Mr. Hurchalla was designated as the authorized representative to receive RDC's repayment of the RDC Loan. *See id.* at ¶ 13. Mr. Hall's agreement to loan funds was based upon Mr. Hurchalla's acting as the authorized representative to receive repayment of the RDC Loan.

20.     Upon information and belief, McNeer removed Mr. Hurchalla as the authorized representative. McNeer has instructed the proceeds of the RDC Loan to be sent to someone other than Mr. Hurchalla. *Id.* McNeer has not disclosed the identity of the new authorized representative who will receive the RDC repayment funds.

21.     Mr. Hurchalla no longer receives any information about the RDC Loan or repayment. *Id.* at ¶¶ 13-14.

22.     Upon information and belief, RDC elected to repay the full amount of the Note, less any reduction for prepayment, on January 31, 2013 and February 1, 2013. *Id.* at ¶ 15.

23.     As of November 2012, McNeer has refused to return Mr. Hall's telephone calls or otherwise communicate with Mr. Hall.

24.     On January 30, 2013, Mr. Hall made written demand to McNeer and Sweezy Investments to confirm that they will hold all proceeds received from the RDC Loan for the benefit of Mr. Hall or authorize such funds to be distributed to Mr. Hurchalla. A true and correct copy of Mr. Hall's Demand is attached hereto as Exhibit "B".

25.     On January 31, 2013, Defendants' counsel responded to Mr. Hall's demand and: (i) refused to provide any information as to the RDC Loan and the substitute authorized representative, (ii) refused to acknowledge that they would not conceal, dissipate, transfer and/or abscond with the funds; and (iii) refused to acknowledge that Mr. Hall provided the funds for the RDC Loan and/or had any connection to the RDC Loan. A true and correct copy of Counsel for Defendants' Response is attached hereto as Exhibit "C".

BROAD and CASSEL
One Biscayne Tower, 21st Floor  2 South Biscayne Blvd.  Miami, Florida 33131-1811  305.373.9400

26.    All conditions precedent to this action have been performed, have occurred, or have been waived.

## COUNT I
### DECLARATORY RELIEF – RDC LOAN TRANSACTION
### Against Defendants Sweezy Investments, LLC
### and William P. McNeer, III

27.    Plaintiff Mr. Hall repeats and realleges the allegations contained in paragraphs 1 through 26 above, as if fully set forth herein.

28.    Sweezy Investments was formed to make the RDC Loan for the benefit of Mr. Hall.

29.    Mr. Hall provided all of the funding to Sweezy Investments to allow it to extend such financing to RDC for the benefit of Mr. Hall.

30.    Upon information and belief, McNeer provided no funds at any time to Sweezy Investments or RDC.

31.    RDC is obligated to repay the RDC Loan pursuant to the Note in the amount of $1.6 million, less any reduction for advance payment pursuant to Section 4 of the Note.

32.    Upon information and belief, RDC is repaying the RDC Loan on February 1, 2013.

33.    Upon information and belief, McNeer removed Mr. Hurchalla as the authorized representative to receive the proceeds of the RDC Loan and instructed the proceeds be sent to someone other than Mr. Hurchalla.  McNeer has not disclosed the identity of the new authorized representative who will receive the RDC Loan repayment.

34.    As such, Mr. Hurchalla will no longer receive the proceeds from the RDC Loan as contemplated when Mr. Hall forwarded his funds to Mr. Hurchalla in connection with the RDC Loan.

BROAD and CASSEL
One Biscayne Tower, 21st Floor  2 South Biscayne Blvd.  Miami, Florida 33131-1811  305.373.9400

35.     McNeer and Sweezy Investments have refused to provide assurances to Mr. Hall that they will return the funds received from the repayment of the RDC Loan to Mr. Hall as intended.   To the contrary, they have taken actions to improperly seize such funds for themselves.

36.     Based upon McNeer and Sweezy Investments' refusal to provide assurances to Mr. Hall and McNeer's assertion of dominion over the RDC Loan and Sweezy Investments, there is a bona fide, actual and present practical need for a declaration of the rights to the proceeds of the Note as a present controversy exists and the parties are unsure of their rights.

37.     Mr. Hall has a right to a declaration that he is entitled to all funds paid by RDC to Sweezy Investments pursuant to the Note which was financed with Mr. Hall's funds at his direction and for his benefit.

38.     Mr. Hall has no adequate remedy at  law that would afford full and complete relief

WHEREFORE, Christopher Hall demands judgment against Defendants in his favor declaring that he is entitled to all proceeds from the RDC Loan paid to Sweezy Investments, LLC pursuant to the Note dated December 21, 2010.

## COUNT II
### IMPOSITION OF A CONSTRUCTIVE TRUST AND PERMANENT INJUNCTION
### Against Sweezy Investments, LLC
### and William P. McNeer, III

39.     Plaintiff Mr. Hall repeats and realleges the allegations contained in paragraphs 1 through 26 above, as if fully set forth herein.

40.     Sweezy Investments, McNeer and Mr. Hall share a confidential relationship because Mr. Hall entrusted McNeer to hold and protect Mr. Hall's funds for the benefit of Mr. Hall and McNeer accepted that position of trust.

6

41.    Sweezy Investments and McNeer made a promise to Mr. Hall to return his investment, plus interest, upon repayment of the RDC Loan pursuant to the Note in exchange for Mr. Hall's funds to finance the loan.

42.    In reliance on their promise, Mr. Hall provided nearly $1 million dollars to McNeer and Sweezy Investments to fund the RDC Loan.

43.    Hall conferred a benefit on Sweezy Investments and McNeer who have knowledge of the benefits and voluntarily accepted and retained the benefit of the funds provided by Mr. Hall under the terms provided.

44.    Mr. Hall has demanded the repayment of such funds.  However, McNeer and Sweezy Investments refuse to communicate with Mr. Hall and have taken actions to seize the funds for themselves.  They refuse to acknowledge Mr. Hall's interest, repay the funds, identify the recipient of such funds or otherwise provide assurances to Mr. Hall.

45.    The circumstances are such that it would be inequitable for Sweezy Investments and McNeer to retain the benefits conferred on them by Mr. Hall without paying for the value of such benefit.

46.    Defendants are unjustly enriched through their wrongful and improper possession of Mr. Hall's funds.

47.    Such funds are the property of Mr. Hall and constitute a *res* upon which Plaintiff seeks the imposition of a constructive trust.

48.    Mr. Hall will be irreparably harmed in the event that Defendants are not enjoined and restrained from transferring, conveying, secreting or releasing these funds.

BROAD and CASSEL
One Biscayne Tower, 21st Floor   2 South Biscayne Blvd.   Miami, Florida 33131-1811   305.373.9400

49.   Defendants' actions were committed intentionally, willfully and for such purpose in such manner as to harm Mr. Hall and to violate and abuse the confidence and trust that Mr. Hall placed in Defendants.

50.   Unless enjoined, Defendants may transfer, convey, secret or release Mr. Hall's funds and Mr. Hall has no adequate remedy at law that would afford full and complete relief.

51.   Mr. Hall has a clear legal right to seek the issuance of a preliminary and permanent injunction against Defendants.

52.   The public interests also favor the entry of the requested relief so that valid financial arrangement are not rendered meaningless, agreements are upheld and money held for the benefit of others remains protected. The public interests further favor entry of the requested relief so that wrongdoers are not permitted to escape the consequences of their misconduct.

53.   The harm to Mr. Hall absent injunctive relief under these facts outweighs any potential harm to Sweezy Investments and McNeer if injunctive relief is granted.

54.   Injunctive relief will maintain the status quo pending this Court's determination of the parties' rights to such funds.

WHEREFORE, Christopher Hall respectfully requests that this Court: 1) exercise its equitable powers to impose a constructive trust on the RDC Loan repayment funds in Sweezy Investments, LLC and/or William P. McNeer, III's bank accounts and/or in bank accounts in which such funds are held on their behalf; 2) enter an Order enjoining and restraining Sweezy Investments, LLC and/or William P. McNeer, III, or anyone acting on their behalf, from transferring, conveying, secreting or releasing such funds in the above-identified accounts and 3) directing them to return the funds to Mr. Hall and/or to an account for the benefit of Mr. Hall and 4) grant such other relief as the court deems just, equitable and proper.

BROAD and CASSEL
One Biscayne Tower, 21st Floor   2 South Biscayne Blvd.   Miami, Florida 33131-1811   305.373.9400

## COUNT III
## UNJUST ENRICHMENT
### Against Sweezy Investments, LLC
### and William P. McNeer, III

55.     Plaintiff Mr. Hall repeats and realleges the allegations contained in paragraphs 1 through 26 and 40 through 54 above, as if fully set forth herein.

56.     Mr. Hall has conferred a benefit on Sweezy Investments and McNeer who have knowledge of the benefits in that Mr. Hall provided nearly $1 million dollars to Sweezy Investments.

57.     Sweezy Investments and McNeer voluntarily accepted and retained the benefit of the funds provided to Sweezy Investments for the sole purpose of financing the RDC Loan and it was agreed that Mr. Hall would receive the proceeds from RDC's repayment of the RDC Loan.

58.     It would be unjust to allow Sweezy Investments and/or McNeer to retain the benefits of the funds under the circumstances described herein.

WHEREFORE, Christopher Hall respectfully requests that this Court: 1) exercise its equitable powers to impose a constructive trust on the RDC Loan repayment funds in Sweezy Investments, LLC and/or William P. McNeer, III's bank accounts and/or in bank accounts in which such funds are held on their behalf; 2) enter an Order enjoining and restraining Sweezy Investments, LLC and/or William P. McNeer, III, or anyone acting on their behalf, from transferring, conveying, secreting or releasing such funds in the above-identified accounts and 3) directing them to return the funds to Mr. Hall and/or to an account for the benefit of Mr. Hall and 4) grant such other relief as the court deems just, equitable and proper.

9

BROAD and CASSEL

## COUNT IV
## BREACH OF FIDUCIARY DUTY
### Against Sweezy Investments, LLC and William P. McNeer, III

59.     Plaintiff Mr. Hall repeats and realleges the allegations contained in paragraphs 1 through 26 and 40 through 54 above, as if fully set forth herein.

60.     Sweezy Investments and McNeer share a confidential and fiduciary relationship with Mr. Hall because Mr. Hall entrusted Sweezy Investments and McNeer to hold and protect Mr. Hall's funds and securities for the benefit of Mr. Hall and Sweezy Investments and McNeer accepted such positions of trust and confidence.

61.     Sweezy Investments and McNeer have a fiduciary duty to Mr. Hall to remit the proceeds of the repayment of the RDC Loan at the time of repayment to Mr. Hall.

62.     Sweezy Investments and McNeer breached their fiduciary duty to Mr. Hall when they changed the authorized representative to receive such funds. They also breached their fiduciary duty by refusing to communicate with Mr. Hall and refusing to repay the funds, identify the recipient of such funds or otherwise provide assurances to Mr. Hall that such funds will be repaid.

63.     As a result of Sweezy Investments and McNeer's breach of fiduciary duty, Mr. Hall has been damaged.

WHEREFORE, Christopher Hall respectfully requests that this Court: 1) exercise its equitable powers to impose a constructive trust on the RDC Loan repayment funds in Sweezy Investments, LLC and/or William P. McNeer, III's bank accounts and/or in bank accounts in which such funds are held on their behalf; 2) enter an Order enjoining and restraining Sweezy Investments, LLC and/or William P. McNeer, III, or anyone acting on their behalf, from transferring, conveying, secreting or releasing such funds in the above-identified accounts and 3)

10

BROAD and CASSEL

directing them to return the funds to Mr. Hall and/or to an account for the benefit of Mr. Hall and

4) grant such other relief as the court deems just, equitable and proper.

## COUNT V
### CONVERSION – RDC LOAN TRANSACTION
### Against Sweezy Investments, LLC
### and William P. McNeer, III

64.     Plaintiff Christopher Hall repeats and realleges the allegations contained in paragraphs 1 through 26 and 40 through 54 above, as if fully set forth herein.

65.     Mr. Hall provided nearly $1 million to Sweezy Investments and McNeer to fund the RDC Loan with the agreement that Mr. Hall was to receive the proceeds of the RDC Loan.

66.     Mr. Hall has demanded the repayment of such funds. However, McNeer and Sweezy Investments refuse to communicate with Mr. Hall and have taken actions to seize the funds for themselves. They refuse to repay the funds, identify the recipient of such funds or otherwise provide assurances to Mr. Hall.

67.     McNeer and Sweezy Investments have improperly exerted dominion that is inconsistent with Mr. Hall's rights.

68.     As a result of Sweezy Investments and McNeer's conversion, Mr. Hall has been damaged.

WHEREFORE, Christopher Hall respectfully requests that this Court: 1) exercise its equitable powers to impose a constructive trust on the RDC Loan repayment funds in Sweezy Investments, LLC and/or William P. McNeer, III's bank accounts and/or in bank accounts in which such funds are held on their behalf; 2) enter an Order enjoining and restraining Sweezy Investments, LLC and/or William P. McNeer, III, or anyone acting on their behalf, from transferring, conveying, secreting or releasing such funds in the above-identified accounts and 3)

BROAD and CASSEL
One Biscayne Tower, 21st Floor   2 South Biscayne Blvd.   Miami, Florida 33131-1811   305.373.9400

directing them to return the funds to Mr. Hall and/or to an account for the benefit of Mr. Hall and

4) grant such other relief as the court deems just, equitable and proper.

### COUNT VI
### BREACH OF CONTRACT - INJUNCTION
### Against Sweezy Investments, LLC
### and William P. McNeer, III

69.      Plaintiff Christopher Hall repeats and realleges the allegations contained in

paragraphs 1 through 26 and 48 through 54 above, as if fully set forth herein.

70.      Sweezy Investments and McNeer agreed to return Mr. Hall's investment, plus

interest, upon repayment of the RDC Loan pursuant to the Note, in exchange for Mr. Hall's

funds to finance the RDC Loan.

