## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 15-23489-CIV-ALTONAGA/O'SULLIVAN

_____
                                :

UNITED STATES SECURITIES AND     :
EXCHANGE COMMISSION,          :
                                :

          Plaintiff,            :
                                :

      vs.                       :
                                :

CHRISTOPHER J. HALL,          :
                                :

          Defendant.        :
_____:

## PLAINTIFF UNITED STATES SECURITIES AND EXCHANGE COMMISSION'S MOTION FOR FINAL JUDGEMENT AGAINST DEFENDANT CHRISTOPHER J. HALL AND MEMORANDUM OF LAW IN SUPPORT THEREOF

Gregory R. Bockin, Special Bar No. A5501158
Sarah H. Concannon, Special Bar No. A5502248
Mark M. Oh, Special Bar No. A5502125
Direct Dial: 202.551.5361 (Concannon)
E-mail: ConcannonS@sec.gov

Attorneys for Plaintiff
**U.S. SECURITIES AND EXCHANGE COMMISSION**
100 F Street, N.E.
Washington, DC 20549

March 8, 2017

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................. 1

EVIDENCE OF MR. HALL'S CONDUCT PRESENTED DURING TRIAL............................ 2

LEGAL STANDARD.......................................................................................................... 3

REQUESTED RELIEF......................................................................................................... 4

   I.   This Court Should Impose a Permanent Injunction ............................................. 4

     A.   Mr. Hall's Violations Were Egregious.................................................... 4

     B.   The Violations Were Not An Isolated Occurrence ........................................ 6

     C.   Mr. Hall Acted With a High Degree of Scienter.......................................... 7

     D.   Mr. Hall Has Given No Assurances Against Future Violations and Has Not Recognized the Wrongful Nature of His Conduct ...................................................................... 7

     E.   Mr. Hall Continues to Support Himself Through Investing, Speculating, and Risk-Taking .......................................................................................................... 8

   II.   This Court Should Order Disgorgement in the Amount of $3,747,717.12, Plus Prejudgment Interest Thereon .................................................................................... 9

     A.   Mr. Hall's Total Ill-Gotten Gain .......................................................... 10

     B.   Offsets to Total Pecuniary Gain .......................................................... 10

     C.   Prejudgment Interest ......................................................................... 11

   III.   This Court Should Order a Civil Money Penalty in the Amount of $3,747,717.12 ...... 13

   IV.   This Court Should Order a Permanent Officer and Director Bar................................. 14

CONCLUSION................................................................................................................... 15

i

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*FTC v. Gem Merchandising Corp.*,
   87 F.3d 466 (11th Cir. 2008) ...................................................................................9

*Gabelli v. SEC*,
   133 S. Ct. 1216 (2013).........................................................................................14

*SEC v. Blatt*,
   583 F.2d 1325 (5th Cir. 1978) ...............................................................................9

*SEC v. Brennan*,
   No. 0:12-cv-62074-RSR, 2013 WL 12091621 (S.D. Fla. Dec. 9, 2013).............14, 15

*SEC v. Calvo*,
   378 F.3d 1212 (11th Cir. 2004) .........................................................................4, 9

*SEC v. Carriba Air, Inc.*,
   681 F.2d 1318 (11th Cir. 1982) ...........................................................................4

*SEC v. Coates*,
   137 F. Supp. 2d 413 (S.D.N.Y.2001).....................................................................1

*SEC v. Conaway*,
   697 F. Supp. 2d 733 (E.D. Mich. 2010)......................................................4, 11, 12

*SEC v. First City Fin. Corp., Ltd.*,
    688 F. Supp. at 705 (D.D.C. 1988) .......................................................................8

*SEC v. First Jersey Sec., Inc.*,
   101 F.3d 1450 (2d Cir. 1996)..............................................................................12

*SEC v. Friendly Power Co.*,
   49 F. Supp. 2d 1363 (S.D. Fla. 1999) ...................................................................9

*SEC v. Graham*,
   823 F.3d 1357 (11th Cir. 2016) ..........................................................................11

*SEC v. Johnson*
    595 F. Supp. 2d 40 (D.D.C. 2009) ............................................................3

*SEC v. Kokesh*,
    834 F.3d 1158 (10th Cir. 2016) ............................................................11

*SEC v. Levin*,
    No. 1:12-cv-21917-UU, 2015 WL 11199843, (S.D. Fla. July 15, 2015) ...............9

*SEC v. Levine*
    279 F. App'x 6 (D.C. Cir. 2008) ............................................................3

*SEC v. Lipson*
    278 F. 3d 656 (7th Cir. 2002) ............................................................3

*SEC v. Marker*,
    427 F. Supp. 2d 583, 592 (M.D.N.C. 2006) ............................................................13

*SEC v. Merchant Capital, LLC*,
    486 Fed. App'x 93 (11th Cir. 2012) ............................................................1, 12

*SEC v. Miller*,
    744 F. Supp. 2d 1325 (N.D. Ga. 2010) ............................................................7

*SEC v. Monterosso*,
    756 F.3d 1326 (11th Cir. 2014) ............................................................13

*SEC v. Opulentica, LLC*,
    479 F. Supp. 2d 319 (S.D.N.Y. 2007)............................................................13

*SEC v. Robinson*,
    No. 00 Civ. 7452, 2002 WL 1552049 (S.D.N.Y. July 16, 2002) ............................9

*SEC v. Rosen*
    No. 01-0369-CIV, 2002 WL 34414715 (S.D. Fla. Apr. 24, 2002)............................3

*SEC v. Shapiro*,
    494 F.2d 1301 (2d Cir. 1974)............................................................4

*SEC v. Solow*,
554 F. Supp. 2d 1356 (S.D. Fla. 2008) ..............................................................9, 13–15

*SEC v. Unique Fin. Concepts*,
196 F.3d 1195 (11th Cir. 1999). ........................................................................4

*SEC v. Velten*,
No. 13-23477 (S.D. Fla. Oct. 9, 2014)...................................................................7

