# EXHIBIT 14

NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC.
DISTRICT BUSINESS CONDUCT COMMITTEE.
DISTRICT NO. 7

| | |
|---|---|
| District Business Conduct Committee<br>For District No. 7<br>　　　　　　　　　　　Complainant :<br><br>vs.<br><br>Howe, Solomon & Hall, Inc.<br>Brickel Bay Tower<br>1001 South Bayshore Drive<br>Miami, Florida 33131<br>　　(CRD No. 13386)<br>　　　　　　　　　　　Member :<br><br>and<br><br>Christopher John Hall<br><br><br>(CRD No. 1051581)<br>　　　　　Registered Principal :<br>　　　　　　　　　Respondents : | DECISION<br><br>Complaint No. C07940078<br><br>Date: October 24, 1995 |

I

INTRODUCTION

The Complaint in this matter was issued on September 27, 1994 by the District Business Conduct Committee (the "Committee") for the Seventh District of the National Association of Securities Dealers, Inc. against Howe, Solomon & Hall, Inc. ("HSH"), a member of this Association, and Christopher J. Hall ("Hall"), an officer and principal of HSH.

This Complaint arose from the Committee's consideration of the results of a routine examination of HSH conducted by Ann Degenshein, Field Supervisor, in February-March, 1994. The Complaint charged Respondents with violations of Rules G-27 and G-30 of the Municipal Securities Rulemaking Board (the "MSRB"), as alleged in the two Causes of Complaint.

PX 124

DECISION FOR COMPLAINT NO. C07940078, PAGE 2

On September 27, 1994, a Notice of Complaint (the "Notice"), together with a copy of the Complaint, was sent to each Respondent's CRD address via certified mail, return receipt requested. The receipt for the Notice sent to Respondent HSH was signed and dated October 3, 1994. The Notice sent to Respondent Hall was returned by the post office marked "Unclaimed." On October 25, 1994, a Second Notice of Complaint (the "Second Notice"), together with a copy of the Complaint, was sent to each Respondent at the same addresses, again via certified mail, return receipt requested. The receipt for the Second Notice sent to HSH was signed and dated October 28, 1994. The Second Notice sent to Respondent Hall was again returned by the post office marked "Unclaimed."

Although Respondent Hall never claimed the certified mail directed to him, he apparently learned of the Complaint issued against him through other means, given that Respondents filed a consolidated Answer to the Complaint dated September 27, 1994 (received on November 18, 1994). Respondents did not indicate in their Answer whether or not they wanted a hearing. Subsequently, however, they did inform the regional attorney of their desire for such. In accordance with their desires, the matter was set for hearing before a Special Hearing Subcommittee (the "Subcommittee") of the Committee on August 22, 1995, in Ft. Lauderdale, Florida, which was held as set.

The District staff called as its only witness Ms. Degenshein and introduced ten exhibits into the record. Respondent Hall, who, along with HSH, was represented by counsel, testified on his own behalf. Respondents also called as a witness Tom Johnson, a registered principal and branch manager of HSH's Saratoga Springs, New York branch. Respondents introduced into the record 30[1] exhibits of their own. At the close of the hearing, the Subcommittee indicated it was going to keep the record open in order to allow Respondents to submit documentation supporting their assertion that they spent "hundreds of thousands of dollars in legal fees annually protecting [their] bond holders [sic] interests." Complainant's Exhibit ("CE 7"), p. 2. Subsequently, on August 29, 1995, the Subcommittee wrote to Respondents inviting them to direct the Subcommittee's attention "to documentary evidence submitted . . . during the hearing that indicates inter-dealer trades in any of the 18 scheduled transactions shown in the statement of claim . . . ."[2]

---

[1] It should be noted that Respondents' Exhibits ("RE") 24-28, identified in the index as "Case law to be submitted at the hearing," were never supplied. Also, RE 29 and 30 are both the same, although the index indicates that RE 29 should be HSH's CRD printout and RE 30 Hall's CRD printout.

[2] This request was made as a result of the National Business Conduct Committee's decision in District Business Conduct Committee No. 7 v. Marion Bass Securities Corp., et al., Complaint No. C07940044, District No. 7 (May 3, 1995). In that case, the NBCC relied on the prices charged in contemporaneous inter-dealer trades to justify the retail prices imposed by the respondents. Unlike those respondents, however, HSH and Hall were unable to demonstrate any contemporaneous wholesale trades involving the bonds at issue here. Accordingly, as we describe in detail below, we utilized HSH's cost as the

DECISION FOR COMPLAINT NO. C07940078, PAGE 3

On September 13, 1995, Respondents provided an additional 122 pages of materials relating to legal bills incurred by HSH. With regard to the Subcommittee's second request, Respondents merely noted that they "had previously submitted all information in Howe, Solomon & Hall's possession regarding the eighteen trades in question."