71.      In performance of the parties' agreement, Mr. Hall funded the RDC Loan.

72.      Mr. Hall has demanded the repayment of such funds.  However, in an anticipatory

repudiation and material breach of the parties' agreement, McNeer and Sweezy Investments

refuse to communicate with Mr. Hall and have taken actions to seize the funds for themselves

including changing the authorized representative to receive such funds.

73.      McNeer and Sweezy Investments also materially breached the parties' agreement

by refusing to communicate with Mr. Hall and refusing to repay the funds, identify the recipient

of such funds or otherwise provide assurances to Mr. Hall that such funds will be repaid.

74.      As a result of McNeer and Sweezy Investments' anticipatory repudiation and

material breach of the agreement, Mr. Hall has been significantly damaged.

WHEREFORE, Christopher Hall respectfully requests that this Court: 1) exercise its

equitable powers to impose a constructive trust on the RDC Loan repayment funds in Sweezy

Investments, LLC and/or William P. McNeer, III's bank accounts and/or in bank accounts in

which such funds are held on their behalf; 2) enter an Order enjoining and restraining Sweezy

BROAD and CASSEL
One Biscayne Tower, 21st Floor   2 South Biscayne Blvd.   Miami, Florida 33131-1811   305.373.9400

Investments, LLC and/or William P. McNeer, III, or anyone acting on their behalf, from transferring, conveying, secreting or releasing such funds in the above-identified accounts and 3) directing them to return the funds to Mr. Hall and/or to an account for the benefit of Mr. Hall and 4) grant such other relief as the court deems just, equitable and proper.

**COUNT VII**
**BREACH OF CONTRACT - DAMAGES**
**Against Sweezy Investments, LLC**
**and William P. McNeer, III**

75.     Plaintiff Christopher Hall repeats and realleges the allegations contained in paragraphs 1 through 26 above, as if fully set forth herein.

76.     Sweezy Investments and McNeer agreed to return Mr. Hall's investment, plus interest, upon repayment of the RDC Loan pursuant to the Note, in exchange for Mr. Hall's funds to finance the RDC Loan.

77.     In performance of the parties' agreement, Mr. Hall funded the RDC Loan.

78.     Mr. Hall has demanded the repayment of such funds. However, in an anticipatory repudiation and material breach of the parties' agreement, McNeer and Sweezy Investments refuse to communicate with Mr. Hall and have taken actions to seize the funds for themselves including changing the authorized representative to receive such funds.

79.     McNeer and Sweezy Investments also materially breached the parties' agreement by refusing to communicate with Mr. Hall and refusing to repay the funds, identify the recipient of such funds or otherwise provide assurances to Mr. Hall that such funds will be repaid.

80.     As a result of McNeer and Sweezy Investments' anticipatory repudiation and material breach of the agreement, Mr. Hall has been significantly damaged.

13

**BROAD and CASSEL**
One Biscayne Tower, 21st Floor   2 South Biscayne Blvd.  Miami, Florida 33131-1811  305.373.9400

WHEREFORE, Christopher Hall respectfully requests that the Court enter judgment against Sweezy Investments, LLC and William P. McNeer, III for damages and grant such further relief as the Court deems just and proper.

## COUNT VIII
## FRAUDULENT MISREPRESENTATION
### Against Sweezy Investments, LLC
### and William P. McNeer, III

81.    Plaintiff Christopher Hall repeats and realleges the allegations contained in paragraphs 1 through 26 above, as if fully set forth herein.

82.    McNeer and Sweezy Investments, through McNeer, fraudulently misrepresented to Mr. Hall, prior to and at the time that Mr. Hall funded the RDC Loan, that the proceeds from the repayment of the RDC Loan at the time of repayment were to be distributed solely to Mr. Hall.

83.    Sweezy Investments and McNeer knew at the time of their material misrepresentation that Sweezy Investments and McNeer never intended to return the proceeds of the RDC Loan to Mr. Hall.

84.    Sweezy Investments and McNeer intended for Mr. Hall to rely, and Mr. Hall did in fact rely, upon their material misrepresentations, as evidenced by Mr. Hall's transfer of approximately $1 million to RDC to fund the RDC Loan.

85.    Mr. Hall has been damaged as a direct result of Sweezy Investments and McNeer's fraudulent misrepresentations.

BROAD and CASSEL
One Biscayne Tower, 21st Floor   2 South Biscayne Blvd.  Miami, Florida 33131-1811   305.373.9400

WHEREFORE, Christopher Hall respectfully requests that the Court enter judgment against Sweezy Investments, LLC and William P. McNeer, III for damages and grant such further relief as the Court deems just and proper.

Respectfully submitted,

**BROAD AND CASSEL**
Attorneys for Plaintiff Christopher Hall
One Biscayne Tower, 21st Floor
2 South Biscayne Boulevard
Miami, Florida 33131
Telephone: (305)373-9467
Facsimile: (305) 373-6387

By: _____
Daniel S. Newman, P.A.
Florida Bar No. 962767
E-Mail: DNewman@BroadandCassel.com
Lauren Deutch, Esq.
Florida Bar No. 015541
E-Mail: LDeutch@BroadandCassel.com

BROAD and CASSEL
One Biscayne Tower, 21st Floor  2 South Biscayne Blvd.  Miami, Florida  33131-1811   305.373.9400

PAGE 1/1 · RCVD AT 2/1/2013 4:01:28 PM [Eastern Standard Time] · SVR:0 · DNIS:3389 · CSID:2102671861 · DURATION (mm-ss):00-52)

## VERIFICATION

STATE OF _Texas_        )
                        ) SS
COUNTY OF _Bexar_       )

_____
Christopher Hall

SWORN TO AND SUBSCRIBED before me this 1st day of February, 2013, by Christopher Hall, who is personally known to me or who has produced _Florida driver's license_ as identification.

_____
Notary Public
State of _Texas_
_Adrienne Denise Edwards_
(Typed Name of Notary)

My Commission Expires: _10-16-2013_



ADRIENNE DENISE EDWARDS
My Commission Expires
October 16, 2013

**BROAD and CASSEL**
One Biscayne Tower, 21st Floor  2 South Biscayne Blvd.  Miami, Florida 33131-1811  305.373.9400

### AFFIDAVIT OF
### JAMES HURCHALLA

STATE OF FLORIDA      )
                           ) SS

COUNTY OF BROWARD    )

    BEFORE ME, the undersigned authority, personally appeared James Hurchalla, affiant, who, after being first duly sworn, deposes and states as follows:

    1.    My name is James Hurchalla. I am over the age of eighteen years of age and competent to testify to the matters set forth in this Affidavit. I have personal knowledge of the matters set forth in this Affidavit.

    2.    I make this Affidavit in connection with Christopher Hall's Verified Complaint for Injunctive Relief and Damages against William P. McNeer, III and Sweezy Investments, LLC.

    3.    From approximately 2005 through 2012, I have been counsel for Christopher Hall ("Mr. Hall"). During the period of time I served as his counsel, I maintained funds for Mr. Hall in my trust account, into which funds were received and disbursed. At times, Mr. Hall would allow William P. McNeer III ("McNeer") to authorize the disbursement of certain funds on his behalf. Mr. Hall and McNeer were very close friends.

    4.    In September, 2010, McNeer formed Sweezy Investments, LLC ("Sweezy"). Mr. Hall told me, and McNeer confirmed, that Hall and McNeer agreed that Sweezy was formed for the benefit of Mr. Hall in order for Mr. Hall to make a one-time loan to RDC that would pay back $1.6 million at maturity ("RDC Loan").

    5.    I prepared certain loan documents and a Texas title company closed the transaction for Sweezy.



EXHIBIT

"A"

6.     Mr. Hall owned an interest in a multi-family housing project which was sold in November, 2010.  On November 12, 2010, I received into my trust account $1,050,000.00 in proceeds for the benefit of Mr. Hall from a settlement agreement relating to this project.

7.     At Mr. Hall's direction, most of the $1,050,000.00 received was to be loaned to RDC.  The beneficial owner of the funds was, at all times, to remain Mr. Hall, who was to receive the proceeds from the repayment of the RDC Loan, including interest on the loaned monies.

8.     Mr. Hall's funds were lent through a loan from Sweezy, the entity formed by McNeer.  On December 17, 2010, I was directed by Mr. Hall to transfer $962,503.04 of his funds to RDC for the purpose of funding the RDC Loan.  The transaction was recorded in my journal as a loan from Mr. Hall to Sweezy.  A copy of the relevant journal page is attached hereto as Exhibit "A".

9.     Mr. Hall provided all the funding for the RDC Loan made through Sweezy.

10.    Pursuant to the Promissory Note executed by RDC on December 21, 2010, RDC is obligated to pay the amount of $1.6 million in satisfaction of the RDC Loan, which includes principal and interest, less any reduction for advance payment pursuant to Section 4 of the Note.  A true and correct copy of the December 21, 2010 Note is attached hereto as Exhibit "B".

11.    In connection with the transaction, Sweezy and RDC also entered into a Mortgage, Assignment of Rents and Security Agreement to secure the repayment of RDC's indebtedness pursuant to the Note.  A true and correct copy of the December 21, 2010 Mortgage, Assignment of Rents and Security Agreement is attached hereto as Exhibit "C".

12.    At the time of the RDC Loan transaction, both McNeer and Mr. Hall indicated that the proceeds from the repayment of the RDC Loan at the time of repayment were to be distributed solely to Mr. Hall.

13.    Upon information and belief, McNeer removed me as the authorized representative to receive repayment of the proceeds from the RDC Loan. He has also told me I am no longer authorized to act for Sweezy in connection with this transaction.

14.    Further, I no longer receive any information about the RDC loan or repayment.

15.    Upon information and belief, RDC has elected to prepay the full amount of the Note, less any reduction for prepayment, on January 31, 2013 and February 1, 2013.

FURTHER AFFIANT SAYETH NAUGHT.

_____
JAMES HURCHALLA

SWORN TO AND SUBSCRIBED before me this 1 day of February, 2013, by James Hurchalla, who is personally known to me or who has produced as identification.

Notary Public
State of Florida

_____
(Typed Name of Notary)

My Commission Expires: _____

Notary Public State of Florida
Ryan Jarkowski
My Commission EE 189293
Expires 04/15/2016

Page 2

## Chris Hall
### Balance Sheet Detail
As of July 29, 2012

| Type | Date | Num | Name | Memo | Clr | Split | Amount | Balance |
|------|------|-----|------|------|-----|-------|--------|---------|
| Check | 12/17/2010 | wt | Loan Chris St... | | | Hall | -962,503.0D | |
| Total Checking/Savings | | | | | | | | |

EXHIBIT

"A"

InterestFirst ℠ NOTE

| December 21, 2010 | Selma, | Texas |
|---|---|---|
| [Date] | [City] | [State] |

One Retama Parkway, Selma, TX 78154
[Property Address]

1.   BORROWER'S PROMISE TO PAY

In return for a loan that Retama Development Corporation, a Texas local government corporation created by the City of Selma, Texas, pursuant to Section 4A of Article 5520, Texas Revised Civil Statutes Annotated ("Borrower") has received, Borrower promises to pay U.S. $1,600,000.00 (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is SWEEZY INVESTMENTS, LLC. Borrower will make all payments under this Note in the form of cash, check or money order.

Borrower understands that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder." Lender shall provide Borrower with no less than ten (10) days prior written notice of the transfer of the Note.

2.   INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. Borrower will pay interest at a yearly rate of 12.00%.

The interest rate required by this Section 2 is the rate Borrower will pay before any default described in Section 6(B) of this Note.

3.   PAYMENTS

(A)    Time and Place of Payments

Borrower will make a payment every month. This payment will be for interest only for the first 35  months, and then will consist of principal and interest.

Borrower will make the monthly payment on the 1st day of each month beginning on February 1, 2011  Borrower will make these payments every month until Borrower has paid all of the principal and interest and any other charges described below that Borrower may owe under this Note.  Each monthly payment will be applied as of its scheduled due date and if the payment includes both principal and interest it will be applied to interest before Principal.  If, on January 1, 2014  Borrower still owes amounts under this Note, Borrower will pay those amounts in full on that date, which is called the "Maturity Date."

Borrower will make the monthly payments at 888 E Las Olas Boulevard, Fort Lauderdale, FL 33301 or at a different place if required by the Note Holder.  Note Holder shall provide Borrower at least ten (10) days prior written notice of any change of address for payment.

(B)    Amount of Monthly Payments

The monthly payment will be in the amount of U.S. $16,000.00 for the first 35 months of this Note, and thereafter will be in the amount of U.S. $1,616,000.00 . The Note Holder will notify Borrower prior to the date of change in monthly payment.

4.   BORROWER'S RIGHT TO PREPAY

Borrower has the right to make payments of Principal at any time before they are due.  A payment of Principal only is known as a "Prepayment." When Borrower makes a Prepayment, Borrower will tell the Note Holder in writing that Borrower is doing so.  Borrower may not designate a payment as a Prepayment if Borrower has not made all the monthly payments due under the Note.

Borrower may make a full Prepayment or partial Prepayments without paying a Prepayment charge.  The Note Holder will use the Prepayments to reduce the amount of Principal that Borrower owes under this Note.  However, the Note Holder may apply the Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying the Prepayment to reduce the Principal amount of the Note.  If Borrower makes a partial Prepayment, there will be no changes in the due date of the monthly payment unless the Note Holder agrees in writing to those changes.  However, if the partial Prepayment is made during the period when the monthly payments consist only of interest, the amount of the monthly payment will decrease for the remainder of the term when the payments consist only of interest as well as during the time that the payments consist of principal and interest.  If the partial Prepayment is made during the period when the payments consist of principal and interest, the amount of the monthly payment will not decrease; however, the principal and the interest required under this Note will be paid prior to the Maturity Date.