*SEC v. Warren*,
534 F.3d 1368 (11th Cir. 2008) ..........................................................................13

*SEC v. Yun*,
148 F. Supp. 2d 1287 (M.D. Fla. 2001) ..............................................................13

## STATUTES AND RULES

15 U.S.C. § 78j(b) ...............................................................................................2

15 U.S.C. § 77q(a) ..............................................................................................2

15 U.S.C. § 77t(d) ...............................................................................................13

15 U.S.C. § 77t(e) ...............................................................................................14

15 U.S.C. § 78l...................................................................................................14

15 U.S.C. § 78o(d) ..............................................................................................14

15 U.S.C. § 78u(d)(1) ..........................................................................................4

15 U.S.C. § 78u(d)(2) ..........................................................................................14

15 U.S.C. § 78u(d)(3) ..........................................................................................13

26 U.S.C. § 6621(a)(2)) .......................................................................................12

28 U.S.C. § 2462................................................................................................11

17 C.F.R. § 201.1005...........................................................................................13

Plaintiff United States Securities and Exchange Commission ("SEC") respectfully moves this Court to issue a final judgment as to Defendant Christopher J. Hall ("Mr. Hall") permanently enjoining Mr. Hall from violating the antifraud provisions of the federal securities laws, ordering disgorgement of Mr. Hall's ill-gotten gains, imposing a civil money penalty, and permanently barring Mr. Hall from acting as an officer or director of any registered issuer.

## **INTRODUCTION**

After a seven-day trial, the jury unequivocally found that Mr. Hall repeatedly violated the federal securities laws—indeed, engaged in fraud—returning findings of liability on both counts and all subsections in less than one hour.  The SEC's evidence established that Mr. Hall profited from his fraudulent conduct.  Mr. Hall used the proceeds of his fraud to fund his lavish lifestyle, pay off personal debts, and engage in business ventures and investment schemes (from which he planned to benefit greatly).  For more than six years, Mr. Hall has had the time value of his ill-gotten gains and, now that his liability has been determined by the jury, the remedial purpose of the federal securities laws demands that those ill-gotten gains be disgorged with prejudgment interest to prevent Mr. Hall from obtaining the benefit "from what in effect amount[s] to interest-free loans of the ill-gotten funds."  *SEC v. Merchant Capital, LLC*, 486 Fed. App'x 93, 97 (11th Cir. 2012).  The SEC respectfully requests further remediation in the form an injunction against future violations of the antifraud provisions of the federal securities laws and an officer and director bar.

Mr. Hall's conduct also demands a substantial penalty.  As many courts have noted, there would be no deterrent impact in the securities laws without penalties.  *See, e.g.*, *SEC v. Coates,* 137 F. Supp. 2d 413, 428–29 (S.D.N.Y.2001) (civil penalties are designed to deter securities fraud violations and extract a price beyond the ill-gotten profits that are disgorged).  The rationale for a penalty is particularly acute in the present case where Mr. Hall displayed absolutely no contrition for his misconduct.  To the contrary, in testimony, Mr. Hall seemed to claim that he was entitled to deceive others for millions of dollars because he had young children and anticipated college expenses (then years away).  Mr. Hall also seemed to suggest that his prior wealth and investment losses during the financial crisis excused his deceit, testifying that he had lost tens of millions of dollars (from the tens of millions of dollars loaned to him by Penson).  Mr. Hall even suggested that when he defrauded Penson and its shareholders, he was being "a team player," but reluctantly admitted on cross-examination that he lied in order to get

1

back some of the value of the collateral pledged to Penson at others' expense.  [Ex. 1 (Trial Day 4 at 215:12–23 (Hall)); Ex. 2 (Trial Day 5 at 54:1–5; 54:23–56:5 (Hall)).]  Mr. Hall's cavalier testimony was, in many ways, tantamount to an assertion that the laws that govern others do not apply to Mr. Hall.  They do.  This Court should impose a substantial penalty.

### EVIDENCE OF MR. HALL'S CONDUCT PRESENTED DURING TRIAL

Trial of this case began on February 13, 2017 and included testimony from three third-party fact witnesses, extensive direct and cross-examination of Mr. Hall, and testimony from Defendant's expert witness, W. Dennis Ferguson.  [D.E. 104–08, 111, 115.]  After hearing the evidence, the jury returned its verdict on February 22, 2017, unanimously finding that Mr. Hall violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rules 10b-5(a)-(c) promulgated thereunder [17 C.F.R. § 240.10b-5] (Count I) and Section 17(a)(1)-(3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] (Count II) [D.E. 112.]  With respect to his violations of Section 10(b), Rule 10b-5(a), Rule 10b-5(b), Rule 10b-5(c), and Section 17(a)(1), the jury found that Mr. Hall acted knowingly or with severe recklessness.  *Id.*  With respect to his violation of Sections 17(a)(2) and 17(a)(3), the jury found that Mr. Hall was at least negligent.  *Id.*  The jury's answers were based on conduct by Mr. Hall occurring both before June 27, 2009 and on or after June 27, 2009.  *Id.*

This verdict was consistent with the evidence at trial, which established that Mr. Hall engaged in a fraudulent scheme, made materially false and misleading statements and omissions, and took actions that operated as a fraud or deceit in connection with certain transactions involving a securities brokerage firm called Penson Financial Services, Inc., or "Penson," and its parent companies, SAI Holdings, Inc. ("SAI"), and Penson Worldwide, Inc. ("PWI"), a publicly-traded company listed on the NASDAQ exchange between 2006 and 2012.  [Ex. 3 (Trial Day 3 at 15:2–11, 23:14–24:19 (Pendergraft)); Ex. 4 (PX 187).]