Following the receipt of Respondents' additional materials, the Subcommittee closed the record and rendered a recommended decision to the Committee. Upon review of the record, which consists of the testimony of Ms. Degenshein, Messrs. Hall and Johnson, the ten exhibits introduced by the District staff, the 30 exhibits introduced by Respondents at the hearing, and the additional documents submitted by Respondents after the hearing, the Committee considered and adopted the recommended decision of the Subcommittee.

II

## BACKGROUND

### Respondent HSH

According to the records of the Association, Respondent HSH joined the Association as a member in October 1983. CE 2. Respondent HSH has no disciplinary history. In April 1993, however, the Committee did issue a Letter of Caution to HSH relating to several deficiencies discovered during a December 1992 routine examination. CE 3. Among the matters cited in the Letter of Caution was a question regarding the fairness of prices charged to customers in 11 transactions involving municipal securities.[3] In response to the Letter of Caution, Respondent Hall, on behalf of HSH, stated that "[w]e continue to monitor all transactions, and will comply with MSRB Rule G-30." CE 4.

### Respondent Hall

Respondent Hall entered the securities industry in May 1982 with Stoever, Glass & Co., Inc., where he was registered in December 1982 as a Municipal Securities Representative. In January 1984, Hall also registered as a General Securities Representative. In September 1984, Hall went to work for Russell & Co., but he only stayed there until February 1985. At that time, Hall joined Firstmark Securities, Inc. Finally, in November 1985, Hall became employed by HSH. At HSH, Hall registered as

---

basis for calculating the mark-ups.

[3]Letters of Caution are considered "informal" action by the Association, and thus are not included in CRD. Such Letters do recite, however, that "should repeat violations occur this letter will be taken into consideration by the District Business Conduct Committee in determining any future action." We deem it proper, therefore, that the Letter of Caution issued to HSH in 1993 be considered here.

DECISION FOR COMPLAINT NO. C07940078, PAGE 4

a Municipal Securities Principal, a General Securities Representative, and, as of February 1989, a Financial and Operations Principal.

Respondent Hall has no disciplinary history.

### III

### SUMMARY OF COMPLAINT AND ANSWER

The Complaint contains two causes. The First Cause alleges a violation of MSRB Rule G-30. Specifically, the Complaint alleges that during the period from November through December 1993, Respondent HSH, acting through Respondent Hall, effected principal sales of 18 different municipal bonds in a total of 41 separate transactions with public customers at prices which were not fair taking into consideration all relevant circumstances. The Complaint also alleges that the mark-ups on the bonds ranged from 4.61% to 354% above the prevailing market price.

The Second Cause alleges that Respondents HSH and Hall violated MSRB Rule G-27 by failing to establish or maintain an adequate written supervisory procedure pertaining to the pricing of municipal securities.

In their joint Answer to the Complaint, Respondents denied that the prices charged in the transactions at issue were not fair, and further denied that the written supervisory procedures pertaining to the pricing of municipal bonds were inadequate.

### IV

### FACTS, FINDINGS AND CONCLUSIONS

#### First Cause Of Complaint

The issue presented by this Cause is whether the mark-ups charged by Respondents on the 41 sales scheduled by the staff were "fair and reasonable," as required by MSRB Rule G-30. To prove that the mark-ups were not fair and reasonable, the staff employed the same methodology in each instance save one: it presented evidence demonstrating the price that HSH paid for each bond,[4] the prices at which HSH subsequently sold each bond to retail

---

[4] Absent countervailing evidence, a non-market maker's contemporaneous cost is the best evidence of the market price, LSCO Securities, Inc., Sec. Exch. Act Rel. No. 28994 (March 21, 1991), 48 SEC Docket 759; Nicholas A. Codispoti, 48 S.E.C. 842 (1987). HSH was not a market maker in these bonds, by Respondent Hall's own admission. Hearing Transcript ("TR") at 139-40.

DECISION FOR COMPLAINT NO. C07940078, PAGE 5

customers, and then calculated the percentage difference between those two figures. The regional attorney then argued that Respondents' retail prices were too high because, based on long-standing legal precedent, the mark-up percentages exceeded established norms.