5.   LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower.  The Note Holder may choose to make this refund by reducing the Principal Borrower owes under this Note or by making a direct payment to Borrower. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

[The balance of this page is intentionally left blank.]

(L & B 07335/00002/L9477082.DOC)

EXHIBIT

"B"

Page 3

6.    BORROWER'S FAILURE TO PAY AS REQUIRED

(A)    Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of 5 calendar days after the date it is due, Borrower will pay a late charge to the Note Holder. The amount of the charge will be 10 % of the overdue payment of interest and/or principal and interest. Borrower will pay this late charge promptly but only once on each late payment. Since Note Holder is maintaining an interest reserve equal to all interest payments, no late charge will be assessed for any payment due prior to the Maturity Date.

(B)    Default

If Borrower does not pay the full amount of each monthly payment on the date it is due, Borrower will be in default upon Borrower's failure to pay the full amount after ten (10) days written notice from Note Holder, provided that no payment default will occur or be declared so long as there are funds in the interest reserve held by Note Holder to cover such payment.

(C)    Notice of Default

If Borrower is in default, the Note Holder may send Borrower a written notice telling Borrower that if Borrower does not pay the overdue amount by a certain date, the Note Holder may require Borrower to pay immediately the full amount of Principal which has not been paid and all the interest that Borrower owes on that amount. That date must be at least 30 days after the date on which the notice is actually received by Borrower.

(D)    No Waiver By Note Holder

Even if, at a time when Borrower is in default, the Note Holder does not require Borrower to pay immediately in full as described above, the Note Holder will still have the right to do so if Borrower is in default at a later time.

(E)    Payment of Note Holder's Costs and Expenses

If the Note Holder has required Borrower to pay immediately in full as described above, the Note Holder will have the right to be paid back by Borrower for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

(F)    Default Interest Rate: The Default Interest Rate shall be the maximum amount allowable under Texas law.

7.    GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to Borrower under this Note will be given by delivering it or by mailing it by first class mail, return receipt requested, to Borrower at the Property Address above or at a different address if Borrower give the Note Holder a notice of the different address. Said notice will be deemed received upon Borrower's actual receipt of said notice.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by certified mail, return receipt requested, to the Note Holder at the address stated in Section 3(A) above or at a different address if Borrower is given a notice of that different address.

8.    OBLIGATIONS OF PERSONS UNDER THIS NOTE

This Note is an obligation of the Borrower, not the individual signing.

9.    WAIVERS

Borrower waives the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

10.    UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if Borrower does not keep the promises which Borrower makes in this Note. That Security Instrument describes how and under what conditions Borrower may be required to make immediate payment in full of all amounts Borrower owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

[The balance of this page is intentionally left blank.]

(L & B 6733\00020\L0477362.DOC)

11.    DOCUMENTARY TAX
The state documentary tax due on this Note has been paid on the mortgage securing this indebtedness.

BORROWER:

RETAMA DEVELOPMENT CORPORATION
a Texas local government corporation created by the City of Selma, Texas, pursuant to Section 4A of Article 5281, Texas Revised Civil Statutes Annotated

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

Retama Development Corporation, a Texas local government corporation

By: _Gary Baber_

Gary Baber, President

[The balance of this page is intentionally left blank.]

(L & B 07335/0002/L0477021.DOC)

# MORTGAGE, ASSIGNMENT OF RENTS
# AND SECURITY AGREEMENT

## (TEXAS)

THIS OPEN-END MORTGAGE, ASSIGNMENT OF RENTS, AND SECURITY AGREEMENT (the "Instrument") is made to be effective December 21, 2010, between Retama Development Corporation, a Texas local government corporation created by the City of Selma, Texas, pursuant to Section 4A of Article 5528l, Texas Revised Civil Statutes Annotated, whose address is 1 Retama Pkwy, Selma, TX, 78154, as mortgagor ("Borrower") and SWEEZY INVESTMENTS, LLC, whose address is 888 E Las Olas Boulevard, St. 200, Fort Lauderdale, FL 33301, as mortgagee ("Lender").   Borrower's organizational identification number is _J2523376__

Borrower is indebted to Lender in the principal amount of ONE MILLION SIX HUNDRED THOUSAND AND 00/100 DOLLARS (US $1,600,000.00), as evidenced by Borrower's Promissory Note payable to Lender, dated as of the date of this Instrument, and maturing on January 1, 2014 (the "Maturity Date").

TO SECURE TO LENDER the repayment of the Indebtedness, and all renewals, extensions and modifications of the Indebtedness, and the performance of the covenants and agreements of Borrower contained in the Loan Documents, Borrower mortgages, warrants, grants, conveys and assigns to Lender, the Mortgaged Property, including the Land located in Bexar County, State of Texas and described in Exhibit A attached to this Instrument.

Borrower represents and warrants that Borrower is lawfully seized of the Mortgaged Property and has the right, power and authority to grant, convey and assign the Mortgaged Property, and that the Mortgaged Property is unencumbered except as shown on the schedule of exceptions to coverage in the title policy issued to and accepted by Lender contemporaneously with the execution and recordation of this Instrument and insuring Lender's interest in the Mortgaged Property (the "Schedule of Title Exceptions").   Borrower covenants that Borrower will warrant and defend generally the title to the Mortgaged Property against all claims and demands, subject to any easements and restrictions listed in the Schedule of Title Exceptions.

Covenants.   In consideration of the mutual promises set forth in this Instrument, Borrower and Lender covenant and agree as follows:

1. DEFINITIONS. The following terms, when used in this Instrument (including when used in the above recitals), shall have the following meanings:

(a) "Assignment" means, collectively, the provisions of Sections 3 and 4 of this Instrument relating to the assignment of rents and leases affecting the Mortgaged Property.

(b) "Attorneys' Fees and Costs" means fees and out-of-pocket costs of Lender's and Loan Servicer's attorneys, as applicable, including reasonable costs of Lender's and Loan Servicer's in-house counsel, support staff costs, computerized research, telephone and facsimile transmission expenses, postage, and reasonable court costs.

(c) "Borrower" means all persons or entities identified as "Borrower" in the first paragraph of this Instrument, together with their successors and assigns.

(d) "Borrower Certificate" means that certain Borrower Certificate dated the same date as this Instrument, executed by Borrower in favor of Lender.

(e) "Collateral Agreement" means any separate agreement between Borrower and Lender for the purpose of establishing replacement reserves for the Mortgaged Property, establishing a fund to assure the completion of repairs or improvements specified in that agreement, or assuring reduction of the outstanding principal balance of the Indebtedness if the occupancy of or income from the Mortgaged Property does not increase to a level specified in that agreement, or any other agreement or agreements between Borrower and Lender which provide for the establishment of any other fund, reserve or account.

(f) "Controlling Entity" means an entity which owns, directly or indirectly through one or more intermediaries, (A) a general partnership interest or a Controlling Interest of the limited partnership interests in Borrower (if Borrower is a partnership or joint venture), (B) a manager's interest in Borrower or a Controlling Interest of the ownership or membership interests in Borrower (if Borrower is a limited liability company), or (C) a Controlling Interest of any class of voting stock of Borrower (if Borrower is a corporation).

(g) "Controlling Interest" means (i) 51 percent or more of the ownership interests in an entity, or (ii) a percentage ownership interest in an entity of less than 51 percent, if the owner(s) of that interest actually direct(s) the business and affairs of the entity without the requirement of consent of any other party.

(L & B 07336/0002/L0477082.DOC)



(h)   "Environmental Indemnity" means that certain Environmental Indemnity Agreement dated the same date as this Instrument, executed by Borrower, as Indemnitor, in favor of Lender, as Indemnitee.

(i)   "Environmental Permit" means any permit, license, or other authorization issued under any Hazardous Materials Law with respect to any activities or businesses conducted on or in relation to the Mortgaged Property.

(j)   "Event of Default" means the occurrence of any event listed in Section 22.

(k)   "Fixtures" means all property owned by Borrower which is so attached to the Land or the Improvements as to constitute a fixture under applicable law, including: machinery, equipment, engines, boilers, incinerators, installed building materials; systems and equipment for the purpose of supplying or distributing heating, cooling, electricity, gas, water, air, or light; antennas, cable, wiring and conduits used in connection with radio, television, security, fire prevention, or fire detection or otherwise used to carry electronic signals; telephone systems and equipment, elevators and related machinery and equipment; fire detection, prevention and extinguishing systems and apparatus; security and access control systems and apparatus; plumbing systems; water heaters, ranges, stoves, microwave ovens, refrigerators, dishwashers, garbage disposers, washers, dryers and other appliances; light fixtures, awnings, storm windows and storm doors; pictures, screens, blinds, shades, curtains and curtain rods; mirrors; cabinets, paneling; rugs and floor and wall coverings; fences, trees and plants; swimming pools; and exercise equipment.

(l)   "Governmental Authority" means any board, commission, department or body of any municipal, county, state or federal governmental unit, or any subdivision of any of them, that has or acquires jurisdiction over the Mortgaged Property or the use, operation or improvement of the Mortgaged Property.

(m)   "Hazard Insurance" is defined in Section 19.

(n)   "Hazardous Materials" means petroleum and petroleum products and compounds containing them, including gasoline, diesel fuel and oil; explosives; flammable materials; radioactive materials; polychlorinated biphenyls ("PCBs") and compounds containing them; lead and lead-based paint; asbestos or asbestos-containing materials in any form that is or could become friable; underground or above-ground storage tanks, whether empty or containing any substance; any substance the presence of which on the Mortgaged Property is prohibited by any federal, state or local authority; any substance that requires special handling; and any other material or substance now or in the future defined as a "hazardous substance," "hazardous material," "hazardous waste," "toxic substance," "toxic pollutant," "contaminant," or "pollutant" within the meaning of any Hazardous Materials Law.

(o)   "Hazardous Materials Laws" means all federal, state, and local laws, ordinances and regulations and standards, rules, policies and other governmental requirements, administrative rulings and court judgments and decrees in effect now or in the future and including all amendments, that relate to Hazardous Materials or the protection of human health or the environment and apply to Borrower or to the Mortgaged Property. Hazardous Materials Laws include, but are not limited to, the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. Section 9601, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., the Toxic Substance Control Act, 15 U.S.C. Section 2601, et seq., the Clean Water Act, 33 U.S.C. Section 1251, et seq., the Emergency Planning and Community Right-to-Know Act of 1986, as amended, the Solid Waste Disposal Act, as amended, the Clean Air Act, as amended, the Safe Drinking Water Act, as amended, the Occupational Safety and Health Act, as amended, and the Hazardous Materials Transportation Act, 49 U.S.C. Section 5101, and their state analogs.

(p)   [Intentionally Omitted.]

(q)   "Improvements" means the buildings, structures, improvements, and alterations now constructed or at any time in the future constructed or placed upon the Land, including any future replacements and additions.

(r)   "Indebtedness" means the principal of, interest at the fixed or variable rate set forth in the Note on, and all other amounts due at any time under, the Note, this Instrument or any other Loan Document, including late charges, default interest, and advances as provided in Section 12 to protect the security of this Instrument.

(s)   [Intentionally Omitted].

(t)   "Land" means the land described in Exhibit A.

(u)   "Leases" means all present and future leases, subleases, licenses, concessions or grants or other possessory interests now or hereafter in force, whether oral or written, covering or affecting the Mortgaged Property, or any portion of the Mortgaged Property, and all modifications, extensions or renewals.

(v)   "Lender" means the entity identified as "Lender" in the first paragraph of this Instrument, or any subsequent holder of the Note.

(w)   "Loan Documents" means the Note, this Instrument, the Assignment, the Borrower Certificate, the Environmental Indemnity, all guaranties, all indemnity agreements, all Collateral Agreements, and any other documents now or in the future executed by Borrower, any guarantor or any other person in connection with the loan evidenced by the Note, as such documents may be amended from time to time.

(x)   "Loan Servicer" means the entity that from time to time is designated by Lender to collect payments and deposits and receive notices under the Note, this Instrument and any other Loan Document, and otherwise to service the loan

(IL & B 07356/0002/LD477082.DOC)

*MPB*

evidenced by the Note for the benefit of Lender. Unless Borrower receives ten (10) days prior written notice to the contrary, the Loan Servicer is the entity identified as "Lender" in the first paragraph of this Instrument.

(y)      "Mortgaged Property" means all of Borrower's present and future right, title and interest in and to all of the following: (1) the Land; (2) the Improvements; (3) the Fixtures; (4) all current and future rights, including air rights, development rights, zoning rights and other similar rights or interests, easements, tenements, rights-of-way, strips and gores of land, streets, alleys, roads, sewer rights, waters, watercourses, and appurtenances related to or benefiting the Land or the Improvements, or both, and all rights-of-way, streets, alleys and roads which may have been or may in the future be vacated; (5) all proceeds paid or to be paid by any insurer of the Land, the Improvements, the Fixtures, or any other part of the Mortgaged Property, whether or not Borrower obtained the insurance pursuant to Lender's requirement; (6) all awards, payments and other compensation made or to be made by any municipal, state or federal authority with respect to the Land, the Improvements, the Fixtures, or any other part of the Mortgaged Property, including any awards or settlements resulting from condemnation proceedings or the total or partial taking of the Land, the Improvements, the Fixtures, or any other part of the Mortgaged Property under the power of eminent domain or otherwise and including any conveyance in lieu thereof; (7) all contracts, options and other agreements for the sale of the Land, the Improvements, the Fixtures, or any other part of the Mortgaged Property entered into by Borrower now or in the future, including cash or securities deposited to secure performance by parties of their obligations; (8) all proceeds from the conversion, voluntary or involuntary, of any of the above into cash or liquidated claims, and the right to collect such proceeds; (9) all Rents and Leases; (10) all earnings, royalties, accounts receivable, issues and profits from the Land, the Improvements or any other part of the Mortgaged Property, and all undisbursed proceeds of the loan secured by this Instrument and, if Borrower is a cooperative housing corporation, maintenance charges or assessments payable by shareholders or residents; (11) all Imposition Deposits; (12) all refunds or rebates of Impositions by any municipal, state or federal authority or insurance company (other than refunds applicable to periods before the real property tax year in which this Instrument is dated); and (13) all tenant security deposits which have not been forfeited by any tenant under any Lease and any bond or other security in lieu of such deposits..