The SEC proved that Mr. Hall falsely claimed that he needed money to pay off liens on shares of stock that Mr. Hall was pledging as collateral in his margin account and in connection with a restructuring of his margin account, causing Penson to pay millions of dollars to pay off liens that did not exist or were grossly exaggerated.  The SEC also proved that Mr. Hall made false and misleading statements and omissions about a purported lien on a limited partnership interest that he pledged to Penson in connection with the restructuring.  The evidence established that Mr. Hall's misstatements and omissions were material—or important—to a reasonable

investor, and that Mr. Hall acted knowingly or with severe recklessness, and (as to Sections 17(a)(2) and 17(a)(3)) at least negligently.

The evidence at trial established that Mr. Hall committed three principal acts of fraud:

First, that Mr. Hall made misstatements and omissions concerning liens on 1.5 million shares of Call Now stock that he was pledging to his margin account in 2009, which resulted in Mr. Hall receiving the total amount of $3,687,915.20 to pay off the purported liens;

Second, that Mr. Hall made misstatements and omissions concerning his sale of Call Now stock to Call Now as part of a restructuring transaction in 2010, falsely claiming that he required $1.8 million to pay off a preexisting lien on 721,463 shares of Call Now stock when he only needed $850,000, which resulted in Mr. Hall's receiving $952,500 more than required to pay off any lien; and

Third, that Mr. Hall made misstatements and omissions concerning his pledge of a limited partnership interest to PFSI in 2010, falsely claiming that his interest was subject to a preexisting lien in the amount of $3,120,444.90 plus 10% interest, which resulted in Mr. Hall receiving $1.36 million from the distribution of the limited partnership interest.  Mr. Hall then loaned $1 million of the distribution proceeds to the Retama Park racetrack through Sweezy Investments, LLC ("Sweezy"), a company created to disguise his assets; he pocketed the rest.

The specific misstatements and omissions proven by the SEC in connection with each of these three principal acts of fraud are detailed in the Court's Instructions to the Jury [D.E. 116, at pp. 6–8 (citing Exs. 5–10 (PX 63, 190, 68, 71, 54, 29).]

## LEGAL STANDARD

It is for this Court to decide, "consistent with the jury's finding of liability, not only what equitable relief to impose, but also the amount of the civil penalty."  *SEC v. Lipson*, 278 F.3d 656, 662 (7th Cir. 2002).  In fashioning appropriate relief, the Court may consider trial testimony and exhibits, *SEC v. Johnson*, 595 F. Supp. 2d 40, 42 (D.D.C. 2009), evidence that was not presented to the jury, *SEC v. Levine*, 279 F. App'x 6, 8 (D.C. Cir. 2008), and, if additional evidence is needed, further discovery or an evidentiary hearing may be permitted.  *SEC v. Rosen*, No. 01-0369-CIV, 2002 WL 34414715, at *1 (S.D. Fla. Apr. 24, 2002) ("parties were given an opportunity to address the remaining remedies issues in post-trial papers or in an evidentiary hearing, at their option").  As with the liability phase, the SEC need only establish its requested

3

relief by a preponderance of the evidence, and may rely on direct or circumstantial evidence to meet its burden. *SEC v. Conaway*, 697 F. Supp. 2d 733, 745 (E.D. Mich. 2010).

<u>**REQUESTED RELIEF**</u>

**I.      This Court Should Impose a Permanent Injunction**

The SEC seeks a permanent injunction against Mr. Hall's future violations of Section 10(b) of the Exchange Act, Rule 10b-5 promulgated thereunder, and Section 17(a) of the Securities Act. Pursuant to Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)] and Section 20(d) of the Securities Act [15 U.S.C. § 78t(b)], the Court is authorized to enjoin any acts or practices constituting a violation of any provision, rule, or regulation of the Acts. The SEC is entitled to injunctive relief when it establishes (1) a violation of the federal securities laws, and (2) a reasonable likelihood of future violations. *SEC v. Calvo*, 378 F.3d 1212, 1216 (11th Cir. 2004); *SEC v. Unique Fin. Concepts*, 196 F.3d 1195, 1199 n.2 (11th Cir. 1999). Injunctions are an important tool for enforcement of securities laws, because "[t]he SEC cannot keep constant surveillance over a defendant." *SEC v. Shapiro*, 494 F.2d 1301, 1309 (2d Cir. 1974). An injunction ensures that a defendant will be careful to avoid future violations.

The jury's verdict establishes the first prong—a violation of the securities laws—against Mr. Hall. In determining whether Mr. Hall is reasonably likely to continue to violate the securities laws, the Court should consider the following factors: (1) the egregiousness of Mr. Hall's actions; (2) the isolated or recurrent nature of the violations; (3) the degree of scienter involved; (4) the sincerity of Mr. Hall's assurances, if any, against future violations; (5) Mr. Hall's recognition of the wrongful nature of his conduct; and (6) the likelihood that Mr. Hall's occupation will present opportunities for future violations. *SEC v. Carriba Air, Inc.*, 681 F.2d 1318, 1322 (11th Cir. 1982) (affirming grant of permanent injunction). Consideration of these factors here leads to the conclusion that a permanent injunction against Mr. Hall is warranted.

**A.      Mr. Hall's Violations Were Egregious**

Mr. Hall's violations of the antifraud provisions of the federal securities laws were egregious. In 2009 and 2010, Mr. Hall engaged in a scheme to defraud Penson and its shareholders of millions of dollars by lying about purported liens on securities that did not exist or were grossly exaggerated. With full knowledge that he had an obligation to tell the truth to his broker-dealer, that he was required to obey all securities laws, rules, and regulations, and knowing that he could not assist or abet the broker-dealer's violations of the securities laws, Mr.

Hall nevertheless lied about five separate purported liens on collateral pledged to Penson in connection with his margin account—all at a time when Mr. Hall was already in debt to Penson for tens of millions of dollars and his margin account was in negative equity.