Respondents did not dispute the staff's figures. Instead, they argued such figures were immaterial, and focused their defense on matters other than the numerical calculation of the mark-ups. In its essence, Respondents' case consisted of two facets: first, an effort to demonstrate that regardless of the mark-ups they charged, the yields their retail customers received were actually greater than yields provided by comparable bonds; and, second, an attempt to prove that the prices charged reflected, in part, that Respondents incurred significant time and expense researching the bonds so as to provide their customers with especially favorable investment opportunities. The basis for Respondents' defense is, of course, MSRB Rule G-30 and the accompanying September 1980 Report on Pricing. This necessitates that we once again address the apparent tension between the rules governing mark-ups on equity securities and municipal securities, respectively.

As we noted in our recent decision in District Business Conduct Committee No. 7 v. Marion Bass Securities Corp., et al., November 11, 1994, historically, mark-up allegations involving any sort of security have been proven by demonstrating, as the staff did here, that the mark-up charged exceeded some particular percentage. It bears repeating, however, that "[n]otably absent from this rule [G-30] is any requirement that a mark-up not exceed some arbitrarily established percentage." Instead, Rule G-30 focuses on a number of different factors, including yield to customer and "the expense involved in effecting the transaction," the very items comprising the heart of Respondents' case. The question we face is, in light of Rule G-30's express disregard for consideration of mark-up percentages, did the staff carry its burden and prove the case against Respondents even though it relied exclusively on just such an analysis? We think it did.

The primary basis for our conclusion is the existence of the various SEC decisions pertaining to municipal mark-ups, many of which the staff cited. While we may not agree with the analyses embodied in these decisions, we recognize that we are compelled to follow them. Thus, because the SEC has consistently indicated that it deems mark-up percentages to have considerable bearing on the fairness and reasonableness of the retail price of a municipal bond despite Rule G-30's silence regarding that particular factor, we have no choice but to include mark-up percentages in our consideration. This was evident from as early as January 1979, in Charles Michael West, Sec. Exch. Act Rel. No. 34-15454 (Jan. 2, 1979), perhaps the first reported municipal mark-up case. There, the mark-ups ranged from 11% to 28% over the prevailing market price and were found to be excessive. Significantly, the SEC for the first time noted with approval a 1973 federal district court decision that found that "markups for municipal securities are generally lower than for equity securities."

Later, in DMR Securities, Inc., Sec. Exch. Act Rel. No. 34-16990 (July 21, 1980), the SEC refined that statement somewhat, observing that markups on municipal securities "are generally a good deal lower" than for equity securities. (Emphasis supplied.) The SEC gave

DECISION FOR COMPLAINT NO. C07940078, PAGE 6

that statement yet another, final twist in Staten Securities Corp., Sec. Exch. Act Rel. No. 34-18628 (April 9, 1982). In finding that mark-ups of 5.1% to 6.7% were excessive, the SEC held in Staten that, "[a]s a general rule, markups on municipal securities are significantly lower than those for equity securities." (Emphasis supplied.) We consider it very telling that the SEC went from merely "lower" in Charles Michael West to "a good deal lower" in DMR, to "significantly lower" in Staten.[5] And since it is undisputed that the mark-ups on equity securities are limited by a guideline of 5%, it certainly seemed evident in wake of the Staten case that, in the eyes of the SEC, mark-ups on municipal securities should be "significantly lower" than 5%.

Any doubts about the propriety of that conclusion were removed by the SEC itself in First Honolulu Securities, Inc., Sec. Exch. Act Rel. No. 32933 (September 21, 1993), one of the most recent municipal mark-up decisions, where it stated, "our opinions suggest that, although some markups on municipal bonds may reach 5%, that figure might be acceptable in only the most exceptional cases." (Emphasis supplied.) It necessarily follows from that pronouncement that despite the absence of any specific numeric guideline in Rule G-30, the initial determination we must make is whether the mark-ups exceed 5%. If they do (as is the case here), our inquiry then becomes whether the circumstances are sufficiently "exceptional" to justify such mark-ups.[6] In any event, it is plain that we cannot, as Respondents urge, allow our consideration of "yield" to completely overshadow any review of the mark-up percentage.[7]

Another reason we feel the staff sustained its burden is that it demonstrated that the mark-ups charged here by Respondents (at least in 11 of the 18 trades) were simply too high to be justified under any circumstance. As the regional attorney observed, there are no

---

[5] Staten also includes this statement: "This does not mean that markups of 5% or less are necessarily 'fair and reasonable.' We note that markups on municipal securities are often as low as one or two percent . . . ."