(z)      "Note" means the Promissory Note described on page 1 of this Instrument, including all schedules, riders, allonges and addenda, as such Promissory Note may be amended from time to time. The Note evidences a loan in the maximum sum of $1,600,000.00.

(aa)     "O&M Program" shall have the meaning as defined in the Environmental Indemnity.

(bb)     [Intentionally Omitted].

(cc)     "Property Jurisdiction" is defined in Section 30(e).

(dd)     "Rents" means all rents, revenues and other income of the Land or the Improvements, including parking fees and vending machine income and fees and charges for other services provided at the Mortgaged Property, whether now due, past due, or to become due, and deposits forfeited by tenants.

(ee)     "Taxes" means all taxes, assessments, vault rentals and other charges, if any, general, special or otherwise, including all assessments for schools, public betterments and general or local improvements, which are levied, assessed or imposed by any public authority or quasi-public authority, and which, if not paid, will become a lien, on the Land or the Improvements.

(ff)     "Transfer" is defined in Section 21.

2.       UNIFORM COMMERCIAL CODE SECURITY AGREEMENT.

(a)      This Instrument is also a security agreement under the Uniform Commercial Code for any of the Mortgaged Property which, under applicable law, may be subjected to a security interest under the Uniform Commercial Code, whether such Mortgaged Property is owned now or acquired in the future, and all products and cash and non-cash proceeds thereof (collectively, "UCC Collateral"), and Borrower hereby grants to Lender a security interest in the UCC Collateral. Borrower hereby authorizes Lender to prepare and file financing statements, continuation statements and financing statement amendments in such form as Lender may require to perfect or continue the perfection of this security interest and Borrower agrees, if Lender so requests, to execute and deliver to Lender such financing statements, continuation statements and amendments. Borrower shall pay all filing costs and all costs and expenses of any record searches for financing statements and/or amendments that Lender may require. Unless Borrower gives Notice to Lender within 30 days after the occurrence of any of the following, and executes and delivers to Lender modifications or supplements of this Instrument (and any financing statement which may be filed in connection with this Instrument) as Lender may require, Borrower shall not (i) change its name, identity, structure or jurisdiction of organization; (ii) change the location of its place of business (or chief executive office if more than one place of business); or (iii) add to or change any location at which any of the Mortgaged Property is stored, held or located. If an Event of Default has occurred and is continuing, Lender shall have the remedies of a secured party under the Uniform Commercial Code, in addition to all remedies provided by this Instrument or existing under applicable law. In exercising any remedies, Lender may exercise its remedies against the UCC Collateral separately or together, and in any order, without in any way affecting the availability of Lender's other remedies. This Instrument constitutes a financing statement with respect to any part of the Mortgaged Property that is or may become a Fixture, if permitted by applicable law.

[L & B 9733&KOO2&L0477092.DOC]

3.   ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION.

(a)   As part of the consideration for the Indebtedness, Borrower absolutely and unconditionally assigns and transfers to Lender all Rents. It is the intention of Borrower to establish a present, absolute and irrevocable transfer and assignment to Lender of all Rents and to authorize and empower Lender to collect and receive all Rents without the necessity of further action on the part of Borrower. Promptly upon request by Lender, Borrower agrees to execute and deliver such further assignments as Lender may from time to time require. Borrower and Lender intend this assignment of Rents to be immediately effective and to constitute an absolute present assignment and not an assignment for additional security only. For purposes of giving effect to this absolute assignment of Rents, and for no other purpose, Rents shall not be deemed to be a part of the "Mortgaged Property" as that term is defined in Section 1. However, if this present, absolute and unconditional assignment of Rents is not enforceable by its terms under the laws of the Property Jurisdiction, then the Rents shall be included as a part of the Mortgaged Property and it is the intention of the Borrower that in this circumstance this instrument create and perfect a lien on Rents in favor of Lender, which lien shall be effective as of the date of this instrument.

(b)   After the occurrence of an Event of Default, Borrower authorizes Lender to collect, sue for and compromise Rents and directs each tenant of the Mortgaged Property to pay all Rents to, or as directed by, Lender. However, until the occurrence of an Event of Default, Lender hereby grants to Borrower a revocable license to collect and receive all Rents, to hold all Rents in trust for the benefit of Lender and to apply all Rents to pay the installments of interest and principal then due and payable under the Note and the other amounts then due and payable under the other Loan Documents, including Imposition Deposits, and to pay the current costs and expenses of managing, operating and maintaining the Mortgaged Property, including utilities, Taxes and insurance premiums (to the extent not included in Imposition Deposits), tenant improvements and other capital expenditures. So long as no Event of Default has occurred and is continuing, the Rents remaining after application pursuant to the preceding sentence may be retained by Borrower free and clear of, and released from, Lender's rights with respect to Rents under this Instrument. From and after the occurrence of an Event of Default, and without the necessity of Lender entering upon and taking and maintaining control of the Mortgaged Property directly, or by a receiver, Borrower's license to collect Rents shall automatically terminate and Lender shall without notice be entitled to all Rents as they become due and payable. Borrower shall pay to Lender upon demand all Rents to which Lender is entitled. At any time on or after the date of Lender's demand for Rents, Lender may give, and Borrower hereby irrevocably authorizes Lender to give, notice to all tenants of the Mortgaged Property instructing them to pay all Rents to Lender, no tenant shall be obligated to inquire further as to the occurrence or continuance of an Event of Default, and no tenant shall be obligated to pay to Borrower any amounts which are actually paid to Lender in response to such a notice. Any such notice by Lender shall be delivered to each tenant personally, by mail or by delivering such demand to each rental unit. Borrower shall not interfere with and shall reasonably cooperate with Lender's collection of such Rents.

(c)   Borrower represents and warrants to Lender that Borrower has not executed any prior assignment of Rents (other than an assignment of Rents securing indebtedness that will be paid off and discharged with the proceeds of the loan evidenced by the Note), that Borrower has not performed, and Borrower covenants and agrees that it will not perform, any acts and has not executed, and shall not execute, any instrument which would prevent Lender from exercising its rights under this Section 3, and that at the time of execution of this Instrument there has been no anticipation or prepayment of any Rents for more than two months prior to the due dates of such Rents. Borrower shall not collect or accept payment of any Rents more than one (1) month prior to the due dates of such Rents.

(d)   If an Event of Default has occurred and is continuing, Lender may, regardless of the adequacy of Lender's security or the solvency of Borrower and even in the absence of waste, enter upon and take and maintain full control of the Mortgaged Property in order to perform all acts that Lender in its discretion determines to be necessary or desirable for the operation and maintenance of the Mortgaged Property, including the execution, cancellation or modification of Leases, the collection of all Rents, the making of repairs to the Mortgaged Property and the execution or termination of contracts providing for the management, operation or maintenance of the Mortgaged Property, for the purposes of enforcing the assignment of Rents pursuant to Section 3(a), protecting the Mortgaged Property or the security of this Instrument, or for such other purposes as Lender in its discretion may deem necessary or desirable. Alternatively, if an Event of Default has occurred and is continuing, regardless of the adequacy of Lender's security, and without regard to Borrower's solvency and without the necessity of giving prior notice (oral or written) to Borrower, Lender may apply to any court having jurisdiction for the appointment of a receiver for the Mortgaged Property to take any or all of the actions set forth in the preceding sentence. If Lender elects to seek the appointment of a receiver for the Mortgaged Property at any time after an Event of Default has occurred and is continuing, Borrower, by its execution of this Instrument, expressly consents to the appointment of such receiver, including the appointment of a receiver ex parte if permitted by applicable law. Lender or the receiver, as the case may be, shall be entitled to receive a reasonable fee for managing the Mortgaged Property. Immediately upon appointment of a receiver or immediately upon the Lender's entering upon and taking possession and control of the Mortgaged Property, Borrower shall surrender possession of the Mortgaged Property to Lender or the receiver, as the case may be, and shall deliver to Lender or the receiver, as the case may be, all documents, records (including computer files and other records on electronic or magnetic media), accounts, surveys, plans, and

(L & B 07335/00021/0477052.DOC)

_MPB_

specifications relating to the Mortgaged Property and all security deposits and prepaid Rents. In the event Lender takes possession and control of the Mortgaged Property, Lender may exclude Borrower and its representatives from the Mortgaged Property. Borrower acknowledges and agrees that the exercise by Lender of any of the rights conferred under this Section 3 shall not be construed to make Lender a mortgagee-in-possession of the Mortgaged Property so long as Lender has not itself entered into actual possession of the Land and Improvements.

(e)     If Lender enters the Mortgaged Property, Lender shall be liable to account only to Borrower and only for those Rents actually received.

(f)     If the Rents are not sufficient to meet the costs of taking control of and managing the Mortgaged Property and collecting the Rents, any funds expended by Lender for such purposes shall become an additional part of the Indebtedness as provided in Section 12.

(g)     Any entering upon and taking of control of the Mortgaged Property by Lender or the receiver, as the case may be, and any application of Rents as provided in this Instrument shall not cure or waive any Event of Default or invalidate any other right or remedy of Lender under applicable law or provided for in this Instrument.

4.     [Intentionally Omitted].

5.     PAYMENT OF INDEBTEDNESS; PERFORMANCE UNDER LOAN DOCUMENTS.  Borrower shall pay the Indebtedness when due in accordance with the terms of the Note and the other Loan Documents and shall perform, observe and comply with all other provisions of the Note and the other Loan Documents.

6.     NON RECOURSE PERSONAL LIABILITY.  The individual signing the Note on behalf of the Borrower is not and shall not be personally liable thereon.

7.     [Intentionally Omitted.]

8.     [Intentionally Omitted.]

9.     APPLICATION OF PAYMENTS.  If at any time Lender receives, from Borrower or otherwise, any amount applicable to the Indebtedness which is less than all amounts due and payable at such time, then Lender may apply that payment to amounts then due and payable in any manner and in any order determined by Lender, in Lender's discretion. Neither Lender's acceptance of an amount which is less than all amounts then due and payable nor Lender's application of such payment in the manner authorized shall constitute or be deemed to constitute either a waiver of the unpaid amounts or an accord and satisfaction.  Notwithstanding the application of any such amount to the Indebtedness, Borrower's obligations under this Instrument and the Note shall remain unchanged.

10.     COMPLIANCE WITH LAWS.  Borrower shall comply with all laws, ordinances, regulations and requirements of any Governmental Authority and all recorded lawful covenants and agreements relating to or affecting the Mortgaged Property, including all laws, ordinances, regulations, requirements and covenants pertaining to health and safety, construction of improvements on the Mortgaged Property, fair housing, zoning and land use, and Leases.  Borrower also shall comply with all applicable laws that pertain to the maintenance and disposition of tenant security deposits. Borrower shall at all times maintain records sufficient to demonstrate compliance with the provisions of this Section 10. Borrower shall take appropriate measures to prevent, and shall not engage in or knowingly permit, any illegal activities at the Mortgaged Property that could endanger tenants or visitors, result in damage to the Mortgaged Property, result in forfeiture of the Mortgaged Property, or otherwise materially impair the lien created by this Instrument or Lender's interest in the Mortgaged Property.  Borrower represents and warrants to Lender that no portion of the Mortgaged Property has been or will be purchased with the proceeds of any illegal activity.

11.     USE OF PROPERTY.  Unless required by applicable law, Borrower shall not (a) except for any change in use approved by Lender, allow changes in the use for which all or any part of the Mortgaged Property is being used at the time this Instrument was executed, or (b) initiate or acquiesce in a change in the zoning classification of the Mortgaged Property, or (c) establish any condominium or cooperative regime with respect to the Mortgaged Property.

12.     PROTECTION OF LENDER'S SECURITY.

(a)     If Borrower fails to perform any of its obligations under this Instrument or any other Loan Document, or if any action or proceeding is commenced which purports to affect the Mortgaged Property, Lender's security or Lender's rights under this Instrument, including eminent domain, insolvency, code enforcement, civil or criminal forfeiture, enforcement of Hazardous Materials Laws, fraudulent conveyance or reorganizations or proceedings involving a bankrupt or decedent, then Lender at Lender's option may make such appearances, disburse such sums and take such actions as Lender reasonably deems necessary to perform such obligations of Borrower and to protect Lender's interest, including (1) payment of fees and out of pocket expenses of attorneys, accountants, inspectors and consultants, (2) entry upon the Mortgaged Property to make repairs or secure the Mortgaged Property, (3) procurement of the insurance required by Section 19, and (4) payment of amounts which Borrower has failed to pay under Sections 15 and 17.

(b)     Any amounts disbursed by Lender under this Section 12, or under any other provision of this Instrument that treats such disbursement as being made under this Section 12, shall be added to, and become part of, the principal component of the Indebtedness, shall be immediately due and payable and shall bear interest from the date of disbursement until paid at the "Default Rate", as defined in the Note.

(1L4&6 0733350002L8477082.DOC)

JPB

(c)    Nothing in this Section 12 shall require Lender to incur any expense or take any action.

13.    INSPECTION.   Upon forty-eight (48) hours prior written notice, Lender, its agents, representatives, and designees may make or cause to be made entries upon and inspections of the Mortgaged Property (including environmental inspections and tests) during normal business hours, or at any other reasonable time.

14.    [Intentionally Omitted.]

15.    TAXES; OPERATING EXPENSES.

(a)    Subject to the provisions of Section 15(c) and Section 15(d), Borrower shall pay, or cause to be paid, all Taxes when due and before the addition of any interest, fine, penalty or cost for nonpayment.