First, Mr. Hall lied about a $672,568 lien to pocket $672,568 of Penson and its shareholders' money.  Second, Mr. Hall lied about a $1.5 million lien, to pocket another $1.5 million.  Third, Mr. Hall lied about a $1.4 million lien, to pocket $1.4 million.  With full knowledge that none of this money had been used to pay off a purported lienholder, Mr. Hall entered into the Amended and Restated Promissory Note with SAI effective June 30, 2009, agreeing to repay $3.68 million to SAI; none of that money has been repaid.  [Ex. 11 (Trial Day 2 at 84:15–17 (Smith)).]  Fourth, Mr. Hall lied about a $1.8 million lien, using just $850,000 to pay off the lienholder (and receiving in exchange an additional 214,104 shares of Call Now stock), and pocketing the remaining $952,500.  Although Penson wired twice the amount Mr. Hall agreed to pay the lienholder, Ms. Ozner, in full, Mr. Hall nevertheless did not pay her, resulting in Ms. Ozner suing him both in 2010 and in 2013 to collect on Mr. Hall's debts.  [Ex. Ex. 33 (DX 42); Ex. 12 (PX 135); Ex. 2 (Trial Day 5 at 50:23–51:19 (Hall)).]  Indeed, Mr. Hall admitted that he "chose" not to pay Ms. Ozner, a widow and the mother of a deceased former business partner, while maintaining six homes.  [Ex. 2 (Trial Day 5 at 51:15–19 (Hall)).]  Fifth, in connection with the restructuring and effort to bring $10 million of additional value into his margin account in 2010, Mr. Hall lied about a $3.1 million lien, plus 10% interest, in favor of Sweezy, failing to tell Penson that there was no such lien, and that even if there were, the lien was in favor of Sweezy, a company created for Mr. Hall's benefit and with the specific intent of disguising assets from Penson.

In total, Mr. Hall received $5.5 million in wires from Penson and $1.36 million from the distribution of his interest in Stone Oak Prime, L.P. ("Stone Oak Prime") only $850,000 of which was ever sent to a lienholder.  Multiple witnesses testified that these funds would not have been wired had Penson known the truth.  [Ex. 11 (Trial Day 2 at 96:11–97:7 (Smith) ("[I]f there isn't a lien, then the company wired out $5.5 million that they didn't need to, so no.")); Ex. 3 (Trial Day 3 at 63:18–64:1, 71:7–9, 79:19–22, 99:19–21 (Pendergraft) (the liens were "the only reason" Penson wired the money to Hall)).]   All of the funds Mr. Hall received from his misrepresentations and omissions were funneled through the trust account of Mr. Hall's attorney

and friend, James J. Hurchalla, a member of the Florida Bar.  [Ex. 1 (Trial Day 4 at 129:5–12 (Hall)).]

There is substantial evidence in the record that these were egregious securities law violations.  This factor weighs in favor of an injunction and also demonstrates Mr. Hall's high degree of scienter.

## B.      The Violations Were Not An Isolated Occurrence

Mr. Hall's violations of the securities laws began in March 2009, and continued until at least November 2010, when he elected to keep the $1.36 million in proceeds from the distribution of his interest in Stone Oak Prime, rather than honoring his commitments to Penson.  In 2013, Mr. Hall still owed Ms. Ozner $150,000, despite the fact that Penson had wired sufficient funds in March 2010 to pay off his debt in full.  [Ex. 12 (PX 135); Ex. 2 (Trial Day 5 at 50:23–51:19 (Hall)).]  When Mr. Hall sued Mr. McNeer and Sweezy  in April 2013 to recover approximately $1 million from the settlement of his investment in Stone Oak Prime that he had loaned to Retama Park, Mr. Hall did so to recover money for himself, not Penson and its shareholders, seemingly with total disregard that the money might properly be due to Penson, not Mr. Hall.  [Ex. 1 (Trial Day 5 at 39:24–40:17, 86:21–87:2 (Hall)).]  Moreover, Mr. Hall is a recidivist, having previously resolved actions with both the National Association of Securities Dealers ("NASD") (the predecessor to the Financial Regulatory Authority ("FINRA")) and the SEC.[1]  [Ex. 13–18 (PX 122, 124, 167, 171–73, for identification only).]

There is substantial evidence in the record that Mr. Hall's violations are not isolated.  This factor weighs in favor of an injunction and also demonstrates Mr. Hall's high degree of scienter.

---

[1]  Mr. Hall has a long and colorful history in the securities industry.  In 1995, the NASD censured and fined Mr. Hall's firm, Howe, Solomon & Hall ("HSH") and Mr. Hall $30,000 for charging excessive markups on municipal bond transactions and failing to have adequate supervisory procedures for pricing municipal securities.  The NASD also ordered HSH to pay $67,936 in restitution to customers.  *See NASD Dist. Bus. Conduct Cmte. v. Howe, Solomon & Hall, Inc.*, Decision, Compl. No. 007940078 (Oct. 24, 1995).  Then, in 1998, the SEC instituted a settled administrative and cease-and-desist proceeding against HSH and Mr. Hall for charging undisclosed, excessive markups on distressed or defaulted municipal bond transactions, ordered HSH to pay a $25,000 civil penalty and $135,412 in disgorgement and prejudgment interest, and censured Mr. Hall.  *See* Howe, Solomon & Hall, Release No. 34-40038, 67 S.E.C. Dkt. 485, 1998 WL 271801 (May 28, 1998).  In 1999, the NASD again sanctioned HSH and Mr. Hall for improperly including defaulted municipal bonds and revenue from manipulative "parking" transactions of defaulted municipal bonds as allowable assets in HSH's net capital computation, causing HSH to have insufficient net capital for six months.  The NASD censured HSH and Mr. Hall and fined each $25,000.  The NASD also suspended Mr. Hall from association with any NASD member in any capacity for two years and permanently barred him from association with any NASD member in any principal capacity.  *See* Howe, Solomon & Hall, Inc., Letter of Acceptance, Waiver and Consent to NASD Regulation, Inc., No. 007980023-AWC (Jan. 14, 1999).