[6] The important role that the presence or absence of "exceptional" circumstances plays in municipal mark-up cases is evident in the National Business Conduct Committee's review of our decision in Marion Bass. In its decision affirming our disposition of that complaint, the NBCC went to pains to highlight that the mark-ups were justified in part because of the "unique facts" and "unique circumstances" present there, i.e., that Marion Bass obtained the bonds at issue in "that rarest of all securities transactions, a true distress discount purchase."

[7] By Respondents' admission, they made no effort at the time of the sales of the bonds to locate comparable issues in an attempt to gauge the proper retail price. TR at 159. We take it, then, that all the evidence submitted by Respondents purporting to demonstrate that the yields on the bonds in question compare favorably to other, allegedly similar bonds apparently was accumulated well after the pricing determinations were made. Even at that, Respondent Hall acknowledged that it was a "challenge" "trying to find similar securities." Id. at 127.

reported cases where mark-ups as high as those present here have been upheld. Even crediting Respondents' evidence regarding the fairness of the yields and the amount of money they spent in support of the bonds, we still cannot lose sight of the fact that these mark-ups were **well** over 5%, indeed, often considerable multiples of 5%. Had the mark-ups been closer to 5%, it is conceivable we could have been convinced of their fairness (as, in fact, we were with six of the bonds). As the mark-ups rise to 15%, 20%, 40% and beyond, however, Respondents' efforts to rationalize their pricing decisions become progressively less compelling.

Under close analysis, even Respondents' argument that they incurred substantial expenses researching these bonds -- expenses they claim a right to recoup -- begins to show some flaws. For example, Respondent Hall testified that in connection with one of the bonds -- Englewood, Colorado Urban Renewal (CE 9, p. 2) -- he made several trips to the project site. The expenses incurred in connection with those trips, however, were in 1990-91; the particular bonds at issue were not sold until 1993. TR at 129-30. We question whether it is proper to make retail customers in December 1993 pay for expenses two or three years old. Moreover, the staff's schedule reflects the sale of only a few of the Englewood bonds. Given the relatively modest amount of money Respondents expended to visit Colorado (about $5,000 according to Hall - TR at 129), and that fact that HSH had owned hundreds of those same bonds from 1991 to 1993 (id. at 130), it seems that the six customers on the schedule were being asked to pay considerably more than their fair share of the expense.[8] Had Respondents demonstrated that there was some proportional relationship between their expenses and the number of individuals to whom they sold the bonds, we might have been able to justify somewhat higher mark-ups. Unfortunately, Respondents were either unable or unwilling to show that the prices they charged reflected an actual attempt to allocate expenses among each purchaser of the bonds.[9]

Respondents' evidence regarding the attorneys' fees they allegedly incurred is also something less than advertised. According to Respondent Hall, HSH spends "hundreds of thousands of dollars in legal fees annually protecting our bond holders [sic] interests." CE 7, p. 2. As noted above, following the hearing, the Subcommittee requested that Respondents provide documentation to support this assertion. The bills subsequently

---

[8] In fact, the gross profits to Respondents from the sales of the Englewood bonds -- $37,331 -- were many times the cost of the trips to Colorado.

[9] We do not mean to suggest, however, that Respondents be able to demonstrate precisely how much they spent on each particular bond. We believe that it would be acceptable for Respondents to allocate generally among all their purchasers of non-rated bonds a portion of the expenses that Respondents incur to research those issues. What we are troubled by here is that Respondents are apparently attempting to use expenses unrelated to their non-rated bond business to support their pricing of such bonds. That we find unacceptable.

DECISION FOR COMPLAINT NO. C07940078, PAGE 8

submitted by Respondents, however, do not approach the total claimed.[10] Moreover, many of the bills appear to concern matters unrelated to bonds marketed by Respondents, such as, for example, HSH's general corporate legal needs and an ongoing dialogue with the SEC.[11] Finally, with the exception of a very few bills, all the legal fees charged to Respondents were incurred <u>after</u> the sales with which we are concerned. Given the nature of Respondents' evidence, we are hard-pressed to conclude that the prices charged by Respondents in the trades at issue are justified to any significant degree by the legal fees they paid.[12]

Before we turn our attention to a discussion of each of the 18 scheduled bonds, we believe it is necessary to make very plain our overall position with regard to municipal mark-ups. Without question, there is no "magic number," no particular percentage to which member firms can safely mark up their municipal bonds. Accordingly, as Rule G-30 instructs, the determination of whether a mark-up is fair and reasonable requires an analysis of many different factors. It is clear to us the SEC dictates that one of those factors is the amount of the mark-up. If that mark-up is too high, the price is likely unfair and unreasonable. This is true regardless of the yield, regardless of the expense involved in the sale, regardless of the broker-dealer's right to earn a profit.