(b)    Subject to the provisions of Section 15(c), Borrower shall pay the expenses of operating, managing, maintaining and repairing the Mortgaged Property (including insurance premiums, utilities, repairs and replacements) before the last date upon which each such payment may be made without any penalty or interest charge being added.

(c)    As long as no Event of Default exists, Borrower shall not be obligated to pay Taxes or insurance premiums (the "Impositions") to Lender. If an Event of Default exists, Lender may require Borrower to deposit the Impositions in an escrow account with Lender. Lender shall have no liability to Borrower for failing to pay any Impositions to the extent that any Event of Default has occurred and is continuing, insufficient Imposition deposits are held by Lender at the time an Imposition becomes due and payable or Borrower has failed to provide Lender with bills and premium notices as provided above.

(d)    Borrower, at its own expense, may contest by appropriate legal proceedings, conducted diligently and in good faith, the amount or validity of any Imposition other than insurance premiums, if (1) Borrower notifies Lender of the commencement or expected commencement of such proceedings, (2) the Mortgaged Property is not in danger of being sold or forfeited, (3) Borrower deposits with Lender reserves sufficient to pay the contested Imposition, if requested by Lender, and (4) Borrower furnishes whatever additional security is required in the proceedings or is reasonably requested by Lender.

16.    LIENS; ENCUMBRANCES.   Lender specifically recognizes that a prior lien exists on the Property and consents to said prior lien and the lien of this Mortgage is subordinate thereto.

17.    PRESERVATION, MANAGEMENT AND MAINTENANCE OF MORTGAGED PROPERTY.   Borrower (a) shall not commit waste or permit impairment or deterioration of the Mortgaged Property, beyond normal wear and tear (b) shall not abandon the Mortgaged Property, (c) shall restore or repair promptly, in a good and workmanlike manner, any damaged part of the Mortgaged Property to the equivalent of its original condition, or such other condition as Lender may approve in writing, whether or not insurance proceeds or condemnation awards are available to cover any costs of such restoration or repair, (d) shall keep the Mortgaged Property in good repair, including the replacement of Fixtures with items of equal or better function and quality, and (e) shall give notice to Lender of and, unless otherwise directed in writing by Lender, shall appear in and defend any action or proceeding purporting to affect the Mortgaged Property, Lender's security or Lender's rights under this Instrument. Borrower shall not (and shall not permit any tenant or other person to) remove, demolish or alter the Mortgaged Property or any part of the Mortgaged Property except in connection with the replacement of tangible Fixtures.

18.    ENVIRONMENTAL HAZARDS.   Borrower shall comply with all covenants, conditions, provisions and obligations of Borrower (as Indemnitor) under the Environmental Indemnity Agreement of even date herewith.

19.    PROPERTY AND LIABILITY INSURANCE.

(a)    Borrower shall keep the Improvements insured at all times against such hazards as Lender may from time to time reasonably require, which insurance shall include but not be limited to coverage against loss by fire and allied perils, general boiler and machinery coverage, and business income coverage. Lender's insurance requirements may change from time to time throughout the term of the Indebtedness.. If any of the Improvements is located in an area identified by the Federal Emergency Management Agency (or any successor to that agency) as an area having special flood hazards, and if flood insurance is available in that area, Borrower shall insure such Improvements against loss by flood. All insurance required pursuant to this Section 19(a) shall be referred to as "Hazard Insurance."

(b)    All such policies shall also be in a form approved by Lender. All policies of property damage insurance shall include a non-contributing, non-reporting mortgage clause in favor of, and in a form approved by, Lender. Lender shall have the right to hold the original policies or duplicate original policies of all insurance required by Section 19(a). Borrower shall promptly deliver to Lender a copy of all renewal and other notices received by Borrower with respect to the policies and all receipts for paid premiums. At least 30 days prior to the expiration date of a policy, Borrower shall deliver to Lender the original (or a duplicate original) of a renewal policy in form satisfactory to Lender.

(c)    Borrower shall maintain at all times commercial general liability insurance, workers' compensation insurance and such other liability, errors and omissions and fidelity insurance coverages as Lender may from time to time reasonably require.

(d)    All insurance policies and renewals of insurance policies required by this Section 19 shall be in such amounts and for such periods as Lender may from time to time reasonably require, shall be in such form and contain such endorsements as Lender may from time to time reasonably require, and shall be issued by insurance companies reasonably satisfactory to Lender.

(L & B 01336/00019/DF/770182.DOC)

(e)     Borrower shall comply with all insurance requirements and shall not permit any condition to exist on the Mortgaged Property that would invalidate any part of any insurance coverage that this Instrument requires Borrower to maintain.

(f)     In the event of loss, Borrower shall give prompt written notice to the insurance carrier and to Lender. However, nothing contained in this Section 19 shall require Lender to incur any expense or take any action. Lender may, at Lender's option, (1) hold the balance of such proceeds to be used to reimburse Borrower for the cost of restoring and repairing the Mortgaged Property to the equivalent of its original condition or to a condition approved by Lender (the "Restoration"), or (2) apply the balance of such proceeds to the payment of the Indebtedness, whether or not then due. To the extent Lender determines to apply insurance proceeds to Restoration, Lender shall do so in accordance with Lender's then-current policies relating to the restoration of casualty damage on similar properties.

(g)     Lender shall not exercise its option to apply insurance proceeds to the payment of the Indebtedness if all of the following conditions are met: (1) no Event of Default (or any event which, with the giving of notice or the passage of time, or both, would constitute an Event of Default) has occurred and is continuing; (2) Lender determines, in its discretion, that there will be sufficient funds to complete the Restoration; (3) Lender determines, in its discretion, that the rental income from the Mortgaged Property after completion of the Restoration will be sufficient to meet all operating costs and other expenses, Imposition Deposits, deposits to reserves and loan repayment obligations relating to the Mortgaged Property; and (4) Lender determines, in its discretion, that the Restoration will be completed before the earlier of (A) one year before the maturity date of the Note or (B) one year after the date of receipt of insurance proceeds.

(h)     If the Mortgaged Property is sold at a foreclosure sale or Lender acquires title to the Mortgaged Property, Lender shall automatically succeed to all rights of Borrower in and to any insurance policies and unearned insurance premiums and in and to the proceeds resulting from any damage to the Mortgaged Property prior to such sale or acquisition.

20.     CONDEMNATION.

(a)     Borrower shall promptly notify Lender of any action or proceeding relating to any condemnation or other taking, or conveyance in lieu thereof, of all or any part of the Mortgaged Property, whether direct or indirect (a "Condemnation"). Borrower shall appear in and prosecute or defend any action or proceeding relating to any Condemnation unless otherwise directed by Lender in writing. However, nothing contained in this Section 20 shall require Lender to incur any expense or take any action. Subject to the rights of any superior lienholder, Borrower hereby transfers and assigns to Lender all right, title and interest of Borrower in and to any award or payment with respect to (i) any Condemnation, or any conveyance in lieu of Condemnation, and (ii) any damage to the Mortgaged Property caused by governmental action that does not result in a Condemnation.

(b)     Lender may apply such awards or proceeds, after the deduction of Lender's reasonable expenses incurred in the collection of such amounts, at Lender's option, to the restoration or repair of the Mortgaged Property or to the payment of the Indebtedness, with the balance, if any, to Borrower. Unless Lender otherwise agrees in writing, any application of any awards or proceeds to the Indebtedness shall not extend or postpone the due date of any monthly installments referred to in the Note, Section 7 of this Instrument or any Collateral Agreement, or change the amount of such installments. Borrower agrees to execute such further evidence of assignment of any awards or proceeds as Lender may require.

21.     TRANSFERS OF THE MORTGAGED PROPERTY OR INTERESTS IN BORROWER [NO RIGHT TO TRANSFER].

(a)     "Transfer" means (A) a sale, assignment, transfer or other disposition (whether voluntary, involuntary or by operation of law); (B) the granting, creating or attachment of a lien, encumbrance or security interest (whether voluntary, involuntary or by operation of law); (C) the issuance or other creation of an ownership interest in a legal entity, including a partnership interest, interest in a limited liability company or corporate stock; (D) the withdrawal, retirement, removal or involuntary resignation of a partner in a partnership or a member or manager in a limited liability company; or (E) the merger, dissolution, liquidation, or consolidation of a legal entity or the reconstitution of one type of legal entity into another type of legal entity." For purposes of defining the term "Transfer," the term "partnership" shall mean a general partnership, a limited partnership, a joint venture and a limited liability partnership, and the term "partner" shall mean a general partner, a limited partner and a joint venturer.

(b)     "Transfer" does not include: (i) a conveyance of the Mortgaged Property at a judicial or non-judicial foreclosure sale, (ii) the Mortgaged Property becoming part of a bankruptcy estate by operation of law under the United States Bankruptcy Code, or (iii) a lien against the Mortgaged Property for local taxes and/or assessments not then due and payable.

(c)     The occurrence of any of the following events shall not constitute an Event of Default under this Instrument, notwithstanding any provision of Section 21(a) to the contrary:

(i)      a Transfer to which Lender has consented;

(ii)     a Transfer that occurs by devise, descent, or by operation of law upon the death of a natural person;

(iii)    the grant of a leasehold interest approved in writing by Lender;

(L & B 07335.00002/L0477351.DOC)

_MPB_

(iv) the creation of a mechanic's, materialman's, or judgment lien against the Mortgaged Property which is released of record or otherwise remedied to Lender's satisfaction within 60 days of the date of creation; and

(v) if Borrower is a housing cooperative, any Transfer of the shares in the housing cooperative or any assignment of the occupancy agreements or leases relating thereto by tenant shareholders of the housing cooperative.

(d) The occurrence of any of the following Transfers shall not constitute an Event of Default under this Instrument, provided that Borrower has notified Lender in writing within 30 days following the occurrence of any of the following, and such Transfer does not constitute an Event of Default under any other Section of this Instrument:

(i) a change of the Borrower's name, provided that UCC financing statements and/or amendments sufficient to continue the perfection of Lender's security interest have been properly filed and copies have been delivered to Lender;

(ii) a change of the form of the Borrower not involving a transfer of the Borrower's assets and not resulting in any change in liability of any Initial Owner, provided that UCC financing statements and/or amendments sufficient to continue the perfection of Lender's security interest have been properly filed and copies have been delivered to Lender;

(iii) the merger of the Borrower with another entity when the Borrowing entity is the surviving entity;

(iv) a Transfer that occurs by devise, descent, or by operation of law upon the death of a natural person;

(v) the grant of an easement, if before the grant Lender determines that the easement will not materially affect the operation or value of the Mortgaged Property or Lender's interest in the Mortgaged Property, and Borrower pays to Lender, upon demand, all costs and expenses, including Attorneys' Fees and Costs, incurred by Lender in connection with reviewing Borrower's request.

(e) The occurrence of any of the following events shall constitute an Event of Default under this Instrument:

(i) a Transfer of all or any part of the Mortgaged Property or any interest in the Mortgaged Property (including without limitation the creation or existence of any Lien as provided in Section 18 of this Instrument);

(ii) if Borrower is a limited partnership, a Transfer of (A) any general partnership interest, or (B) limited partnership interests in Borrower that would cause the Initial Owners of Borrower to own less than a Controlling Interest of all limited partnership interests in Borrower;

(iii) if Borrower is a general partnership or a joint venture, a Transfer of any general partnership or joint venture interest in Borrower;

(iv) if Borrower is a limited liability company, (A) a Transfer of any membership interest in Borrower which would cause the Initial Owners to own less than a Controlling Interest of all the membership interests in Borrower, (B) a Transfer of any membership or other interest of a manager in Borrower that results in a change of manager, or (C) a change of a nonmember manager;

(v) if Borrower is a corporation, (A) the Transfer of any voting stock in Borrower which would cause the Initial Owners to own less than a Controlling Interest of any class of voting stock in Borrower or (B) if the outstanding voting stock in Borrower is held by 100 or more shareholders, one or more transfers by a single transferor within a 12-month period affecting an aggregate of 5% or more of that stock;

(vi) if Borrower is a trust, (A) a Transfer of any beneficial interest in Borrower which would cause the Initial Owners to own less than a Controlling Interest of all the beneficial interests in Borrower, or (B) the termination or revocation of the trust, or (C) the removal, appointment or substitution of a trustee of Borrower; and

(vii) a Transfer of any interest in a Controlling Entity which, if such Controlling Entity were Borrower, would result in an Event of Default under any of Sections 21(e)(i) through (vi) above.

Lender shall not be required to demonstrate any actual impairment of its security or any increased risk of default in order to exercise any of its remedies with respect to an Event of Default under this Section 21.

22. EVENTS OF DEFAULT. The occurrence of any one or more of the following shall constitute an Event of Default under this Instrument:

(a) any failure by Borrower to pay or deposit when due any amount required by the Note, this Instrument or any other Loan Document upon ten (10) days' written notice from Lender to Borrower of any such failure and Borrower's failure to cure;

(b) any failure by Borrower to maintain the insurance coverage required by Section 19;

(L & B 0732620002A.2477652.DOC)

*DPB*

(c)   [Intentionally Omitted.]