### C.      Mr. Hall Acted With a High Degree of Scienter

Mr. Hall's conduct reflects a high degree of scienter.  Substantial evidence of Mr. Hall's high degree of scienter—including, primarily, his own testimony—was presented at trial.  Mr. Hall is a sophisticated and experienced player in the securities markets, having owned his own securities brokerage firm for over a decade.  [Ex. 1 (Trial Day 4 at 103:23–25 (Hall)).]  Mr. Hall previously resolved actions with both the NASD (the predecessor to FINRA) and the SEC and was aware that he had a duty to tell the truth to his broker-dealer.  [Ex. 1 (Trial Day 4 at 115:10– 13 (Hall)).]  Mr. Hall was also aware, based on his representations in his written margin and option agreements with Penson, that he was required to comply with all applicable laws, rules, and regulations in connection with his account.  [Exs. 19–20 (PX 92; PX 121).]  Despite this express knowledge, however, Mr. Hall admitted that he repeatedly made written misrepresentations to Penson regarding so-called liens on shares of Call Now stock to be pledged to Penson to increase the value of the collateral in his margin account.  Mr. Hall admitted under oath that he repeatedly lied to Penson and that his emails were false.  [Ex. 1 (Trial Day 4 at 127:5–10, 128:3–5, 143:25–144:12, 206:8–23, 208:1–3 (Hall)); Ex. 2 (Trial Day 5 at 56:3–5 (Hall)).]  Mr. Hall likewise admitted he omitted important information—including that although Penson wired $1.8 million to him for the specific purpose of paying off a purported lien on 721,463 shares of Call Now stock to be sold to Call Now as part of the restructuring, and that Mr. Hall only used $850,000 of that money to pay off the lien.  At one point during his trial testimony, Mr. Hall even suggested that he could have used the money fraudulently obtained from the Stone Oak Prime distribution "to buy a boat," evidencing Mr. Hall's willful disregard of the securities laws and his intent to act in his own self-interest at the expense of others.  [Ex. 1 (Trial Day 4 at 199:14–15 (Hall)); Ex. 34 (PX 31).]

"Courts in the Eleventh Circuit have found a 'high level of scienter' justifying the award of a civil penalty when a defendant repeatedly lied and deceived others."  *SEC v. Velten*, No. 13-23477 (S.D. Fla. Oct. 9, 2014) (Altonaga, J.) [D.E. 40, Order] (citing *SEC v. Miller*, 744 F. Supp. 2d 1325, 1339, 1345 (N.D. Ga. 2010)).  This is the case here.

### D.      Mr. Hall Has Given No Assurances Against Future Violations and Has Not Recognized the Wrongful Nature of His Conduct

Although Mr. Hall testified at length at trial, both on direct and cross-examination, he persistently refused to recognize his culpability in this case.  Although Mr. Hall admitted that he lied in connection with pledges and sales of securities for additional collateral in his margin

account, he continued to maintain at trial that he did not violate the securities laws because he was "desperate," "needed to have something to be able to make sure my kids could go to college," Penson was "looking for everything, I was going to be penniless," and that Penson's violations of the securities laws somehow excused Mr. Hall's own repeated violations of the law. [Ex. 1 (Trial Day 4 at 127:21–22, 159:15–18 (Hall)).]  Even if Mr. Hall now were to express any remorse for his actions, such statements would be unpersuasive and self-serving, since they would be made in response to the Jury's Verdict that he committed multiple frauds, and the SEC's requests for relief that include disgorgement of ill-gotten gains and a substantial monetary penalty.  *See SEC v. First City Fin. Corp., Ltd.*, 688 F. Supp. at 705, 725–26 (D.D.C. 1988) (defendant's "representations that he will comply fully with the law in the future are self-serving and 'neither … conclusive or even necessarily persuasive, especially if no evidence of remorse surfaces until the violator is caught'").  Mr. Hall's willful blindness to the wrongful nature of his own misconduct and the damage to the integrity of the financial markets caused thereby weighs in favor of an injunction.  *Id.* at 726 ("failure to express remorse at any time casts serious doubt on the sincerity of [any] assurances of future compliance").

### E. Mr. Hall Continues to Support Himself Through Investing, Speculating, and Risk-Taking

Mr. Hall continues to support himself through investing, speculating, and risk-taking. Mr. Hall's current occupation—as a self-employed investor—presents a likelihood of future violations that only a permanent injunction can prevent.  Mr. Hall is a proven recidivist. Moreover, his prior NASD and SEC sanctions (which effectively barred him from the broker-dealer industry and from misconduct in selling municipal securities) did not prevent Mr. Hall, as a self-employed investor/speculator in real estate and municipal securities and a chairman of a public company, from committing fraud more broadly in connection with the purchase or sale of other securities.

Mr. Hall's testimony further evidences his intent to continue to his risky conduct.  When asked about his real estate holdings by his own counsel, Mr. Hall indicated that many of these properties are significantly leveraged, and that he had pledged money for a new "deal" he was "working on."  [Ex. 2 (Trial Day 5 at 67:14–69:1 (Hall)); Ex. 21 (PX 57).]  Mr. Hall also immediately diverted the proceeds from the Stone Oak Prime distribution through a loan to Retama Park, seemingly believing that it was more important to support his ongoing investments, than to honor his commitments to Penson.  [Ex. 2 (Trial Day 5 at 58:18–59:1

(Hall)); Ex. 34 (PX 31).]  As long as Mr. Hall continues to support himself through investing, speculating, and risk-taking, there is a substantial risk that Mr. Hall will engage in further fraudulent schemes.

For these reasons, the SEC's request for injunctive relief should be granted.

**II.      This Court Should Order Disgorgement in the Amount of $3,747,717.12, Plus Prejudgment Interest Thereon**

The SEC seeks disgorgement of Mr. Hall's ill-gotten gains in the amount of $3,747,717.12, plus prejudgment interest thereon.  A district court may exercise its equitable power to grant disgorgement once a jury finds a defendant committed securities violations.  *SEC v. Robinson*, No. 00 Civ. 7452, 2002 WL 1552049, at *6–8 (S.D.N.Y. July 16, 2002). Disgorgement is not intended to compensate victims of a defendant's securities violations, and is not considered to be a punitive measure.  *FTC v. Gem Merchandising Corp.*, 87 F.3d 466, 470 (11th Cir. 2008) (quoting *SEC v. Blatt*, 583 F.2d 1325, 1335 (5th Cir. 1978)).  Rather, the purpose of disgorgement is to force a defendant to give up the entire amount by which he was unjustly enriched and to deter others from violating the securities laws. *Blatt*, 583 F.2d at 1335.