What Respondents did here is easy to describe and to understand. By their own admission, they knowingly and intentionally bid hundreds of different bonds every day "at levels well below their market value." TR at 153; 181; CE 7, p. 1. To use Respondent Hall's own words, "[t]he situation is analogous to going to an auction and putting some minimum bid on all or nearly all the items being auctioned. You count on the fact that a few items will sell well below their true value." CE 7, p. 2; TR at 191. If Respondents successfully bid on a bond, they would turn around and sell it at a retail price marked up to "a little below the market value." TR at 154. Because Respondents were often able to

---

[10] The one exception is the Statement of Account from Ehmann, Van Denbergh & Trainore dated September 7, 1995, which reflects "Unpaid Fees" of $197,401.00 and "Unpaid Disbursements" of $8,686.79. Given that only the disbursements are indicated as being due, we are left to wonder whether the fees shown are truly payable, or perhaps reflect some sort of alternative fee arrangement, such as a contingency fee.

[11] As far as we can tell, none of the bills submitted relates to any of the 18 bonds at issue in this case.

[12] It is also worth noting the SEC's observation that "in seeking a profit," firms cannot simply "pass along to the customer their expenses if the total would unreasonably exceed the prevailing wholesale price." Investment Planning, Inc., Sec. Exch. Act Rel. No. 32687 (July 20, 1993). "If the firm's expenses are too high to generate a sufficient profit, then it is up to the firm to reduce expenses or increase profitability by generating more business, rather than charging excessive markups." G.K. Scott & Co., Inc., Sec. Exch. Act Rel. No. 33485 (January 14, 1994). To the extent municipal firms seek to recoup their expenses by elevating the prices of their bonds, these principles must be borne in mind.

DECISION FOR COMPLAINT NO. C07940078, PAGE 9

acquire the bonds at prices significantly below the true market price, even retail prices somewhat below the market yielded very high mark-ups, as well as windfall profits to Respondents.[13] While a literal reading of Rule G-30 would lead one to conclude that such mark-ups are likely permissible, the SEC decisions cited above interpreting Rule G-30 do not justify them.

What we attempt to do below is describe the mark-ups which we feel Respondents were entitled to charge. Relative to the mark-ups deemed to be acceptable by the SEC, our standards are, admittedly, somewhat more lenient. This is deliberate, however, and for two reasons. First, there is a need in the marketplace for firms like HSH, that is, broker-dealers who specialize in non-rated issues. Necessarily, the marketing of such securities requires research (and the accompanying expenses) that other securities do not. It is proper that buyers of thinly traded securities pay for these services. To limit HSH's mark-ups to the maximum percentage dictated by the SEC would ensure the firm's inability to make any profit on these trades. Second, the evidence was unrefuted that HSH's customers generally got fair yields. Under Rule G-30, yield to the customers is the most important factor in determining the fairness of a price. While a fair yield does not automatically dictate the conclusion that the price was also fair, it certainly impacts the analysis. For the sake of clarity, we will present our analysis on a bond-by-bond basis for each of the 18 bonds involved in this case, rather than a trade-by-trade basis.

1. Connecticut State Development Authority

As with the other 17 bonds, the staff's evidence concerning the trading of these bonds was undisputed: On December 22, 1993, HSH bought 300,000 of the bonds from a broker's broker at a price of $93.50 per bond. That same day,[14] HSH sold a total of 120,000 of the bonds to eight different retail customers at the price of $100.00 per bond. CE 9, p. 1. The next day, HSH sold an additional 25,000 bonds to another retail customer for the same $100.00 price. This calculates out to a mark-up of 6.95% on each of the nine sales. We do not find this to be an excessive mark-up. The bonds were unrated and, generally, sold in

---

[13]Respondent Hall, who admitted he was responsible for making all the pricing decisions (TR at 157), testified that HSH had an "unwritten" policy in 1993 that there was a 5% mark-up guideline. Id. at 151. Interestingly, however, Tom Johnson, HSH's research analyst, testified that when pricing the bonds, the amount of the mark-up was not even discussed, that it was not a consideration. Id. at 159-60. Respondent Hall later testified to the contrary. Id. at 164.