(d)   fraud or material misrepresentation or material omission by Borrower, any of its officers, directors, trustees, general partners or managers or any guarantor in connection with (A) the application for or creation of the Indebtedness, (B) any financial statement, rent roll, or other report or information provided to Lender during the term of the Indebtedness, or (C) any request for Lender's consent to any proposed action, including a request for disbursement of funds under any Collateral Agreement;

(e)   any Event of Default under Section 21;

(f)   the commencement of a forfeiture action or proceeding, whether civil or criminal, which, in Lender's reasonable judgment, could result in a forfeiture of the Mortgaged Property or otherwise materially impair the lien created by this instrument or Lender's interest in the Mortgaged Property;

(g)   any failure by Borrower to perform any of its obligations under this instrument (other than those specified in Sections 22(a) through (f)), as and when required, which continues for a period of 30 days after notice of such failure by Lender to Borrower;

(h)   any failure by Borrower to perform any of its obligations as and when required under any Loan Document other than this instrument which continues beyond the applicable cure period, if any, specified in that Loan Document;

(i)   any exercise by the holder of any debt instrument secured by a mortgage, deed of trust or deed to secure debt on the Mortgaged Property of a right to declare all amounts due under that debt instrument immediately due and payable;

(j)   should any representation or warranty contained in this instrument, the Borrower's Certificate, any other Loan Document, or any other document submitted by Borrower to Lender be or become false or misleading in any material respect; and

(k)   Borrower makes a general assignment for the benefit of creditors, voluntarily files for bankruptcy protection under the United States Bankruptcy Code or voluntarily becomes subject to any reorganization, receivership, insolvency proceeding or other similar proceeding pursuant to any other federal or state law affecting debtor and creditor rights, or an involuntary case is commenced against Borrower by any creditor (other than Lender) of Borrower pursuant to the United States Bankruptcy Code or other federal or state law affecting debtor and creditor rights and is not dismissed or discharged within 60 days after filing.

23.   REMEDIES CUMULATIVE.  Each right and remedy provided in this instrument is distinct from all other rights or remedies under this instrument or any other Loan Document or afforded by applicable law, and each shall be cumulative and may be exercised concurrently, independently, or successively, in any order.

24.   FORBEARANCE.

(a)   Lender may (but shall not be obligated to) agree with Borrower, from time to time, and without giving notice to, or obtaining the consent of, or having any effect upon the obligations of, any guarantor or other third party obligor, to take any of the following actions: extend the time for payment of all or any part of the Indebtedness; reduce the payments due under this instrument, the Note, or any other Loan Document; release anyone liable for the payment of any amounts under this instrument, the Note, or any other Loan Document; accept a renewal of the Note; modify the terms and time of payment of the Indebtedness; join in any extension or subordination agreement; release any Mortgaged Property; take or release other or additional security; modify the rate of interest or period of amortization of the Note or change the amount of the monthly installments payable under the Note; and otherwise modify this instrument, the Note, or any other Loan Document.

(b)   Any forbearance by Lender in exercising any right or remedy under the Note, this instrument, or any other Loan Document or otherwise afforded by applicable law, shall not be a waiver of or preclude the exercise of any right or remedy. The acceptance by Lender of payment of all or any part of the Indebtedness after the due date of such payment, or in an amount which is less than the required payment, shall not be a waiver of Lender's right to require prompt payment when due of all other payments on account of the Indebtedness or to exercise any remedies for any failure to make prompt payment. Enforcement by Lender of any security for the Indebtedness shall not constitute an election by Lender of remedies so as to preclude the exercise of any other right available to Lender.  Lender's receipt of any awards or proceeds under Sections 19 and 20 shall not operate to cure or waive any Event of Default.

25.   LOAN CHARGES.  If any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower is interpreted so that any charge provided for in any Loan Document, whether considered separately or together with other charges levied in connection with any other Loan Document, violates that law, and Borrower is entitled to the benefit of that law, that charge is hereby reduced to the extent necessary to eliminate that violation.  The amounts, if any, previously paid to Lender in excess of the permitted amounts shall be applied by Lender to reduce the principal of the Indebtedness.  For the purpose of determining whether any applicable law limiting the amount of interest or other charges permitted to be collected from Borrower has been violated, all Indebtedness which constitutes interest, as well as all other charges levied in connection with the Indebtedness which constitute interest, shall be deemed to be allocated and spread over the stated term of the Note.  Unless otherwise required by applicable law, such allocation and spreading shall be effected in such a manner that the rate of interest so computed is uniform throughout the stated term of the Note.

(L & B 0733\00002\0477082.DOC)

*MPB*

26.    [Intentionally Omitted.]

27.    WAIVER OF MARSHALLING. Notwithstanding the existence of any other security interests in the Mortgaged Property held by Lender or any other party, Lender shall have the right to determine the order in which any or all of the Mortgaged Property shall be subjected to the remedies provided in this Instrument, the Note, any other Loan Document or applicable law. Lender shall have the right to determine the order in which any or all portions of the indebtedness are satisfied from the proceeds realized upon the exercise of such remedies. Borrower and any party who now or in the future acquires a security interest in the Mortgaged Property and who has actual or constructive notice of this Instrument waives any and all right to require the marshalling of assets or to require that any of the Mortgaged Property be sold in the inverse order of alienation or that any of the Mortgaged Property be sold in parcels or as an entirety in connection with the exercise of any of the remedies permitted by applicable law or provided in this Instrument.

28.    FURTHER ASSURANCES. Borrower shall execute, acknowledge, and deliver, at its sole cost and expense, all further acts, deeds, conveyances, assignments, estoppel certificates, financing statements, transfers and assurances as Lender may require from time to time in order to better assure, grant, and convey to Lender the rights intended to be granted, now or in the future, to Lender under this Instrument and the Loan Documents.

29.    ESTOPPEL CERTIFICATE. Within 10 days after a request from Lender, Borrower shall deliver to Lender a written statement, signed and acknowledged by Borrower, certifying to Lender or any person designated by Lender, as of the date of such statement, (i) that the Loan Documents are unmodified and in full force and effect (or, if there have been modifications, that the Loan Documents are in full force and effect as modified and setting forth such modifications); (ii) the unpaid principal balance of the Note; (iii) the date to which interest under the Note has been paid; (iv) that Borrower is not in default in paying the indebtedness or in performing or observing any of the covenants or agreements contained in this Instrument or any of the other Loan Documents (or, if the Borrower is in default, describing such default in reasonable detail); (v) whether or not there are then existing any setoffs or defenses known to Borrower against the enforcement of any right or remedy of Lender under the Loan Documents; and (vi) any additional facts requested by Lender.

30.    GOVERNING LAW; CONSENT TO JURISDICTION AND VENUE.

(a)    This Instrument, and any Loan Document which does not itself expressly identify the law that is to apply to it, shall be governed by the laws of the jurisdiction in which the Land is located (the "Property Jurisdiction").

(b)    Borrower agrees that any controversy arising under or in relation to the Note, this Instrument, or any other Loan Document shall be litigated exclusively in the Property Jurisdiction. The state and federal courts and authorities with jurisdiction in the Property Jurisdiction shall have exclusive jurisdiction over all controversies which shall arise under or in relation to the Note, any security for the indebtedness, or any other Loan Document. Borrower irrevocably consents to service, jurisdiction, and venue of such courts for any such litigation and waives any other venue to which it might be entitled by virtue of domicile, habitual residence or otherwise.

31.    NOTICE.

(a)    All notices, demands and other communications ("notice") under or concerning this Instrument shall be in writing. Each notice shall be addressed to the intended recipient at its address set forth in page one of this Instrument, and shall be deemed given on the earliest to occur of (1) the date when the notice is actually received by the addressee; (2) the first Business Day after the notice is delivered to a recognized overnight courier service, with arrangements made for payment of charges for next Business Day delivery; or (3) the third Business Day after the notice is deposited in the United States mail with postage prepaid, certified mail, return receipt requested. As used in this Section 31, the term "Business Day" means any day other than a Saturday, a Sunday or any other day on which Lender is not open for business.

(b)    Any party to this Instrument may change the address to which notices intended for it are to be directed by means of notice given to the other party in accordance with this Section 31. Each party agrees that it will not refuse or reject delivery of any notice given in accordance with this Section 31, that it will acknowledge, in writing, the receipt of any notice upon request by the other party and that any notice rejected or refused by it shall be deemed for purposes of this Section 31 to have been received by the rejecting party on the date so refused or rejected, as conclusively established by the records of the U.S. Postal Service or the courier service.

(c)    Any notice under the Note and any other Loan Document which does not specify how notices are to be given shall be given in accordance with this Section 31.

32.    SALE OF NOTE; CHANGE IN SERVICER. The Note or a partial interest in the Note (together with this Instrument and the other Loan Documents) may be sold one or more times with prior notice to Borrower. A sale may result in a change of the Loan Servicer. There also may be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given notice of the change.

33.    [Intentionally Omitted.]

34.    SUCCESSORS AND ASSIGNS BOUND. This Instrument shall bind, and the rights granted by this Instrument shall inure to, the respective successors and assigns of Lender and Borrower. However, a Transfer not permitted by Section 21 shall be an Event of Default.

(L & B 073060002&047082.DOC)

DPB

35.   [Intentionally Omitted.]

36.   RELATIONSHIP OF PARTIES; NO THIRD PARTY BENEFICIARY.

(a)   The relationship between Lender and Borrower shall be solely that of creditor and debtor, respectively, and nothing contained in this Instrument shall create any other relationship between Lender and Borrower.

(b)   No creditor of any party to this Instrument and no other person shall be a third party beneficiary of this Instrument or any other Loan Document.  Without limiting the generality of the preceding sentence, (1) any arrangement (a "Servicing Arrangement") between the Lender and any Loan Servicer for loss sharing or interim advancement of funds shall constitute a contractual obligation of such Loan Servicer that is independent of the obligation of Borrower for the payment of the Indebtedness, (2) Borrower shall not be a third party beneficiary of any Servicing Arrangement, and (3) no payment by the Loan Servicer under any Servicing Arrangement will reduce the amount of the Indebtedness.

37.   SEVERABILITY; ENTIRE AGREEMENT; AMENDMENTS.  The parties intend that the provisions of this Instrument and all other Loan Documents shall be legally severable.  If any term or provision of this Instrument, or any other Loan Document, to any extent, be determined by a court of competent jurisdiction to be invalid or unenforceable, the remainder of this Instrument or of such other Loan Document shall not be affected thereby, and each term and provision shall be valid and be enforceable to the fullest extent permitted by law.  This Instrument contains the entire agreement among the parties as to the rights granted and the obligations assumed in this Instrument.  This Instrument may not be amended or modified except by a writing signed by the party against whom enforcement is sought.

38.   CONSTRUCTION.  The captions and headings of the sections of this Instrument are for convenience only and shall be disregarded in construing this Instrument.  Any reference in this Instrument to an "Exhibit" or a "Section" shall, unless otherwise explicitly provided, be construed as referring, respectively, to an Exhibit attached to this Instrument or to a Section of this Instrument.  All Exhibits attached to or referred to in this Instrument are incorporated by reference into this Instrument.  Any reference in this Instrument to a statute or regulation shall be construed as referring to that statute or regulation as amended from time to time.  Use of the singular in this Agreement includes the plural and use of the plural includes the singular.  As used in this Instrument, the term "including" means "including, but not limited to."

39.   LOAN SERVICING.  All actions regarding the servicing of the loan evidenced by the Note, including the collection of payments, the giving and receipt of notice, inspections of the Property, inspections of books and records, and the granting of consents and approvals, may be taken by the Lender unless Borrower receives notice to the contrary.  If Borrower receives conflicting notices regarding the identity of the Loan Servicer or any other subject, any such notice from Lender shall govern.

40.   DISCLOSURE OF INFORMATION.  Lender may furnish information regarding Borrower or the Mortgaged Property to third parties with an existing or prospective interest in the servicing, enforcement, evaluation, performance, or purchase of the Indebtedness, including but not limited to trustees, master servicers, special servicers, rating agencies, and organizations maintaining databases on the underwriting and performance of similar mortgage loans.

41.   NO CHANGE IN FACTS OR CIRCUMSTANCES.  All information in the application for the loan submitted to Lender (the "Loan Application") and in all financial statements, rent rolls, reports, certificates and other documents submitted in connection with the Loan Application are complete and accurate in all material respects.  There has been no material adverse change in any fact or circumstance that would make any such information incomplete or inaccurate.

42.   SUBROGATION.  If, and to the extent that, the proceeds of the loan evidenced by the Note are used to pay, satisfy or discharge any obligation of Borrower for the payment of money that is secured by a pre-existing mortgage, deed of trust or other lien encumbering the Mortgaged Property (a "Pre-Existing Lien"), such loan proceeds shall be deemed to have been advanced by Lender at Borrower's request, and Lender shall automatically, and without further action on its part, be subrogated to the rights, including lien priority, of the owner or holder of the obligation secured by the Pre-Existing Lien, whether or not the Pre-Existing Lien is released.

43.   [Intentionally Omitted.]

44.   ACCELERATION; REMEDIES, WAIVER OF PERMISSIVE COUNTERCLAIMS.  At any time during the existence of an Event of Default, Lender, at Lender's option, may declare the Indebtedness to be immediately due and payable without further demand, and may foreclose this Instrument by judicial proceeding and may invoke any other remedies permitted by Texas law or provided in this Instrument or in any other Loan Document.  Lender shall be entitled to collect all costs and expenses incurred in pursuing such remedies, including attorneys' fees, costs of documentary evidence, abstracts and title reports.

45.   RELEASE.  Upon payment of the Indebtedness, Lender shall discharge this Instrument.  Borrower shall pay Lender's reasonable costs incurred in discharging this Instrument.

46.   FUTURE ADVANCES.  Lender may from time to time, in Lender's discretion, make optional future or additional advances (collectively, "Future Advances") to Borrower, except that at no time shall the unpaid principal balance of all indebtedness secured by the lien of this Instrument, including Future Advances, be greater than an amount equal to two hundred percent (200%) of the original principal amount of this Note as set forth on the first page of this Instrument plus accrued interest

(L & B 0733570002\L0477382.DOC)

MPB

and amounts disbursed by Lender under Section 12 or any other provision of this Instrument that treats a disbursement by Lender as being made under Section 12. All Future Advances shall be made, if at all, within twenty (20) years after the date of this Instrument, or within such lesser period that may in the future be provided by law as a prerequisite for the sufficiency of actual or record notice of Future Advances as against the rights of creditors or subsequent purchasers for value. Borrower shall, immediately upon request by Lender, execute and deliver to Lender a promissory note evidencing each Future Advance together with a notice of such Future Advance in recordable form. All promissory notes evidencing Future Advances shall be secured, pari passu, by the lien of this Instrument, and each reference in this Instrument to the Note shall be deemed to be a reference to all promissory notes evidencing Future Advances.