The SEC is not required to trace every dollar of ill-gotten gains, and need only show that the amount of disgorgement is a "reasonable approximation of the profits causally connected to the violation."  *SEC v. Friendly Power Co.*, 49 F. Supp. 2d 1363, 1372–73 (S.D. Fla. 1999). Once the SEC establishes a reasonable approximation of profits causally connected to the violation, the burden shifts to the defendant, since calculating disgorgement may at times be a near-impossible task, the risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty.  All doubts concerning the determination of disgorgement are to be resolved against the defendant.  *SEC v. Solow*, 554 F. Supp. 2d 1356, 1363 (S.D. Fla. 2008). Calculation of the defendant's economic gain need not be exact, and determination of the approximate amount is left to the sound discretion of the trial court.  *Id.* ("Exactitude is not a requirement; so long as the measure of disgorgement is reasonable, any risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty.") (quoting *Calvo*, 378 F.3d at 1217).  A defendant's inability to pay or financial hardship is no defense to a request for disgorgement.  *SEC v. Levin*, No. 1:12-cv-21917-UU, 2015 WL 11199843, at *2 (S.D. Fla. July 15, 2015).

### A.  Mr. Hall's Total Ill-Gotten Gain

Mr. Hall personally benefitted from his fraudulent scheme, misstatements, and omissions as follows:

(1) Obtaining a $3.68 million loan from Penson in three separate advances purportedly to pay off liens on approximately 1.5 million shares of his Call Now stock so that he could pledge those shares to Penson as additional collateral for his margin loans as follows:

**Table 1:**

| Date of Loan Advance | Amount of Loan Advance | Call Now Shares Pledged | Date Shares Deposited into Hall's Penson Account |
|---|---|---|---|
| 4/16/09 | $672,568.00 | 300,724 | 4/27/09 |
| 5/20/09 | $1,586,500.00 | 702,654 | 6/8/09 |
| 6/30/09 | 1,428,847.20 | 534,034 | 7/9/09 |
| TOTAL | $3,687,915.20 | 1,537,412 | |

(2) Obtaining a $1,802,500.00 payment from Penson in March 2010 purportedly to pay off an existing lien on an additional 721,463 shares of his Call Now stock so that he could sell them to Call Now as part of a restructuring of his and Call Now's margin accounts; and

(3) His pledge of his Stone Oak Prime interest in February 2010 as additional collateral for his margin loans without disclosing that the interest was subject to a lien by an entity that he controlled an created to hide his assets from Penson; when Hall received a $1,366.369.92 distribution from his Stone Oak Prime interest in November 2010, he failed to deliver the proceeds to Penson as he had pledged.

Thus, the total amount of Mr. Hall's ill-gotten gain is $6,856,785.12.

### B.      Offsets to Total Pecuniary Gain

Mr. Hall's total ill-gotten gain of $6,856,785.12 is offset by: (i) $850,000 that was distributed by Mr. Hall to an innocent third-party lienholder, June Ozner, shortly after Mr. Hall received the $1.8 million wire transfer from Penson [Ex. 22 (JX 13)]; and (ii) the portion of Mr. Hall's ill-gotten gain that was received outside the five-year statute of limitations.

With respect to the statute of limitations, Mr. Hall's earliest misconduct occurred on or around April 16 and May 20, 2009.  Hall executed tolling agreements tolling the five-year statute of limitations period from June 11, 2014 to August 31, 2015.  [Exs. 23–28 (PX 149–154, for identification only).]  Because the SEC filed its Complaint against Hall on September 17, 2015,

the parties agree that June 27, 2009 is the beginning of the five-year statute of limitations period under 28 U.S.C. § 2462. Pursuant to the Eleventh Circuit's opinion in *SEC v. Graham*, 823 F.3d 1357 (11th Cir. 2016), the SEC does not seek disgorgement of the first two advances on the $3.68 million loan that Mr. Hall received in 2009. Although Mr. Hall's misconduct with respect to the loans continued past the statute of limitations cutoff, the specific ill-gotten gain that Mr. Hall obtained on April 16 ($672,568) and May 20, 2009 ($1,586,500) is currently time-barred under *Graham*.[2]

Therefore, The SEC seeks $3,747,717.12 in disgorgement for the gross amount of Mr. Hall's ill-gotten gain within the five-year statute of limitations.[3] The precise calculation supporting this disgorgement amount is set forth below:

**Table 2:**

| Violation | Amount of Pecuniary Gain |
|---|---|
| June 30, 2009 Advance | $1,428,847.20 |
| Mar. 2, 2010 Wire (Less $850,000 Paid to June Ozner) | $952,500 |
| Nov. 12, 2010 Stone Oak Prime, L.P. Interest Distribution | $1,366,369.92 |
| **TOTAL** | **$3,747,717.12** |

## C. Prejudgment Interest

The SEC also seeks prejudgment interest on the $3,747,717.12 disgorgement amount. "A decision to award prejudgment interest, and at what rate, like the decision to grant disgorgement, is in the broad discretion of the district court." *Conaway*, 697 F. Supp. 2d at 747. In deciding whether to award prejudgment interest, courts look to various factors, such as "(i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or

---

[2] The Supreme Court recently granted *certiorari* to resolve the question whether the limitations period in 28 U.S.C. § 2462—which sets a five-year limitations period for suits "for the enforcement of any civil fine, penalty, or forfeiture"—applies to SEC actions seeking disgorgement of ill-gotten gains. *Compare, e.g.*, *SEC v. Kokesh*, 834 F.3d 1158 (10th Cir. 2016) (holding that the five-year limitations period set forth in 28 U.S.C. § 2462 does not also applies to claims for disgorgement), *with SEC v. Graham*, 823 F.3d 1257 (11th Cir. 2016) (holding that Section 2462's limitations period applies to claims for disgorgement).