[14]While some of the retail sales came very soon (or, in the case of trade no. 1-1, before the purchase by HSH), Respondents testified that the trades were not riskless principal transactions. TR at 174; 185. According to Respondents, the times on the order tickets may not necessarily reflect the actual time of order entry. Id. at 63; 185-86.

small lots. Moreover, HSH still held many of the bonds after these sales, subjecting it to risk. All these factors justify these slightly higher mark-ups.

   2.   Englewood, Colorado Urban Renewal

Respondent HSH sold 205,000 of these bonds to six different retail customers. CE 9, p. 2. On November 23, 1993, HSH bought 120,000 bonds at a price of $36.31 per bond and sold them all that same day for $55.19. That reflects a mark-up of 52%. On December 3, 1993, HSH acquired an additional 5,000 bonds for $35.50 and then sold them the same day for $56.00, a mark-up of 57.75%. On December 7, HSH bought 75,000 more bonds for $37.00 and sold them the next day for $54.00, yielding a 46% mark-up. Finally, on December 22, HSH bought 5,000 bonds for $36.00 and sold them the same day for $54.00. That trade reflects an even 50% mark-up. These mark-ups are excessive. In our opinion, an appropriate mark-up on these bonds would have been 5%. Accordingly, Respondents' profits in excess of 5% -- $33,586.15 (CE 10) -- were wrongfully obtained.

   3.   Groton Town, Connecticut

HSH bought 5,000 of these rated bonds on December 9, 1993 at a price of $105.08 and sold them to a single retail customer on December 15 for $110.32. CE 9, p. 3. The mark-up was 4.98%. We do not believe this was excessive, given the small size of the trade and the fact that HSH was at risk for six days. Moreover, Respondents presented evidence of comparable yields, showing that the yield to the customer was fair.

   4.   Albuquerque, New Mexico Retirement

This trade involved the purchase of 6,000 bonds on December 15 for $82.61 and the subsequent sale the same day to a retail customer at a price of $96.24. CE 9, p. 4. This calculates to a mark-up of 16.49%. That is excessive. A more reasonable mark-up on these bonds would have been 10%, given the small size of the trade and the "story" nature of the bonds involved. The profits in excess of 10% were $322.14.

   5.   Fulton County, Georgia Housing Authority

On December 14, 1993, HSH bought 100,000 bonds at $87.10 and almost immediately sold them for $98.50, reflecting a mark-up of 13.09%. CE 9, p. 5. In a simultaneous, seemingly riskless situation like this, it is appropriate to mark-up from cost.[15] Accordingly, the mark-up charged was excessive. As an alternative, we find that a 5% mark-up would have been fair. Respondents' profits in excess of 5% were $7,045.00. CE 10.

---

[15]LSCO Securities, Inc., Sec. Exch. Act Rel. No. 26779 (May 3, 1989)

6. <u>Gainesville, Florida Utility System</u>

HSH bought 5,000 of these AAA-rated bonds at $112.06 on December 14 and sold them for $120.22, a mark-up of 7.28%. CE 9, p. 6. We find that mark-up to be unfair. Respondents did not conduct any research on these bonds, which are widely traded. Accordingly, a 3% mark-up would have been appropriate. With a 3% mark-up, Respondents' excess profits were $239.91.

7. <u>Fort Scott, Kansas, IDR Mid-America Nursing</u>

The evidence shows that this transaction was simultaneous. On December 3, 1993, HSH bought 5,000 bonds at $81.10 and immediately sold them to a retail customer for $100.00 CE 9, p. 7. This mark-up – 23.3% – was excessive. Given the nature of this bond and the size of the trade, a 10% mark-up would have been acceptable. The profits on this trade in excess of 10% were $539.50.

8. <u>Chattanooga, Tennessee IDR 5/25/05</u>

On November 2, 1993, HSH purchased 200,000 bonds, paying a price of $53.50. The next day it sold 105,000 of the bonds to five retail customers; the first two paid $64.28 (for a mark-up of 20.1%) and the next three paid $65.00 (a 21.5% mark-up). CE 9, p. 8. These are excessive mark-ups. We find that 5% reflects a fair mark-up on these bonds. With such a mark-up, Respondents' excess profits were $8,834.25. CE 10.