47.    AGREEMENT TO PROVIDE ADDITIONAL DOCUMENTS.  Borrower agrees to execute and acknowledge such additional documents as may be necessary or desirable in order to carry out the intent and purpose of this Instrument and the other Loan Documents, to confirm or establish the lien hereof, or to correct any clerical errors or legal deficiencies.  Without limiting the foregoing, Borrower agrees to execute a replacement Note in the event the Note is lost or destroyed and to execute an amended and restated substitute Note to correct any clerical or other errors which may be discovered in the original Note. Failure of Borrower to comply with any request by Lender pursuant to this Section or under Section 28 above within ten (10) days after written request by Lender shall constitute a material Event of Default hereunder.

48.    EXECUTION IN COUNTERPARTS.  This Instrument may be executed in multiple counterparts, and the separate signature pages and notary acknowledgments may then be combined into a single original document for recordation.

49.    PAYMENT OF CLOSING COSTS.  If for any reason the escrow or closing agent fails to reserve and pay for all of Lender's fees, legal, documentation, appraisal, title, recording and other closing costs incurred in connection with the closing and funding of the Loan, then Borrower shall pay or reimburse Lender for any such unpaid fees or costs within ten (10) days after written demand by Lender itemizing the unpaid fees and costs. Failure of Borrower to so pay or reimburse Lender for any such unpaid fees and costs within ten (10) days after written demand by Lender shall constitute an Event of Default and, without limiting any other remedies of Lender, Lender may immediately instate the Default Rate under the Note until such amounts are received by Lender.

[The balance of this page is intentionally left blank.]

{L & B 9773 6/00621.0477081.DOC}

*HPB*

50.   WAIVER OF TRIAL BY JURY. BORROWER AND LENDER EACH (A) COVENANTS AND AGREES NOT TO ELECT A TRIAL BY JURY WITH RESPECT TO ANY ISSUE ARISING OUT OF THIS INSTRUMENT OR THE RELATIONSHIP BETWEEN THE PARTIES AS BORROWER AND LENDER THAT IS TRIABLE OF RIGHT BY A JURY AND (B) WAIVES ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO SUCH ISSUE TO THE EXTENT THAT ANY SUCH RIGHT EXISTS NOW OR IN THE FUTURE. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS SEPARATELY GIVEN BY EACH PARTY, KNOWINGLY AND VOLUNTARILY WITH THE BENEFIT OF COMPETENT LEGAL COUNSEL.

ATTACHED EXHIBIT. The following Exhibit is attached to this Instrument:

Addendum (With Power of Sale)
Exhibit "A"         Description of the Land

THIS MORTGAGE SECURES A FIXED RATE PROMISSORY NOTE.   THIS MORTGAGE IS A SECOND MORTGAGE.

IN WITNESS WHEREOF, Borrower has signed and delivered this Instrument or has caused this Instrument to be signed and delivered by its duly authorized representative.

Borrower:

Retama Development Corporation,
a Texas local government corporation created by the City of Selma, Texas, pursuant to Section 4A of Article 1528n, Texas Revised Civil Statutes Annotated

By:  _Gary Baber_____
Gary Baber, President

State of Texas
County of _Comal_____  }

The foregoing Instrument was acknowledged before Borrower this 21 day of Dec_____, 2010, by Gary Baber, President  of Retama Development Corporation, a Texas local government corporation, on behalf of said corporation.

He/She/They:
☐ Is personally known to Borrower – OR –
☑ Has produced   TX DL___
              Type of Identification
as Identification.

_Signature of Notary Public_   Notary Public

Commission No. _____

[Notary seal:]
JANINE MCADA
Notary Public, State of Texas
My Commission Expires
May 13, 2014

[The balance of this page is intentionally left blank.]

# ADDENDUM

## (With Power of Sale)

This Addendum is made to the Mortgage, Assignment of Rents and Security Agreement (the "Instrument") between Retama Development Corporation, a Texas local government corporation and Sweezy Investments, LLC dated December 21, 2010. In the event of any conflict between the terms of the Addendum and the terms of the Instrument, the terms of this Addendum shall prevail.

For this Addendum, Retama Development Corporation shall be "Grantor" and Sweezy Investments LLC shall be "Beneficiary." All other Definitions of the Instrument shall apply here.

The Trustee is James J. Hurchalla, whose address is 888 E. Las Olas Blvd, Ste 200, Fort Lauderdale, FL 33301.

## GRANT

1.1     Grant. To secure the full and timely payment of the Indebtedness and the full and timely performance and discharge of the obligations of the Loan Documents, Grantor has GRANTED, BARGAINED, SOLD and CONVEYED, and by these presents does GRANT, BARGAIN, SELL  and CONVEY, unto Trustee, in trust, the Mortgaged Property, subject, however, to the Schedule of Title Exceptions, TO HAVE AND TO HOLD the Mortgage Property unto Trustee, forever, and Grantor does hereby bind itself, its successors, and assigns to WARRANT AND FOREVER DEFEND the title to the Mortgaged Property unto Trustee against every person whomsoever lawfully claiming or to claim the same or any part thereof, provided, however, that if Grantor shall pay (or cause to be paid) the Indebtedness as and when the same shall become due and payable and shall fully perform and discharge (or cause to be fully performed and discharged) the obligations of the Loan Documents on or before the date same are to be performed and discharged, then the liens, security interest, estates, and rights granted by the Loan Documents shall terminate when released by Beneficiary otherwise same shall remain in full force and effect.   A certificate or other written statement executed on behalf of Trustee or Beneficiary confirming that the Indebtedness has not been fully paid or the obligations of the Loan Documents have not been fully performed or discharged shall be sufficient evidence thereof for the purpose of reliance by third parties on such fact.

## REMEDIES

2.1     Beneficiary's Remedies upon Default.  Upon the occurrence of an Event of Default or any event or circumstance which, with the lapse of time, or the giving of notice, or both, would constitute an Event of Default, Beneficiary may, at Beneficiary's option, and by or through Trustee, by Beneficiary itself or otherwise, do any one or more of the following:

Initialed for Identification *MPB*                                          Page 1

(a)    <u>Right to Accelerate.</u>  Beneficiary may, without notice, demand, presentment, notice of nonpayment or nonperformance, protest, notice of protest, notice of intent to accelerate, notice of acceleration, or any other notice or any other action, all of which are hereby waived by Grantor and all other parties obligated in any manner whatsoever on the Indebtedness, declare the entire unpaid balance of the Indebtedness immediately due and payable, and upon such declaration, the entire unpaid balance of the Indebtedness shall be immediately due and payable. The failure to exercise any remedy available to Beneficiary shall not be deemed to be a waiver of any rights or remedies of Beneficiary under the Loan Documents, at law or in equity.

(b)    <u>Foreclosure-Power of Sale.</u>  Beneficiary may request Trustee to proceed with foreclosure under the power of sale which is hereby conferred, such foreclosure to be accomplished in accordance with the following provisions:

(i)    Public Sale.  Trustee is hereby authorized and empowered, and it shall be Trustee's special duty, upon such request of Beneficiary, to sell the Mortgaged Property, or any part thereof, at public auction to the highest bidder for cash, with or without having taken possession of same. Any such sale (including notice thereof) shall comply with the applicable requirements, at the time of the sale of Section 51.002 of the Texas Property Code or, if and to the extend such statute is not then in force, with the applicable requirements, at the time of the sale, of the successor statute or statutes, if any, governing sales of Texas real property under powers of sale conferred by deeds of trust. If there is no statute in force at the time of the sale governing sales of Texas real property under powers of sale conferred by deeds of trust, such sale shall comply with applicable law, at the time of the sale, governing sales of Texas real property under powers of sale conferred by deeds of trust.

(ii)    Right to Require Proof of Financial Ability and/or Cash Bid.  At any time during the bidding, the Trustee may require a bidding party (A) to disclose its full name, state and city of residence, occupation, and specific business office location, and the name and address of the principal the bidding party is representing (if applicable), and (B) to demonstrate reasonable evidence of the bidding party's financial ability (or, if applicable, the financial ability of the principal of such bidding party), as a condition to the bidding party submitting bids at the foreclosure sale. If any such bidding party (the "Questioned Bidder") declines to comply with the Trustee's requirement in this regard, or if such Questioned Bidder does respond but the Trustee, in Trustee's sole and absolute discretion, deems the information or the evidence of the financial ability of the Questioned Bidder ( or, if applicable, the principal of such bidding party) to be inadequate, then the Trustee may continue the bidding with reservation; and in such event (1) the Trustee shall be authorized to caution the

Initialed for Identification  *MPB*                        Page 2

Questioned Bidder concerning the legal obligations to be incurred in submitting bids, and (2) if the Questioned Bidder is not the highest bidder at the sale, or if having been the highest bidder the Questioned Bidder fails to deliver the cash purchase price payment promptly to the Trustee, all bids by the Questioned Bidder shall be null and void. The Trustee may, in Trustee's sole and absolute discretion, determine that a credit bid may be in the best interest of Grantor and Beneficiary, and elect to sell the Mortgaged Property for credit or for a combination of cash and credit; provided, however, that the Trustee shall have no obligation to accept any bid except an all cash bid. In the event the Trustee requires a cash bid and cash is not delivered within a reasonable time after conclusion of the bidding process, as specified by the Trustee, but in no event later than 3:45 p.m. local time on the day of sale, then said contingent sale shall be null and void, the bidding process may be recommenced, and any subsequent bids or sale shall be made as if no prior bids were made or accepted.

(iii)    Sale Subject to Unmatured Indebtedness. In addition to the rights and powers of sale granted under the preceding provisions of this subsection, if default is made in the payment of any installment of the Indebtedness, Beneficiary may, at Beneficiary's option, at once or at any time thereafter while any matured installment remains unpaid, without declaring the entire Indebtedness to be due and payable, orally or in writing direct Trustee to enforce this trust and to sell the Mortgaged Property subject to such unmatured Indebtedness and to the rights, powers, liens, security interests, and assignments securing or providing recourse for payment of such unmatured Indebtedness, in the same manner, all as provided in the preceding provisions of this subsection. Sales made without maturing the Indebtedness may be made hereunder whenever there is a default in the payment of any installment of the Indebtedness, without exhausting the power of sale granted hereby, and without affecting in any way the power of sale granted under this subsection, the unmatured balance of the Indebtedness or the rights, powers, liens, security interests, and assignments securing or providing recourse for payment of the Indebtedness.

(iv)    Partial Foreclosure. Sale of a part of the Mortgaged Property shall not exhaust the power of sale, but sales may be made from time to time until the Indebtedness is paid and the Obligations are performed and discharged in full. It is intended by each of the foregoing provisions of this subsection that Trustee may, after any request or direction by Beneficiary, sell not only the Land and the Improvements, but also the Fixtures and Personalty and other interests constituting a part of the Mortgaged Property or any part thereof, along with the Land and the Improvements, or any part thereof, as a unit and as a part of a single sale, or may sell at any time or from time to time any part or parts of the Mortgaged Property

Initialed for Identification    *MPB*                       Page 3

separately from the remainder of the Mortgaged Property. It shall not be necessary to have present or to exhibit at any sale any of the Mortgaged Property.

(v)     **Trustee's Deeds.** After any sale under this subsection, Trustee shall make good and sufficient deeds, assignments, and other conveyances to the purchaser or purchasers thereunder in the name of Grantor, conveying the Mortgaged Property or any part thereof so sold to the purchaser or purchasers with general warranty of title by Grantor. It is agreed that in any deeds, assignments or other conveyances given by Trustee, any and all statements of fact or other recitals therein made as to the identity of Beneficiary, the occurrence or existence of any Event of Default, the notice of intention to accelerate, or acceleration of, the maturity of the Indebtedness, the request to sell, notice of sale, time, place, terms and manner of sale, and receipt, distribution, and application of the money realized therefrom, the due and proper appointment of a substitute Trustee, and without being limited by the foregoing, any other act or thing having been duly done by or on behalf of Beneficiary or by or on behalf of Trustee, shall be taken by all courts of law and equity as _prima_ _facie_ evidence that such statements or recitals state true, correct, and complete facts and are without further question to be so accepted, and Grantor does hereby ratify and confirm any and all acts that Trustee may lawfully do in the premises by virtue hereof.

(c)     **Beneficiary's Judicial Remedies.** Beneficiary, or Trustee, upon written request of Beneficiary, may proceed by suit or suits, at law or in equity, to enforce the payment of the Indebtedness and the performance and discharge of the obligations under the Loan Documents in accordance with the terms hereof, of the Note, and the other Loan Documents, to foreclose the liens and security interests of this Instrument as against all or any part of the judgment or decree of a court of competent jurisdiction. This remedy shall be cumulative of any other nonjudicial remedies available to Beneficiary with respect to the Loan Documents. Proceeding with a request or receiving a judgment for legal relief shall not be or be deemed to be an election of remedies or bar any available nonjudicial remedy of Beneficiary.

(d)     **Beneficiary as Purchaser.** Beneficiary may be the purchaser of the Mortgaged Property or any part thereof, at any sale thereof, whether such sale be under the power of sale herein vested in Trustee or upon any other foreclosure of the liens and security interests hereof, or otherwise, and Beneficiary shall, upon any such purchase, acquire good title to the Mortgaged Property so purchased, free of the liens and security interests hereof, unless the sale was made subject to an unmatured portion of the Indebtedness. Beneficiary, as purchaser, shall be treated in the same manner as any third party purchaser and the proceeds of Beneficiary's purchase shall be applied in accordance with Section 2.1(f) of this Addendum.