The SEC therefore requests findings by this Court with respect to the total amount of Mr. Hall's pre-June 27, 2009 pecuniary gain, such that the SEC may seek leave from the Court to seek additional disgorgement for pre-June 27, 2009 violations in the event the Supreme Court affirms *Kokesh*, effectively overruling *Graham*. As set forth in Table 1, above, the record supports a finding by this Court that Mr. Hall's total pecuniary gain before June 27, 2009 is $2,259,068 ($672,568 + $1,586,500). [Ex. 35 ([Proposed] Final Judgment, ¶ 7)].

[3] Because the evidence showed that Mr. Hall distributed some of his ill-gotten gains to third-party creditors [Ex. 22 (JX 13); Ex. 34 (PX 31)] and also that Mr. Hall has a history of concealing assets, the SEC also respectfully requests an instruction by the Court that Mr. Hall cooperate fully with the SEC's efforts to execute and recover any and all ill-gotten gains. [Ex. 35 ([Proposed] Final Judgment, ¶ 13)].

(iv) such other general principles as are deemed relevant by the court." *Conaway*, 697 F. Supp. at 747. In SEC enforcement actions, the remedial purpose of the statute, which is to deprive culpable defendants of their unlawful gains, takes on special importance. *Id.*; *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1474 (2d Cir. 1996). Mr. Hall used his ill-gotten gains to pay down business and personal obligations, including high-interest debts and tax liens. [Ex. 1 (Trial Day 5 at 51:15–19, 152:6–8, 152:12–153:8 (Hall)); Ex. 22 (JX 13).] To not apply interest to Mr. Hall's ill-gotten gains would therefore be the equivalent of giving him the benefit of "what in effect amount[s] to interest-free loans of the ill-gotten funds." *Merchant Capital*, 486 Fed. App'x at 97; *see also SEC v. Moran*, 944 F. Supp. 286, 295 (S.D.N.Y. 1996).

Application of prejudgment interest usually begins with the date of the unlawful gain and ends at the entry of judgment. *First Jersey*, 101 F.3d at 1477. Usually, the interest rate applied is the underpayment rate used by the Internal Revenue Service, because it "reflects what it would have cost to borrow the money from the government and therefore reasonably approximates one of the benefits the defendant derived from" his securities violations. *Id.* at 1476 (citing 26 U.S.C. § 6621(a)(2)).

Here, Mr. Hall received the ill-gotten gains subject to disgorgement on three separate dates over a two-year period: $1.4 million on June 30, 2009; $952,500 on March 2, 2010; and $1,366,369.92 on November 12, 2010. The SEC can provide a prejudgment interest calculation for any date selected by the Court. For example, if the Court elects to conservatively apply prejudgment interest through February 22, 2017, the date of the jury's verdict, then the calculation would be as follows:

**Table 3:**

| Date of Violation | Date of Verdict | Amount of Disgorgement | Prejudgment Interest |
|---|---|---|---|
| June 30, 2009 | Feb. 22, 2017 | $1,428,847.20 | $415,030.82 |
| March 2, 2010 | Feb. 22, 2017 | $952,500.00 | $240,486.34 |
| Nov. 12, 2010 | Feb. 22, 2017 | 1,366,369.92 | $300,066.23 |
| **TOTAL** | | **$3,747,717.12** | **$955,583.39** |

*See* Exs. 29–31 (Prejudgment Interest Reports).[4]

---

[4] Mr. Hall, of course, will have the time value of the relevant money until a Final Judgment is imposed by this Court. Once this Court has resolved the relevant remedies issues and determined the appropriate amount of disgorgement, the SEC can provide a prejudgment interest calculation through the anticipated entry of the Final Judgment in this case. *See First Jersey*, 101 F.3d at 1477.

### III.  This Court Should Order a Civil Money Penalty in the Amount of $3,747,717.12

The SEC seeks a civil money penalty in the amount of $3,747,717.12.  In SEC enforcement actions, "[c]ivil penalties are intended to punish the individual wrongdoer and to deter him and others from future securities laws violations."  *SEC v. Monterosso*, 756 F.3d 1326, 1338 (11th Cir. 2014); *SEC v. Opulentica, LLC*, 479 F. Supp. 2d 319, 331 (S.D.N.Y. 2007).  "A civil penalty is necessary because disgorgement merely requires the return of illegal profits; it does not impose an actual economic penalty as a deterrent to violations of the securities laws." *SEC v. Marker*, 427 F. Supp. 2d 583, 592 (M.D.N.C. 2006).  The imposition of a penalty is a discretionary determination to be made "in light of the facts and circumstances" of the particular case.  *Solow*, 554 F. Supp. 2d at 1365; *Monterosso*, 756 F.3d at 1338.  When deciding an appropriate penalty, a court may look at several factors, including the egregiousness of the violations, the isolated or repeated nature of the violations, the degree of scienter involved, and the deterrent effect given the defendant's financial worth.  *Solow*, 554 F. Supp. 2d at 1365–66; *SEC v. Yun*, 148 F. Supp. 2d 1287, 1295 (M.D. Fla. 2001).[5]

Under Section 20(d)(2) of the Securities Act [15 U.S.C. § 77t(d)(2)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], the SEC may seek a first-tier penalty for each violation of the Securities Act or Exchange Act; a second-tier penalty for violations that "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement;" or a third-tier penalty for violations that, in addition to meeting the requirements of a second-tier penalty also "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons."  Each tier provides that the amount of the penalty shall not exceed the greater of a specified amount for each violation *or* the "defendant's gross amount of pecuniary gain."  The maximum amounts of civil money penalties under the first, second, and third tiers for violations occurring between March 3, 2009 to March 5, 2013 are $7,500, $75,000, and $150,000, respectively or, for any of the tiers, the gross amount of pecuniary gain.  17 C.F.R. § 201.1005.