9. <u>Chattanooga, Tennessee IDR 6/25/05</u>

The evidence submitted here was slightly different than for all the other bonds. What the staff showed was that on December 7, HSH sold 25,000 of these bonds to Barron Chase Securities, another broker-dealer, at a price of $57.00. On December 2, however, five days earlier, HSH had sold 10,000 of the bonds to a retail customer and charged him $65.00. CE 9, p. 9. Here, the mark-up of 14.04% was based on the difference between that retail price and the inter-dealer price of $65, rather than HSH's cost. That is appropriate given that HSH did not acquire the bonds contemporaneously (*i.e.*, within five days) with the retail sale.[16] In any event, that mark-up was too high. As in the immediately preceding situation,

---

[16] See <u>First Honolulu Securities:</u> "[W]here a dealer is not a market maker, the best evidence of that market price, absent countervailing evidence, is the dealer's contemporaneous cost. . . . If there are no contemporaneous purchases by the dealer, other contemporaneous inter-dealer transactions are examined as evidence of the prevailing market price."

DECISION FOR COMPLAINT NO. C07940078, PAGE 12

a 5% mark-up is more appropriate. At that percentage, the excess profits were $515. CE 10.[17]

### 10. Geary and Riley Counties, Kansas

On December 2, 1993, HSH bought 10,000 of these B-rated bonds from a broker's broker at a price of $91.51. That same day, it sold the bonds to two retail customers for $100.00, resulting in a 9.29% mark-up. CE 9, p. 10. Once again, we feel a 5% mark-up would have been more suitable for these trades. Using 5% as our guide here, Respondents' excess profits were $391.44. CE 10.

### 11. Illinois Housing Development Authority

This is another same-day trade: on November 29 HSH acquired 100,000 bonds for $99.06 and then sold them at retail for $103.62. CE 9, p. 11. The mark-up of this trade was only 4.61%, which we think was acceptable.

### 12. Billings, Montana IDR

The mark-up on this trade is alarmingly high. HSH bought 10,000 bonds on November 18 for $16.06 and sold them four days later for $73.00, a mark-up of 354%. CE 9, p. 12. At the hearing Respondent Hall explained that the reason the bonds were marked up to such a degree was to account for the fact that immediately before HSH acquired the bonds a bankruptcy court had confirmed a plan of reorganization that resulted in significant payouts to bondholders. TR at 192-99. While the ultimate purchaser of these bonds may, in fact, have received a fair yield, it remains, consistent with our analysis above, that Respondents simply cannot charge a mark-up this high. Given the obscure nature of this bond and the work that Respondents did researching the situation, we are willing to agree that a 10% mark-up would have been acceptable. At 10%, however, Respondents' excess profits were still $5,533.40.

### 13. Cobb County, Georgia

On November 15, 1993, HSH bought 5,000 bonds for $121.04. CE 9, p. 13. The next day, it bought another 5,000 for $117. Later that day, HSH sold all 10,000 to a retail customer for $123.76. That sale resulted in a 2.25% mark-up from the bonds acquired on November 15 and a 5.78% mark-up from the bonds acquired on November 16. That averages out to a 4.02% mark-up, which we find to be acceptable.

---

[17]Complainant's Exhibit 10 actually contains an error in the calculation of the excess profits. Rather than $366.04, the profits in excess of 5% are $391.44.

14. Prichard, Alabama Waterworks

In this apparently simultaneous transaction, on November 18, 1993 HSH purchased 40,000 bonds for $102.50 and sold them for $108.08, resulting a 5.44% mark-up. CE 9, p. 14. As we noted earlier, in a simultaneous, riskless situation like this, it is appropriate to mark-up from cost. While this is a non-rated issue, it is a water and sewer issue that does not involve considerable research. Therefore, it does not justify the mark-up. Using 4% as a more appropriate mark-up, Respondents' excess profits are $592.[18]

15. Broward County, Florida Housing Finance Authority

HSH bought 10,000 bonds on November 8 at $55.06 and sold them the same day for $67.21. CE 9, p. 15. This yielded a mark-up of 22.1%, which was excessive. We find that 10% would have been an acceptable mark-up. Using our mark-up figure, Respondents' excess profits total $664.40.

16. Lee County, Florida

HSH purchased 5,000 AAA-rated bonds for $115.06 on November 3, 1993 and sold them almost immediately for $121.46. CE 9, p. 16. The mark-up was 5.01%. Under the circumstances, that was fair, particularly considering the evidence concerning yield on comparable AAA-rated securities at the same time in the market.

17. Arvada, Colorado Urban Renewal

On October 26, 1993, HSH bought 15,000 bonds for $72.61. CE 9, p. 17. On November 2, it sold those bonds (plus others previously acquired) in three separate trades, charging one customer (who purchased 10,000) $98.00, the second customer $91.23 and the third, $91.24. (The second and third customers each bought 25,000.) The mark-ups on the three trades were, respectively, 34.97%, 25.65% and 25.66%. All these trades were marked up to excessive degrees. For these bonds, a 5% mark-up would have been acceptable. Using 5% instead of Respondents' actual mark-ups, the excess profits are $9,673.21.[19]

---

[18] As with trade no. 10, Complainant's Exhibit 10 contained a mathematical error in the computation of the excess profits. The correct number is as shown in the text of the Decision.