Initialed for Identification _MPB_                                    Page 4

(e)   Possession after Foreclosure.   If the liens or security interests hereof shall be foreclosed by power of sale granted herein, by judicial action, or otherwise, the purchaser at any such sale shall receive, as an incident to purchaser's ownership, immediate possession of the property purchased, and if Grantor or Grantor's successors shall hold possession of said property or any part thereof subsequent to foreclosure, Grantor and Grantor's successors shall be considered as tenants at sufferance of the purchaser at foreclosure sale (without limitation of other rights or remedies, at a reasonable rental per day, due and payable daily, based upon the value of the portion of the Mortgaged Property so occupied and sold to such purchaser), and anyone occupying such portion of the Mortgaged Property, after demand is made for possession thereof, shall be subject to a suit for forcible detainer and shall be subject to eviction and removal, forcible or otherwise, with or without process of law, and all damages by reason thereof are hereby expressly waived.

(f)   Application of Proceeds.   The proceeds from any sale, or other disposition made pursuant to this Addendum or any other remedy shall be applied by Trustee, or by Beneficiary, as the case may be, to the Indebtedness in the following order and priority: (i) to the payment of all expenses of advertising, selling, and conveying the Mortgaged Property or part thereof, and/or prosecuting or otherwise collecting Rents, proceeds, premiums, or other sums including reasonable attorneys' fees and a reasonable fee or commission to Trustee, not to exceed five percent (5%) of the proceeds thereof or sums so received; (ii) to the remainder of the Indebtedness as follows: first, to the remaining accrued but unpaid interest, second, to the matured portion of principal of the Indebtedness, and third, to prepayment of the unmatured portion, if any, of principal of the Indebtedness applied to installments of principal in inverse order of maturity; (iii) the balance, if any and to the extent applicable, remaining after the full and final payment of the Indebtedness and full performance and discharge of the obligations under the Loan Documents to the holder or Beneficiary of any superior liens covering the Mortgaged Property, if any, in order of the priority of such superior liens (Trustee and Beneficiary shall hereby be entitled to rely exclusively upon a commitment for title insurance issued to determine such priority); (iv) the balance, if any and to the extent applicable, remaining after the full and final payment of the Indebtedness and full performance and discharge of the obligations under the Loan Documents to the holder or Beneficiary of any inferior liens covering the Mortgaged Property, if any, in order of the priority of such inferior liens (Trustee and Beneficiary shall hereby be entitled to rely exclusively upon a commitment for title insurance issued to determine such priority); and (v) the cash balance, if any, to Grantor. The application of proceeds of sale or other proceeds as otherwise provided herein shall be deemed to be a payment of the Indebtedness like any other payment. The balance of the Indebtedness remaining unpaid, if any, shall remain fully due and owing in accordance with the terms of the Note or the other Loan Documents.

Initialed for Identification   *DPB*                                    Page 5

(g)    **Abandonment of Sale.** In the event a foreclosure hereunder is commenced by Trustee at any time before the sale, Trustee may abandon the sale, and Beneficiary may then institute suit for the collection of the Indebtedness and for the foreclosure of the liens and security interests hereof and of the Loan Documents. If Beneficiary should institute a suit for the collection of the Indebtedness and for a foreclosure of the liens and security interests, Beneficiary may, at any time before the entry of a final judgment in said suit, dismiss the same and require Trustee to sell the Mortgaged Property or any part thereof in accordance with the provisions of this Addendum.

(h)    Trustee may, in its sole discretion, impose any other reasonable terms for the foreclosure and/or the public sale of the Mortgaged Property by announcing the terms prior to accepting any bids.

## THE TRUSTEE

3.1    **No Required Action.** Trustee shall not be required to take any action toward the execution and enforcement of the trust hereby created or to institute, appear in, or defend any action, suit, or other proceeding in connection therewith where, in Trustee's opinion, such action would be likely to involve Trustee in Expense or liability, unless requested so to do by a written instrument signed by Beneficiary and, if Trustee so requests, unless Trustee is tendered security and indemnity satisfactory to Trustee against any and all cost, expense, and liability arising therefrom. Trustee shall not be responsible for the execution, acknowledgment, or validity of the Loan Documents, or for the proper authorization thereof, or for the sufficiency of the lien and security interest purported to be created hereby, and Trustee make no representation in respect thereof or in respect of the rights, remedies, and recourses of Beneficiary.

3.2    **Certain Rights.** With the approval of Beneficiary, Trustee shall have the right to take any and all of the following actions: (i) to select, employ, and advise with counsel (who may be, but need not be, counsel for Beneficiary) upon any matters arising hereunder, including the preparation, execution, and interpretation of the Loan Documents, and shall be fully protected in relying as to legal matters on the advice of counsel, (ii) to execute any of the trust and powers hereof and to perform any duty hereunder either directly or through his agents or attorneys, (iii) to select and employ, in and about the execution of his duties hereunder, suitable accountants, engineers and other experts, agents and attorney-in-fact, either corporate or individual, not regularly in the employ of Trustee, and Trustee shall not be answerable for any act, default, negligence, or misconduct of any such accountant, engineer or other expert, agent or attorney-in-fact, if selected with reasonable care, or for any error of judgment or act done by Trustee in good faith, or be otherwise responsible or accountable under any circumstances whatsoever, except for Trustee's gross negligence or bad faith, and (iv) any and all other lawful action as Beneficiary may instruct Trustee to take to protect or enforce Beneficiary's rights hereunder. Trustee shall not be personally liable in case of entry by Trustee, or anyone entering by virtue of the powers herein granted to Trustee, upon the Mortgaged Property

Initialed for Identification   _MPB_                    Page 6

for debts contracted for or liability or damages incurred in the management or operation of the Mortgaged Property. Trustee shall have the right to rely on any instrument, document, or signature authorizing or supporting any action taken or proposed to be taken by Trustee hereunder, believed by Trustee in good faith to be genuine. Trustee shall be entitled to reimbursement for expenses incurred by Trustee in the performance of Trustee's duties hereunder and to reasonable compensation for such of Trustee's services hereunder as shall be rendered. Grantor will, from time to time, pay the compensation due to Trustee hereunder and reimburse Trustee for, and save Trustee harmless against, any and all liability and expenses which may be incurred by Trustee in the performance of Trustee's duties.

3.3    Retention of Money. All moneys received by Trustee shall, until used or applied as herein provided, be held in trust for the purposes for which they were received, but need not be segregated in any manner from any other moneys (except to the extent required by applicable law) and Trustee shall be under no liability for interest on any moneys received by Trustee hereunder.

3.4    Successor Trustees. Trustee may resign by the giving of notice of such resignation in writing or verbally to Beneficiary. If Trustee shall die, resign, or become disqualified from acting in the execution of this trust, or if, for any reason, Beneficiary shall prefer to appoint a substitute Trustee or multiple substitute Trustees, or successive substitute Trustees or successive multiple substitute Trustees, to act instead of the aforenamed Trustee, Beneficiary shall have full power to appoint a substitute Trustee (or, if preferred, multiple appointed, each of such multiple substitute Trustees shall succeed) to all the estates, right, powers, and duties of the aforenamed Trustee. Such appointment may be executed by any authorized agent of Beneficiary, and if such Beneficiary be a corporation and such appointment be executed in its behalf by any officer of such corporation, such appointment shall be conclusively presumed to be executed with authority and shall be valid and sufficient without proof of any action by the board of directors or any superior officer of the corporation. Grantor hereby ratifies and confirms any and all acts which the aforenamed Trustee, or Trustee's successor or successors in this trust, shall do lawfully by virtue hereof. If multiple substitute Trustees are appointed, each of such multiple substitute Trustees shall be empowered and authorized to act alone without the necessity of the joinder of the other multiple substitute Trustees, whenever any action or undertaking of such substitute Trustees is requested or required under or pursuant to this Deed of Trust or applicable law.

3.5    Perfection of Appointment. Should any deed, conveyance, or instrument of any nature be required from Grantor by any Trustee or substitute Trustee to more fully and certainly vest in and confirm to the Trustee or substitute Trustee such estates, rights, powers, and duties, then, upon request by the Trustee or substitute Trustee, any and all such deeds, conveyances and instruments shall be made, executed, acknowledged, and delivered and shall be caused to be recorded and/or filed by Grantor.

Initialed for Identification _MPB_                                                    Page 7

3.6   Succession Instruments.   Any substitute Trustee appointed pursuant to any of the provisions here shall, without any further act, deed, or conveyance, become vested with all the estates, properties, rights, powers, and trust of its or his predecessor in the rights hereunder with like effect as if originally named as Trustee herein; but nevertheless, upon the written request of Beneficiary or of the Substitute Trustee, the Trustee ceasing to act shall execute and deliver any instrument transferring to such substitute Trustee, upon the trusts herein expressed, all the estates, properties, rights, powers, and trusts of the Trustee so ceasing to act, and shall duly assign, transfer and deliver any of the property and moneys held by such Trustee to the substitute Trustee so appointed in the Trustee's place.

3.7   No Representation by Trustee or Beneficiary.   By accepting or approving anything required to be observed, performed, or fulfilled or to be given to Trustee or Beneficiary pursuant to the Loan Documents, including without limitation, any officer's certificate, balance sheet, statement of profit and loss or other financial statement, survey, appraisal, or insurance policy, neither Trustee nor Beneficiary shall be deemed to have warranted, consented to, or affirmed the sufficiency, legality, effectiveness, or legal effect of the same, or of any term, provision, or condition thereof, and such acceptance or approval thereof shall not be or constitute any warranty or affirmation with respect thereto by Trustee or beneficiary.

RETAMA DEVELOPMENT CORPORATION,
a Texas local government corporation created
by the City Selma, Texas, pursuant to Section
4A of Article 15281, Texas Revised Civil
Statues Annotated

By: _Gary Baber_
GARY BABER, President

Initialed for Identification _GPB_

**EXHIBIT 'A'**

File No.:    1529338-SA60 (JMM)

Property:    9023 Retama Parkway, Selma, TX

Tract F, containing 226 acres, SAVE AND EXCEPT, Tract D, containing 7.658 acres, all as more particularly described in Exhibit A to the Funding Agreement Deed of Trust dated March 1, 1997, recorded in Volume 7042, Page 91, et seq., Real Property Records of Bexar County, Texas, and further SAVE AND EXCEPT a 9.381 acre tract conveyed to the City of Selma, in exchange deed dated December 31, 2001, recorded in Volume 9199, Page 572, et. seq., Real Property Records of Bexar County, Texas ("Exchange Deed"); TOGETHER WITH the 3.822 acre tract as described in such Exchange Deed.

**A.P.N.**

1529336-SA60



ONE BISCAYNE TOWER
2 SOUTH BISCAYNE BOULEVARD
21ST FLOOR
MIAMI, FLORIDA 33131
TELEPHONE 305.373.9400
FACSIMILE 305.373.9443
www.broadandcassel.com

DANIEL NEWMAN, P.A.
DIRECT LINE 305.373.9467
DIRECT FACSIMILE 305.995.6387
EMAIL: dnewman@broadandcassel.com

January 30, 2013

*Via U.S. Mail and E-mail*

Marc S. Dobin, Esq.
Dobin Law Group, P.A.
500 University Boulevard, Suite 205
Jupiter, FL 33458

      Re:    Sweezy Investments, LLC

Dear Mr. Dobin:

      This firm represents Christopher Hall ("Mr. Hall"). This letter shall serve as Mr. Hall's demand for repayment to him of various monies that are wrongfully being withheld by your client, William ("Chip") McNeer ("McNeer"), and to rectify actions wrongfully taken by McNeer in an apparent attempt to convert the return of funds belonging to Mr. Hall.

      First, McNeer holds certain funds from the sale in or about April 2012 of certain bonds that were purchased with Mr. Hall's monies pursuant to an agreement between Mr. Hall and McNeer. Mr. Hall seeks the immediate return of the proceeds from that sale, the amount of which is believed to be approximately $660,000.00.

      Second, as you know, on or about December 21, 2010, Mr. Hall lent funds to Retama Development Corporation ("RDC"). The funds were forwarded by Mr. Hall for RDC's benefit through his counsel, James Hurchalla. It is our understanding that your client, McNeer, formed Sweezy Investments, LLC ("Sweezy") for the benefit of Mr. Hall, as the vehicle through which the loan was formally made.

      We have been told that the loan, the terms of which run until January 2014, is going to be prepaid which repayment will occur on or about February 1, 2013. It is further our understanding that McNeer has instructed Mr. Hurchalla to no longer to act as the authorized representative and directed that all matters regarding the repayment under the RDC loan documents be directed to you. Despite numerous efforts by Mr. Hall to communicate with McNeer, McNeer has basically refused to speak with Mr. Hall much less discuss how he intends to return those funds to Mr. Hall or identify the new authorized representative or the proposed recipient of the loan proceeds.

**EXHIBIT**
"B"

Marc S. Dobin, Esq.
January 30, 2013
Page 2

We have now spoken on several occasions. In both conversations, I inquired as to McNeer's intentions with regard to the loan proceeds. You told me you were unable to provide me with any information in response to my inquiry. However, you have not disputed that Mr. Hall was the source of the funding for the RDC loan or that he has a claim to these monies. In light of the foregoing, we are formally placing you on notice that any funds received by McNeer and/or your firm should be held in escrow for the benefit of Mr. Hall. We also seek identification of the new authorized representative or proposed recipient for such funds, and the authority for McNeer making a change from Mr. Hurchalla as the recipient.

Be advised that we deem any attempt on McNeer to take possession of these funds personally or any distribution by you or any third party, other than to an agreed upon escrow agent, to constitute a conversion and/or civil theft of Mr. Hall's monies. Please confirm by no later than 12:00 p.m. on January 31, 2013, that you and McNeer will retain all funds received from RDC and the proceeds from the bond transaction described herein, for the benefit of Mr. Hall, or authorize such funds to be distributed to said agreed upon escrow agent. If we do not hear from you, we will have no alternative but to pursue all appropriate legal actions.

Very truly yours,

Daniel S. Newman, P.A.

DSN/ms