---

[5] Although courts often consider a defendant's ability to pay a penalty, "nothing in the securities laws expressly prohibits a court from imposing penalties or disgorgement liability in excess of a violator's ability to pay." *SEC v. Warren,* 534 F.3d 1368, 1370 (11th Cir. 2008).  Moreover, apart from Mr. Hall's self-serving testimony concerning his debt, there is no evidence in the record that Mr. Hall lacks the ability to pay a substantial penalty, and other evidence— including the number of properties Mr. Hall owns and the $1 million currently subject to the Court's Temporary Injunction in *Christopher J. Hall v. William P. McNeer, III and Sweezy Investments, LLC*, Case No. 2013 CA 001958 XXXX MB (Palm Beach Cty., Fla. April 29, 2013) [Ex. 32 (JX 14)]—suggests that Mr. Hall has the means to pay a substantial civil money penalty.

The SEC seeks a civil money penalty based on the gross amount of Mr. Hall's pecuniary gain during the limitations period.  As discussed above in Section I, and as the jury found by a preponderance of the evidence, Mr. Hall's violations of the antifraud provisions of the securities laws were egregious, repeated, and made with a high level of scienter.  *Solow*, 554 F. Supp. 2d at 1366 (jury finding of fraud under Section 10(b) of Exchange Act forecloses the possibility that jury only found defendant to have acted negligently).  From 2009 to 2010, Mr. Hall, repeatedly engaged in fraudulent schemes and made material misstatements and omissions to obtain more than $6.85 million in loans or credit from Penson.  Pursuant to the Supreme Court's opinion in *Gabelli v. SEC*, 133 S. Ct. 1216 (2013), the SEC does not seek a penalty for the first two advances Mr. Hall received on the $3.68 million loan in 2009.  The SEC therefore seeks a civil money penalty in the amount of $3,747,717.12 based on Mr. Hall's gross amount of pecuniary gain from his fraudulent conduct during the statute of limitations period.  *See* Table 2, *supra*.[6]

## IV.  This Court Should Order a Permanent Officer and Director Bar

The SEC seeks an order permanently barring Mr. Hall from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78*l*] and that is required to file reports under Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)] pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)] and Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)]  In determining whether to impose an officer and director bar, a court may consider the following factors: (1) the egregiousness of the underlying securities law violations; (2) the defendant's repeat-offender status; (3) the defendant's role or position when he engaged in the fraud; (4) the defendant's degree of scienter; (5) the defendant's economic stake in the violation; and (6) the likelihood that misconduct will recur.  *SEC v. Brennan*, Case No. 0:12-cv-62074-RSR, 2013 WL 12091621, at *4 (S.D. Fla. Dec. 9, 2013).

In this case, all of these factors weigh in favor of an officer-and-director bar.  Mr. Hall's violations of the securities laws were egregious, as set forth above.  Mr. Hall also acted with scienter, as discussed previously.  At the time of the fraud, Mr. Hall was the Chairman of the Board of Directors of Call Now, Inc., a public company, as well as its principal shareholder. [Ex. 2 (Trial Day 5 at 90:7–11, 105:11–14 (Hall)).]  Mr. Hall also abused his position of trust as

---

[6] Given that Mr. Hall netted more than six million as a result of his illegal conduct, the SEC's total requested remedies of approximately $8.5 million in disgorgement, prejudgment interest, and penalty, are necessary to achieve both the remedial and deterrent purposes of the federal securities laws.

a long-time customer of Penson and sophisticated market participant by exploiting his knowledge of the obligations of the broker-dealer in order to fraudulently obtain millions of dollars at the expense of Penson and its shareholders.  Finally, given Mr. Hall's pattern of repeated violations of the securities laws, it is likely that he will continue such schemes unless barred by this Court.  Therefore, an officer-and-director bar against Mr. Hall is appropriate. *Brennan*, 2013 WL 12091621, at *4.[7]

## CONCLUSION

For the foregoing reasons, the SEC respectfully requests that this Court enter Final Judgment imposing a permanent injunction against future violations of the antifraud provisions of the securities laws, disgorgement in the amount of $3,747,717.12, plus prejudgment interest thereon, a civil money penalty in the amount of $3,747,717.12, and a permanent officer and director bar.  A [Proposed] Final Judgment is filed as Exhibit 35 to this motion.


Respectfully submitted,

By:     /s/ *Sarah H. Concannon*_____
Gregory R. Bockin, Special Bar No. A5501158
Sarah H. Concannon, Special Bar No. A5502248
Mark M. Oh, Special Bar No. A5502125
Direct Dial: 202.551.5361 (Concannon)
E-mail: ConcannonS@sec.gov

Attorneys for Plaintiff
**U.S. SECURITIES AND EXCHANGE COMMISSION**
100 F Street, N.E.
Washington, DC 20549


Dated:  March 8, 2017

---

[7] *See also Solow*, 554 F. Supp. 2d at 1362–63 ("During the trial I saw [the defendant] blame others for his failings, refuse to accept any responsibility for his own actions, and repeatedly testify falsely under oath.  Based upon his demeanor and testimony at trial, and after watching his video presentation to investors and hearing the testimony of those individuals he enticed into risky investments through false promises, I conclude he should not be allowed to register as, or associate with a registered, broker-dealer or investment adviser.").

## LOCAL RULE 7.1(a)(3) CERTIFICATION

I certify that, on February 28 and March 3, 6, and 7, 2017, counsel of record for the Plaintiff United States Securities and Exchange Commission met and conferred with counsel of record for the Defendant Christopher J. Hall pursuant to Local Rule 7.1(a)(3) in an attempt to narrow or resolve the issues set forth herein.

/s/ *Sarah H. Concannon*
Sarah H. Concannon

## CERTIFICATE OF SERVICE

I certify that, on March 8, 2017, I served defense counsel of record with the foregoing brief via the Court's ECF system.

/s/ *Sarah H. Concannon*
Sarah H. Concannon

16