[19] Because the staff's evidence only showed the acquisition by HSH of 15,000 bonds and the subsequent retail sale of 60,000 bonds, and Respondents did not provide any evidence in this regard, we do not know for certain HSH's cost for each of the bonds sold. Accordingly, to calculate the excess profits, we have presumed that the market value for each of the bonds was $72.61.

DECISION FOR COMPLAINT NO. C07940078, PAGE 14

18. Bell County, Texas Health Facility

The final trade at issue started with the purchase by HSH of 25,000 bonds on November 12, 1993 for $99. CE 9, p. 18. The same day HSH sold 10,000 of the bonds to a retail customer for $104.50. The mark-up, which was 5.56%, was acceptable.

Based on the particular factual findings outlined above, we find that Respondents HSH and Hall violated MSRB Rule G-30, as alleged in the Second Cause of Complaint.

## Second Cause of Complaint

The Second Cause of Complaint deals with supervision. Specifically, it alleges that Respondent HSH's written supervisory procedures regarding the pricing of municipal securities were inadequate. The staff introduced into evidence a copy of those procedures in effect at the time of the trades in question. CE 8. We are called on to determine whether that document adequately laid out the procedures and policies for supervising municipal transactions. We find that it did not.

As was made clear by the testimony, there were only two statements in the entire exhibit that related to pricing. Section 3.8, entitled "Prohibited Business Practices," outlines two particular activities that are not allowed:

> The Firm shall not engage in the practices set forth in the following paragraphs:
>
> \* \* \*
>
> (12) Entering into a transaction for its own account with a customer with an unreasonable mark-up or mark-down.
>
> \* \* \*
>
> (14) Entering into a transaction with or for a customer at a price not reasonable [sic] related to the current market price.

It appears to us that the supervisors at HSH charged with the responsibility of overseeing municipal transactions would not have been able to ensure compliance with the pertinent MSRB and Association rules based solely on these two provisions. Indeed, the MSRB rules are not even mentioned. While we are of the opinion that Respondent Hall was aware of the various factors to be considered when pricing municipal securities, it remains that HSH and Hall, given his positions with HSH, had an obligation to put those factors in writing in the firm's supervisory procedures. The fact that they did not mandates our finding that there was a violation.

DECISION FOR COMPLAINT NO. C07940078, PAGE 15

Accordingly, based on the evidence in the record, we <u>find</u> that Respondents HSH and Hall violated MSRB Rule G-27, as alleged in the Second Cause of Complaint.

V

## SANCTIONS

In arriving at the appropriate sanctions that represent a proper discharge by the Association of its regulatory responsibilities under the Securities Exchange Act of 1934, we considered the nature and seriousness of Respondents' conduct, that they are still involved in the securities business, and that Respondent HSH was previously cautioned regarding its pricing of municipal securities. We also considered, however, that Respondent Hall has no disciplinary history, that no customers have complained about the prices they paid, and that, most importantly, the yields to Respondents' customers were, apparently, fair.

Despite this mitigation, we cannot condone Respondents' actions. As involved as they are in the municipal securities business, we have no doubt that Respondents are well acquainted with the various decisions the SEC has issued over the years that speak directly about the levels of mark-ups that are deemed acceptable. As we found above, those decisions simply do not provide support for mark-ups of the magnitude charged here. Although Respondents claim they were following the dictates of Rule G-30, it remains, nevertheless, that they ignored the directives of the SEC. There does not appear to have been any evidence of bad faith, however, and Respondents strike us as rule-abiding, more or less. The sanctions we impose, therefore, are intended to reflect our displeasure with the particular pricing decisions in question here, but not a condemnation of Respondents' general business practices.

Based on the foregoing, it is the decision of the Committee that with regard to the First Cause of Complaint, Respondents HSH and Hall be censured and fined $20,000, jointly and severally. Respondent HSH is also required to disgorge its excess profits to its customers. These profits, by our calculation, total $67,936.40. As to the Second Cause of Complaint, Respondents HSH and Hall are censured and fined $10,000, jointly and severally. Finally, the costs of the hearing are assessed against Respondents, jointly and severally.

DISTRICT BUSINESS CONDUCT COMMITTEE
FOR DISTRICT NO. 7

By: _____
District Director